**Charles Rodman CAMPBELL, Petitioner–Appellant,**

v.

**Tana WOOD,\* Superintendent, Washington State Penitentiary, Walla Walla, Washington; Christine O. Gregoire,\*\* Attorney General, State of Washington, Respondents–Appellees.**

No. 89–35210.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 20, 1993.

Submission Withdrawn Jan. 29, 1993.

Submitted Nov. 5, 1993.

Decided Feb. 8, 1994.

---

\* Tana Wood is substituted for James Blodgett pursuant to Fed.R.App.P. 43(c).

\*\* Christine O. Gregoire is substituted for Kenneth O. Eikenberry pursuant to Fed.R.App.P. 43(c).

666

Charles Rodman Campbell, pro per, Walla Walla, Washington.

James E. Lobsenz, Carney, Bradley, Smith & Spellman, Seattle, Washington, for the petitioner-appellant.

Paul D. Weisser, Assistant Attorney General, John M. Jones, Assistant Attorney General, Olympia, Washington, for the respondents-appellees.

Before: WALLACE, Chief Judge, BROWNING, TANG, POOLE, D.W. NELSON, REINHARDT, BEEZER, WIGGINS, THOMPSON, O'SCANNLAIN, and KLEINFELD, Circuit Judges.

BEEZER, Circuit Judge:

Charles Rodman Campbell was convicted in 1982 of three counts of aggravated first-degree murder and sentenced to death. We consider en banc the denial of Campbell's second federal habeas corpus petition. We affirm the district court and provide for the dissolution of the stay of execution pending appeal.

I

We begin with an overview of the procedural and factual background of Campbell's conviction and his current and prior petitions for post-conviction relief.

A

Campbell was convicted of three counts of aggravated murder and sentenced to death. The Washington Supreme Court affirmed the conviction and sentence. *State v. Campbell,* 103 Wash.2d 1, 691 P.2d 929 (1984). The Snohomish County Superior Court issued a death warrant scheduling Campbell's execution for March 29, 1985. The Washington Supreme Court stayed the execution to allow Campbell to petition the United States Supreme Court for a writ of certiorari. The Supreme Court denied certiorari on April 29, 1985. *Campbell v. Washington,* 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 526 (1985).

A second death warrant issued on May 17, 1985, setting Campbell's execution for July 25, 1985. Campbell moved the Washington Supreme Court for another stay. The court treated the motion as a personal restraint petition, and on July 18, 1985, denied the motion for a stay and dismissed the petition on the merits. On July 22, 1985, Campbell filed a habeas corpus petition in the United States District Court for the Western District of Washington. The district court granted a stay of the execution. Campbell's petition made 61 claims, 40 of which the district court determined had not been exhausted in state court. Campbell amended his petition to limit his claims to the 21 exhausted claims. The district court held an evidentiary hearing, and on February 12, 1986, denied the habeas petition. We affirmed on October 6, 1987. *Campbell v. Kincheloe,* 829 F.2d 1453 (9th Cir.1987) (*Campbell I* ). We denied the petition for rehearing and the suggestion for rehearing en banc. The Supreme Court denied certiorari. *Campbell v. Kincheloe,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). We dissolved the stay of execution on January 25, 1989.

A third death warrant issued on February 15, 1989, scheduling Campbell's execution for

March 30, 1989. Campbell appealed from the order scheduling his execution. The Washington Supreme Court affirmed on March 23, 1989. *State v. Campbell,* 112 Wash.2d 186, 770 P.2d 620 (1989). Campbell filed a second petition for a writ of habeas corpus in the district court. The district court held an evidentiary hearing and then denied the petition and request for a stay on March 28, 1989. The district court issued a certificate of probable cause. Campbell appealed on March 29, 1989, and on March 30, 1989, we granted a stay of the execution pending appeal.

While this appeal was pending, Campbell filed another personal restraint petition in the Washington Supreme Court. The Washington Supreme Court denied the petition on March 21, 1991, and denied rehearing on May 15, 1991. On August 7, 1991, we granted Campbell leave to file a third habeas petition, and indicated that an appeal, if any, from the district court's decision on the third petition would be consolidated with the pending appeal on the second petition. *Campbell v. Blodgett,* 940 F.2d 549 (9th Cir.1991); *see also Campbell v. Blodgett,* 927 F.2d 444 (9th Cir.1991). Campbell filed his third habeas corpus petition in the district court on September 18, 1991. The district court dismissed the petition as successive and an abuse of the writ on March 9, 1992.

While Campbell's third habeas petition was pending before the district court, the Washington Attorney General filed a petition for mandamus in the United States Supreme Court on October 25, 1991. The Supreme Court denied the writ, but stated that it found no plausible reason for the delay in resolving Campbell's second appeal. *In re Blodgett,* —— U.S. ——, ——, ——, 112 S.Ct. 674, 675, 677, 116 L.Ed.2d 669 (1992). The appeals therefore were not consolidated. We affirmed the district court's denial of relief on Campbell's third petition on December 24, 1992. *Campbell v. Blodgett,* 982 F.2d 1321, *superceded on denial of reh'g,* 997 F.2d 512 (9th Cir.1993) (*Campbell III* ).

The panel filed its opinion on Campbell's second petition on April 1, 1992. *Campbell v. Blodgett,* 978 F.2d 1502 (9th Cir.1992) (*Campbell II* ). We granted rehearing en banc on October 8, 1992. *Campbell v. Blodgett,* 978 F.2d 1519 (9th Cir.1992).

On May 1, 1993, we ordered a limited 35–day remand to the district court for an evidentiary hearing on the issue of whether execution by hanging violates the Eighth Amendment prohibition of cruel and unusual punishment. *See Campbell v. Blodgett,* 992 F.2d 984 (9th Cir.1993) (denying reconsideration of remand order); *see also Blodgett v. Campbell,* —— U.S. ——, 113 S.Ct. 1965, 124 L.Ed.2d 66 (1993) (O'Connor, J.) (denying application to vacate remand order). The district court heard three days of testimony and entered findings and conclusions on June 1, 1993. Campbell attempted to appeal from the findings and conclusions by filing a notice of appeal in the district court on June 7, 1993. In an order dated July 23, 1993, we stated that an appeal from the limited remand was error. *Campbell v. Blodgett,* 998 F.2d 763 (9th Cir.1993). Campbell moved to allow supplemental briefing. We granted the motion on August 27, 1993. Briefing was completed on October 22, 1993, and we ordered the case resubmitted for decision on November 5, 1993. We now affirm.

### B

In 1974, Charles Campbell assaulted and sodomized Renae Wicklund in her residence in Clearview, Washington. Campbell held a knife to the throat of Wicklund's one-year-old daughter Shannah, threatening to harm her if Renae did not submit. After the attack, Wicklund ran to the house of her neighbor, Barbara Hendrickson, for help. Campbell was tried and convicted on the assault and sodomy charges in 1976. Both Renae Wicklund and Barbara Hendrickson testified at the trial. Campbell was sentenced to a prison term. In March 1982, Campbell was transferred to a work release facility in Everett, Washington.

On April 14, 1982, Renae Wicklund, Shannah Wicklund (then eight years old), and Barbara Hendrickson were found brutally slain in the Wicklund residence. Wicklund had been sick and remained at home that day. Hendrickson had gone to Wicklund's residence to assist her.

The evidence at trial showed that Wicklund had been the first victim. She was found naked on her bedroom floor. She had been beaten with a blunt instrument on her head, back, and upper chest. Her jaw and nose were broken, and she had been strangled. She had a seven-inch cut across her neck, from which she had bled to death. After her death, she had been vaginally assaulted with a blunt instrument which left a one-inch cut in her vaginal wall.

Wicklund's daughter had also been strangled, and she had a seven-and-one-half-inch cut across her upper neck. She had lost so much blood that a sample was difficult to obtain.

Hendrickson's throat also had been cut, leaving a seven-inch wound. She died of a massive hemorrhage. *See generally State v. Campbell,* 691 P.2d at 933.

Campbell was charged and tried on three counts of aggravated first degree murder. In affirming the convictions, the Washington Supreme Court noted that the State's case was "overwhelmingly strong." *State v. Campbell,* 691 P.2d at 933. Several witnesses testified that they saw a man near the Wicklund residence on the afternoon of the murders and identified Campbell at trial as the man they had seen. Two other witnesses described a car matching the description of Campbell's car and testified that they observed the car parked in an inlet in a wooded area near the Wicklund residence on April 14, 1982. Judith Dirks testified that Campbell had visited her on the morning of April 14, that he had been drinking, and that he drank a six-pack of beer at her residence. Dirks later noticed her butcher knife was missing. Another of Campbell's acquaintances, Debbie Kedziroski, testified that Campbell visited her in the early afternoon of April 14. Kedziroski testified that Campbell proposed to have sexual relations and tugged at her clothes but did not hurt her.

Items seized from Campbell on the day of the murders included a pair of earrings that a witness identified as belonging to Renae Wicklund. An earring found in Campbell's car was identified by a business associate of Renae's as a birthday present he had given to Shannah. A glass found in the Wicklunds'

kitchen bore a fingerprint matching Campbell's. Finally, another work-release resident directed police to a place on the Snohomish River where he and Campbell had been on the evening of April 14. Investigators and divers found a bracelet, three earrings, two necklaces, a piece of pottery, and a brass object, all of which were linked to the Wicklund residence and the victims. *See generally State v. Campbell,* 691 P.2d at 933–936.

The jury convicted Campbell on November 26, 1982. The jury found four aggravating factors: (1) Campbell was serving a term of imprisonment at the time he committed the murders, Wash.Rev.Code 10.95.020(2); (2) Barbara Hendrickson and Renae Wicklund were former witnesses against Campbell and their murders were related to the exercise of their official duties at that trial, Wash.Rev.Code 10.95.020(6)(b); (3) Campbell murdered Barbara Hendrickson and Shannah Wicklund to protect or conceal his identity, Wash.Rev.Code 10.95.020(7); and (4) Campbell committed the murder in the course of, in the furtherance of, or in the immediate flight from the crime of burglary in the first degree, Wash.Rev.Code 10.95.020(9)(c). In a separate proceeding, the jury found insufficient mitigating circumstances to merit leniency, and Campbell was sentenced to death. *State v. Campbell,* 691 P.2d at 937.

C

Campbell presents the following questions:

(1) Whether Campbell's absence at the empanelling of the state court jury violated his constitutional rights;

(2) Whether Campbell received ineffective assistance of counsel with respect to his waiver of presence at jury selection;

(3) Whether the Washington death penalty statute, Wash.Rev.Code 10.95, provides a mandatory death penalty formula and fails to provide appropriate or reliable standards for the sentencing authority to determine whether a death sentence should be imposed;

(4) Whether the trial court's instructions to the jury unconstitutionally limited the facts the jury could consider in mitigation;

(5) Whether Campbell has been denied effective assistance of counsel and adequate access to the courts in his post-conviction proceedings;

(6) Whether the district court erred by denying Campbell's motion for a stay of execution and by not providing an adequate evidentiary hearing;

(7) Whether execution by hanging violates the Eighth Amendment; and

(8) Whether Washington employs qualified personnel to execute the death warrant.

## II

■ Campbell contends that a defendant in a capital case can never waive the right of presence at the empanelling of the jury. We disagree. We hold that Campbell could, and did, waive his right to be present during the empanelling of the jury.

## A

Due to the inordinate amount of local publicity generated by the charges against Campbell and his pending trial, the state trial court ordered that the jury be selected at the Spokane County Courthouse, a location 275 miles east of the Snohomish County Courthouse. Once selected, the jury was to be transported to Snohomish County for the trial. On October 21, 1982, Campbell's attorney told the court that Campbell wanted to waive his presence at the jury selection and to remain in Snohomish County. Counsel stated that Campbell had "legitimate fears" as to the treatment he would receive from officers and other prisoners in Spokane, and that Campbell preferred "to stay [in Snohomish County] and concentrate on the trial and his future."

The prosecutor objected immediately, expressing the concern that Campbell was playing a game, and that Campbell's proposed waiver was a tactic to create an issue for appeal. The judge then addressed Campbell personally to satisfy himself that Campbell knew what he was doing.[1] The

judge informed Campbell that he had a constitutional right to be present during jury selection, and that if he were absent, he would not be able to help his lawyers select the jury. The judge warned Campbell that he might not approve of the jurors selected by his attorneys. The judge also advised Campbell that he would have little contact with his lawyers while they were in Spokane.

Campbell repeatedly indicated that he understood the repercussions of his decision. He stated:

I have a lot of confidence in Mr. Mestel and Mr. Savage going over there. They do that for a living. I am trying to prepare myself for my part in the trial and I am trying to relax and get my head together.... I feel like going to Spokane will be a real inconvenience.... My time will be limited and I will not be able to prepare things I am working on right now. It is my decision to stay here in Snohomish County so that I can accomplish that.

The state trial judge considered the matter further the next day and informed Campbell that his waiver of presence at the empanelling of the jury would, in effect, be irrevocable due to the difficulty of getting Campbell to Spokane if he changed his mind. Campbell stated that he still wished to waive presence. The court concluded that there was "good cause" to honor Campbell's request because Campbell felt he had more important things to do in preparing for trial. The court also stated that honoring the request was "justified by the expense and difficulty and security means that would have to be taken to afford us to transport him and the security during the course of any jury selection in a foreign county."

Campbell executed the following written waiver of his right to be present at the empanelling of the jury:

The defendant being advised that he has an absolute right to travel to Spokane and be present during the selection of the jury to sit in the guilt and penalty phases of this cause of action and mindful that by not

---

**1.** Refer to Appendix A for the transcript of this hearing and the hearing conducted the following day.

attending the jury selection proceedings he will be forever precluded from challenging those persons impaneled by his counsel or from contesting its composition, knowingly, intelligently and voluntarily waives his right to be present to allow him to remain in Snohomish County to continue his preparation for trial.

Campbell further orally agreed in open court to waive his right to raise an ineffective assistance of counsel claim connected with the waiver of the right to be present. Although the prosecution preferred to have this additional aspect of the agreement in writing, the state trial judge found the oral waiver on the record in court was sufficient. *Cf.*, Wash. R.Sup.Ct. CR 2A.

### B

■ A person charged with a felony has a fundamental right to be present at every stage of the trial. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). This includes the right to be present at the voir dire and empanelling of the jury. *Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 254, 56 L.Ed. 500 (1912). The right of presence derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments. *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (per curiam).

■ A defendant's rights under the Constitution may be waived, provided such waiver is voluntary, knowing, and intelligent. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Characterization of the right of presence as "fundamental" adds little to the analysis. A defendant may waive such fundamental rights as the right to be silent, *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); the right to counsel, *Johnson, supra; Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); the right to be present at the trial, *Taylor v. United States*, 414 U.S. 17, 19–20, 94 S.Ct. 194, 195–96, 38 L.Ed.2d 174 (1973); and the right to be present at a conference between the judge and a juror, *United States v. Gagnon*, 470 U.S. 522, 529, 105 S.Ct. 1482,

1486, 84 L.Ed.2d 486 (1985) (per curiam). By pleading guilty to a charge, an accused may waive the right to a jury trial, the right against self-incrimination, and the right to confront witnesses. *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969); *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969).

Campbell argues that the right to be present may not be waived in a capital case. Campbell relies on two nineteenth-century Supreme Court decisions to support this proposition. In *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), the Court held that it was not within the power of the accused or his counsel to waive a statutory requirement of presence at the trial. In *Lewis v. United States*, 146 U.S. 370, 372, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892), the Court held that "after the indictment found, nothing shall be done in the absence of the prisoner."

These authorities do not compel the result Campbell urges. In *Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 254, 56 L.Ed. 500 (1912), the Court distinguished between capital and noncapital cases and between custodial and noncustodial defendants, stating that the courts

> have regarded an accused who is in custody and one who is charged with a capital offense as incapable of waiving the right; the one, because his presence or absence is not within his own control, and the other because, in addition to being usually in custody, he is deemed to suffer the constraint naturally incident to an apprehension of the awful penalty that would follow conviction.

The Court held that a defendant who was neither in custody nor charged with a capital offense was free to waive the right of presence by voluntarily absenting himself. *Id.*

This analysis was expanded in *Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), a capital case in which the Court observed that the privilege of presence "may be lost by consent or at times even by misconduct." Finally, in *Illinois v. Allen*, 397 U.S. 337, 342, 90 S.Ct.

1057, 1060, 25 L.Ed.2d 353 (1970), the Court stated that "[t]he broad dicta in [*Hopt* and *Lewis* ] that a trial can never continue in the defendant's absence have been expressly rejected." The Court stated that it accepted instead that a defendant may lose the right to be present at trial by consent or misconduct. *Id.* at 342–43, 90 S.Ct. at 1060–61.

Campbell further argues that *Bustamante v. Eyman,* 456 F.2d 269 (9th Cir.1972), dictates that he could not waive his right to be present at jury selection. In *Bustamante,* defendant's attorney had waived the presence of his client when a tape recording was replayed for the jury. *Id.* at 271. We reversed, suggesting both that the right could not be waived, and that the right had not, in fact, been waived:

> Since appellant was in custody for a capital offense and his absence was not necessitated by disruptive behavior, we hold that he did not, indeed could not, waive his right to be present in the courtroom at trial. Furthermore, there is no evidence that he even attempted to waive this right. He could not voluntarily have waived this right before the tape was replayed, because it appears that he was not even aware of this replay until almost a year later. Neither is there evidence that he attempted to waive this right after he gained knowledge of it.

The dicta of *Bustamante* is not compelling.[2] Had we there been convinced that the right absolutely could not be waived, we would not have engaged in any analysis of whether a waiver had occurred. More recent authority supports our holding today. We held in *Brewer v. Raines,* 670 F.2d 117, 119 (9th Cir.1982), that a defendant's knowing, voluntary, and intelligent absence from his trial acts as a waiver of the right of confrontation.

■ There is no principled basis for limiting to noncapital offenses a defendant's ability knowingly, voluntarily, and intelligently to waive the right of presence. Nor do we find logic in the proposition that a right that may be waived by disruptive behavior cannot be waived by an affirmative petition freely made and based on informed judgment. The state trial judge correctly observed that refusing Campbell's request might be "an invitation to be ungovernable and get sent back [to Snohomish County]." A rational decision to waive the constitutional right is entitled to the same weight as a waiver imputed by disruptive conduct. We conclude that Campbell was capable of waiving the right to be present at the empanelling of the jury.

.

### C

■ A waiver is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The finding of a knowing and voluntary waiver is a mixed question of law and fact which we review *de novo. Terrovona v. Kincheloe,* 852 F.2d 424, 427 (9th Cir.1988). The ultimate issue of voluntariness is a legal question requiring independent federal determination. *Arizona v. Fulminante,* 499 U.S. 279, 286, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991).

■ We must indulge every reasonable presumption against the loss of the constitutional right to be present at a critical stage of the trial. *Allen,* 397 U.S. at 343, 90 S.Ct. at 1061. Still, we have no difficulty concluding that Campbell knowingly, voluntarily, and intelligently waived his right of presence at the empanelling of the jury.

The notion of remaining in Snohomish County while the jury was empanelled in Spokane County originated with Campbell. Neither his own attorneys nor the Snohomish County Prosecuting Attorney sought to deprive Campbell of his right to attend the proceedings in Spokane. Campbell's attorney Mark Mestel[3] was opposed to the decision, but believed that opposing Campbell on the issue would undermine an already fragile

---

2. To the extent that the phrase "indeed could not" may be interpreted as a holding with which our decision today conflicts, we note that an *en banc* court may overrule existing Ninth Circuit precedent. *See LeVick v. Skaggs Co., Inc.,* 701 F.2d 777, 778 (9th Cir.1983).

3. Campbell was represented by Mr. Mestel and Anthony Savage at trial. Mr. Savage was not consulted prior to Campbell's execution of the waiver of the right to be present at jury selection.

professional relationship. Twice in open court, Campbell discussed his decision to waive presence. He spoke directly with the trial judge. Campbell signed his written waiver after being fully informed that his absence would deprive him of an opportunity to advise his attorneys on jury selection matters, impair his ability to communicate with his attorneys, and preclude him from changing his mind and travelling to Spokane after jury selection began. There has never been any suggestion that Campbell was incompetent to execute the waiver. The terms of the written waiver are unambiguous.

## D

■ The nature of Campbell's waiver of his right of presence provides another basis supporting our conclusion. Criminal defendants are entitled to make agreements that affect their constitutional rights. *Newton v. Rumery*, 480 U.S. 386, 393, 107 S.Ct. 1187, 1192, 94 L.Ed.2d 405 (1987).

■ Campbell entered into an express agreement to waive his constitutional rights in exchange for permission to remain in Snohomish County and attend to matters he deemed more important. The terms of the written and oral agreements he made bar his constitutional claim. The fundamental rights afforded Campbell in the Constitution do not relieve him " 'from the consequences of his voluntary choice.' " *Ricketts v. Adamson*, 483 U.S. 1, 8, 107 S.Ct. 2680, 2685, 97 L.Ed.2d 1 (1987) (quoting *Adamson v. Ricketts*, 789 F.2d 722, 740 (9th Cir.1986) (Brunetti, J., dissenting)).

## III

Campbell claims that he received ineffective assistance of trial counsel because his lawyers permitted Campbell to waive his right to be present at the empanelling of the jury. Correctly anticipating that Campbell would claim that his attorneys were ineffective in allowing him to waive his presence, the prosecutor secured, in open court, Campbell's waiver of any claim that counsel was deficient in allowing him to waive his presence at jury selection.[4] We have never addressed whether a defendant may waive the right to claim ineffective assistance of counsel. We reserve that question for another day, because Campbell's counsels' assistance was not ineffective, despite the waiver.

■ To prevail on the claim that his counsel were ineffective because they allowed Campbell to waive presence during the jury selection process, Campbell must demonstrate (1) that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The proper standard for attorney performance is that of "reasonably effective assistance." *Id.* The defendant must therefore show that the representation he received "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064.

■ Our review of counsel's performance is highly deferential. *Id.* at 689, 104 S.Ct. at 2065. We will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

■ Applying these principles, we have no difficulty concluding that Campbell did not receive ineffective assistance of trial

4. On the morning of October 22, the court considered and accepted Campbell's waiver of his right to be present while the jury was selected. *See* Appendix A. The prosecutor explained that he believed the written waiver should contain a clause dealing with any future claim of ineffective assistance. The prosecutor requested that Campbell waive in writing "all future objections to be raised as to competency of counsel."

The judge addressed Campbell, and asked him if he was "willing to waive any claim of incompetency of counsel as [a] result of this waiver?" Campbell was careful to limit his waiver to the jury selection process, and agreed to waive an ineffective assistance claim specific only to the waiver of his right to be present. The court ruled that the waiver need not be reduced to writing.

counsel when he decided to waive his right of presence at the jury empanelling. The district court conducted a hearing at which both of Campbell's trial attorneys, Mark Mestel and Anthony Savage, testified. Campbell informed Mestel several days before jury selection began that he did not want to attend. Mestel counseled him against waiving his right of presence. Campbell was emphatic on the issue, and Mestel knew from prior experience that Campbell was unlikely to change his mind. Mestel honored Campbell's request, based on his conclusion that the only way he could maintain a professional relationship with Campbell was to refrain from advocating against Campbell's personal decision to stay in Snohomish County during jury selection.

The district court concluded that counsel's representation was not ineffective. We agree. Mestel's decision was motivated by legitimate concerns of preserving a harmonious working relationship with Campbell. We see nothing in Mestel's representation of Campbell that falls below an objective standard of reasonableness. We are also persuaded that, had Mestel argued against allowing Campbell to waive the right of presence, we would be here resolving whether Campbell's counsel were ineffective in not letting him stay in Snohomish County to prepare for trial. That course of events, we believe, would have presented a far greater risk of undermining the relationship between Campbell and his counsel. To the extent that Mestel was forced to choose between two evils, we agree his choice was professionally justified.

IV

Campbell claims that Washington's death penalty statute, Wash.Rev.Code 10.95, is unconstitutional. He makes three arguments: First, Campbell argues that the statute creates a mandatory death sentence formula, thereby preventing individualized determination; second, he argues that the statute fails to provide appropriate or reliable standards for the sentencing authority to determine whether to impose the death penalty; and third, Campbell argues that the trial court's instructions to the jury unconstitutionally limited the factors and circumstances the jury could consider in mitigation.

A

Campbell claims that Washington's death penalty statute imposes a mandatory death penalty formula. He argues that the statute creates an impermissible balancing test that prevents the jury from making an individualized determination of the sentence. The statute provides that the sentence shall be death if the jury finds "beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency." Wash.Rev. Code 10.95.060(4). Section 10.95.070 allows the sentencing authority to consider "any relevant factors" in deciding the question and provides a non-exclusive list of mitigating factors that could merit leniency.

■ Individualized determination in capital sentencing is constitutionally required. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). As the Court explained in *Woodson,*

[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.

*Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991.

Under the individualized sentencing schema, the Court has struck down statutes that provide for a mandatory sentence of death upon conviction of a particular crime, even if narrowly defined, *Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), as well as statutes that limit the kinds of mitigating circumstances the sentencing authority may consider, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

■ Campbell's argument that Wash. Rev.Code 10.95 creates a mandatory death penalty formula has no merit. The Supreme Court has repeatedly held "[t]he requirement

of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Blystone v. Pennsylvania*, 494 U.S. 299, 307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990) (footnote omitted) (rejecting challenge to death penalty statute that did not preclude the sentencer from considering any type of mitigating evidence); *Boyde v. California*, 494 U.S. 370, 374–77, 110 S.Ct. 1190, 1194–96, 108 L.Ed.2d 316 (1990) (rejecting challenge to death penalty statute providing that "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death").

In his opening brief on this issue, filed in 1989, Campbell relied on *Adamson v. Ricketts*, 865 F.2d 1011, 1042–43 (9th Cir.1988), for the proposition that a statute with language similar to that of Wash.Rev.Code 10.95 is unconstitutional. In that case, we held that the language "the court ... shall impose a sentence of death if the court finds one or more of the aggravating circumstances ... and that there are no mitigating circumstances sufficiently substantial to call for leniency" unconstitutional because it created a presumption of death and removed the sentencing judge's discretion. *Id.* In *Walton v. Arizona*, 497 U.S. 639, 651–52, 110 S.Ct. 3047, 3056, 111 L.Ed.2d 511 (1990), this holding was overturned.[5] The Court reiterated that the Constitution's requirements are satisfied by a provision allowing the sentencer to consider any mitigating factors. *Id.*

We have already held that Wash.Rev.Code 10.95 creates a presumption of leniency. *Campbell I*, 829 F.2d at 1465. The statute does not interfere with Campbell's right to an individualized sentence by limiting the discretion of the sentencing authority. Because the jury is free to consider any mitigating factors, the death penalty statute is not a mandatory formula.

### B

Campbell argues that the Washington death penalty statute is unconstitutional be-cause it fails to provide the sentencing authority with an appropriate and reliable standard for determining whether to impose the death penalty. The district court determined that Campbell had raised this claim in his first petition and that the claim was barred.

■■■ Controlling weight may be accorded to the denial of a prior petition for habeas corpus where "(1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." *Sanders v. United States*, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963). *Sanders* substantially reflects Rule 9(b) of the Rules Governing Habeas Corpus Proceedings. Rule 9(b) provides, in part, that "[a] second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits." A judge may also dismiss a single successive claim within a particular petition.

■■ The legal ground asserted here is not new. In his 1985 habeas corpus petition, Campbell urged that the statute was unconstitutional because it failed to adequately channel and guide jury discretion. He now uses the language "appropriate and reliable standard." And he has shifted the focal point of his argument: in his first petition, he relied on the instruction based on Wash.Rev. Code 10.95.070, which provides a non-exclusive list of relevant factors for the jury to consider in mitigation; now he relies on the jury instruction derived from Wash.Rev.Code 10.95.060(4), which requires the jury to decide whether "there are not sufficient mitigating circumstances to merit leniency."

■■ In the *Sanders* analysis, a "ground" is "sufficient legal basis for granting the relief sought." *Sanders*, 373 U.S. at 16, 83 S.Ct. at 1077. A petitioner does not raise a new ground by offering different factual alle-

---

**5.** Justice White wrote for a plurality of four on this issue; Justice Scalia concurred separately in the judgment, stating his position that the claim that a sentencer's discretion has been unlawfully restricted does not state an Eighth Amendment challenge. *Walton*, 497 U.S. at 673–74, 110 S.Ct. at 3068 (Scalia, J., concurring).

gations or legal arguments. We are also unpersuaded by Campbell's argument that, in his first petition, he was challenging the statute, while in his second petition, he is challenging the jury instruction; either way, the claim is directed to the jury's understanding of its obligations.

Campbell argues that *State v. Rupe*, 108 Wash.2d 734, 743 P.2d 210 (1987) *(Rupe II)*, *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988), effected a change of the law and that the "ends of justice" would be served by a redetermination of issues related to Wash.Rev.Code 10.95.070. We disagree. *Rupe II* does not represent an intervening change of law. Rather, the court there rejected the defendant's claim that the statute confused the jury. Nor has Campbell presented any other persuasive argument to show that the "ends of justice" would be served by a redetermination of his claim that the Washington death penalty statute is unconstitutional.

## C

■■■ Campbell argues that the jury instructions unconstitutionally limited the facts the jury could consider in mitigation. The challenged jury instruction, taken verbatim from Wash.Rev.Code 10.95.070, provides that the jury may consider "any relevant factors, including but not limited to" eight enumerated factors. Campbell, as noted above, challenged this instruction in his first petition. He argues *now*, however, that he is raising two new legal grounds. First, he argues that section 10.95.070(2) allows the jury to consider mental disturbance only if it finds the influence to have been "extreme"; and second, he argues that section 10.95.070(6) allows the jury to consider impairment due to mental disease or defect only if it was "substantial."

These are not new legal grounds. The district court correctly concluded that Campbell had previously challenged the mitigating-factors instruction. Campbell cannot manufacture a new ground by narrowing his claim to two specific modifiers. He has also

failed to demonstrate that the "ends of justice" demand a redetermination.

## V

We next address Campbell's claims that he has been denied right to counsel and meaningful access to the courts during collateral proceedings.[6]

Campbell claims that he received ineffective assistance of counsel and was denied meaningful access to the courts in both his state and federal habeas proceedings. He argues that his attorneys were not given adequate time to prepare properly for the collateral attacks on his convictions. He also claims that "meaningful access" to the courts requires not only representation by counsel, but adequate time to prepare. The district court held that counsel's performance satisfied the standard enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that Campbell had meaningful access to the courts.

## A

■■■ Two recent Supreme Court decisions directly address and dispose of all but the second element of Campbell's meaningful access argument. In *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), the Court held that there is no constitutional right to counsel in state habeas proceedings. *Id.* at 556–57, 107 S.Ct. at 1994. The Court reaffirmed this rule in *Murray v. Giarratano*, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989), holding that *Finley* applies in both noncapital and capital cases, and that meaningful access to the courts does not require appointment of counsel. *Id.* at 12, 109 S.Ct. at 2271.

Because both *Finley* and *Giarratano* were decided after Campbell's conviction became final in 1985, we must consider whether *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), prevents their application to Campbell's case. In *Teague*, the Court held that new constitutional rules of

---

6. We substantially adopt the opinion of the three-judge panel on these issues. *See Campbell II,*

criminal procedure may not be applied retroactively to cases for which direct review had been completed prior to the decision creating the new rule. *Id.* at 310, 109 S.Ct. at 1075 (plurality opinion). If the rules announced in *Finley* and *Giarratano* are not new, they apply to this case.

According to *Teague,*

a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Teague,* 489 U.S. at 301, 109 S.Ct. at 1070 (citations omitted). In *Finley,* the Court held that the right to counsel does not extend to post-conviction civil procedures. *Finley,* 481 U.S. at 555–56, 107 S.Ct. at 1993–94. In reaching this conclusion, the Court stated:

We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.... We think that since a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, *a fortiori,* he has no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process.

*Id.* at 555, 107 S.Ct. at 1993 (citations omitted). This language unambiguously indicates that the Court's decision follows directly from its prior holdings. Indeed, the Court relied heavily on its opinion in *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), stating that the analysis in that case "forecloses respondent's constitutional claim." *Finley,* 481 U.S. at 556, 107 S.Ct. at

1994. The rule stated in *Finley* is a straightforward application of precedent; it broke no new ground. *Finley* applies retroactively to this case.

We reach the same conclusion with regard to *Giarratano.* There, the Court reaffirmed *Finley,* holding that it applies to both capital and noncapital cases. *Giarratano,* 492 U.S. at 12, 109 S.Ct. at 2271. A thorough review of the principles and holdings in the Court's previous death penalty cases led the Court to conclude that "these cases *require* the conclusion that the rule of *Pennsylvania v. Finley* should apply no differently in capital cases than in noncapital cases." *Id.* at 10, 109 S.Ct. at 2770 (emphasis added). It also dismissed the prisoners' argument that the right of meaningful access to the courts, announced in *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), required appointment of counsel. *Giarratano,* 492 U.S. at 4, 109 S.Ct. at 2767. The Court explained that the prisoner's proposed rule "rest[ed] on a misreading" of *Bounds. Id.* We are convinced that *Giarratano* did not announce a new rule of constitutional jurisprudence, but instead was a direct application and clarification of existing precedent.

## B

■ Campbell's ineffective assistance of counsel claim fails under *Finley* and *Giarratano;* Campbell had no right to counsel in his federal and state post-conviction proceedings.[7] *Giarratano,* 492 U.S. at 10, 109 S.Ct. at 2770; *Finley,* 481 U.S. at 555–56, 107 S.Ct. at 1993–94. "Since [he] had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel...." *Wainwright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 1301, 71 L.Ed.2d 475 (1982). Similarly, *Giarratano* disposes of Campbell's contention that meaningful access to the courts requires the appointment of counsel.[8]

---

7. Campbell claims that the state's termination of its contract with Evergreen Legal Services one month before his original execution date requires an evidentiary hearing to determine whether the state deliberately interfered with the right to counsel. Because Campbell had no right to counsel, his claim is without merit.

8. The Washington Supreme Court did, in fact, appoint counsel. Campbell petitioned the Washington Supreme Court for appointment of counsel both times he decided to initiate state post-conviction proceedings. The court appointed counsel for the first state petition, but initially refused to appoint counsel when, over three years later, Campbell decided to initiate a second state challenge. Campbell's second request for

*Giarratano,* 492 U.S. at 11–12, 109 S.Ct. at 2771–72. We reject Campbell's ineffective assistance claim.

## C

■ Campbell's second argument is that meaningful access to the courts required the state supreme court to grant counsel adequate time to prepare his post-conviction petitions. Campbell filed his first state personal restraint petition on July 11, 1985. The Washington Supreme Court denied his petition on July 18, 1985, just seven days before his scheduled execution. Campbell's attorneys then filed the first federal habeas petition, and the federal district court granted a stay of execution on July 22, 1985. The district court dismissed the petition because it contained unexhausted claims, and Campbell's attorneys filed an amended petition including only exhausted claims. Despite the dismissal of unexhausted claims, Campbell did not file a concurrent petition in state court raising his unexhausted claims. Campbell's federal petition was ultimately denied, and appellate review of this petition concluded in 1987. *See Campbell I,* 829 F.2d 1453 (9th Cir.1987). Campbell waited, however, until late 1988 to seek counsel in order to raise his unexhausted claims in a second state personal restraint petition.

Campbell alleges that the Washington Supreme Court failed to grant his counsel adequate time to prepare both times he sought state collateral review. This is not the case. The court set a strict filing deadline only with regard to his second state personal restraint petition.[9] In August 1988, almost one year after we affirmed the district court's denial of habeas relief, *see Campbell I,* 829 F.2d 1453, Campbell petitioned the Washington Supreme Court to provide him with counsel to assist him in pursuing his unexhausted claims in a second state personal restraint petition. The Washington Supreme Court appointed counsel and directed counsel to file, within five working days, a memorandum demonstrating "that there exists in this matter issues not previously litigated which have sufficient potential merit to require further consideration by this court, and if necessary to permit such consideration, the issuance of a stay." Campbell asserts that this deadline denied him meaningful access to the courts.

The Supreme Court has held that the "State must assure the indigent defendant an adequate opportunity to present his claims fairly." *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977) (quotation omitted). Although Campbell had no right to counsel under the meaningful access doctrine, his counsel, once appointed, was entitled to a fair chance to represent his client. Given the procedural history of Campbell's case, the Washington Supreme Court satisfied its constitutional obligation under *Bounds.* In his second state personal restraint action, Campbell's attorneys raised the 40 unexhausted claims dismissed by the district court. Because Campbell's prior counsel had discovered and presented these claims in his first federal habeas petition, Campbell's new counsel did not have the burden of having to search the record for claimed errors. Rather, counsel were afforded seven days to brief the issues already presented in Campbell's 1985 petition. We also note that Campbell was aware for three years that he could raise the unexhausted claims in state court. He had ample time in which to review the record, become familiar with the law, and brief the issues he sought to raise in his second personal restraint petition. Even if Campbell's strategy was to wait to see if this court agreed that the 40 claims were indeed unexhausted, Campbell still had adequate time to prepare, as the appellate review process ended in 1987.

counsel, filed one month before his scheduled execution, was accompanied by an amicus request filed by two attorneys. Upon this second request, the court appointed counsel.

9. As to Campbell's first personal restraint petition, there was no strict filing deadline. Evergreen Legal Services had agreed to represent Campbell, but their contract with the State was

terminated one month before Campbell's scheduled execution. The Washington Supreme Court immediately appointed the Washington Appellate Defender Association to represent Campbell, and set no filing deadline. We therefore do not address Campbell's claim that his counsel had inadequate time to prepare his first personal restraint petition.

In light of the fact that Campbell knew, since 1985, that these claims had yet to be reviewed by the state court, and that the issues had been defined in his first habeas petition, we hold that the state court did not deny Campbell meaningful access by imposing the five-working-day limit in which to file a written memorandum in support of these claims.

## VI

Campbell claims that the district court denied him an adequate evidentiary hearing on the claims he asserts in his second petition. He also claims that the district court erred in denying his application for a stay. These claims lack merit.

■ In habeas corpus proceedings, an evidentiary hearing is required where the petitioner's allegations, if proved, would establish the right to relief. *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); *Van Pilon v. Reed,* 799 F.2d 1332, 1338 (9th Cir.1986). An evidentiary hearing is not required on allegations that are "conclusory and wholly devoid of specifics." *Boehme v. Maxwell,* 423 F.2d 1056, 1058 (9th Cir.1970). Nor is an evidentiary hearing required on issues that can be resolved by reference to the state court record. *Bashor v. Risley,* 730 F.2d 1228, 1233 (9th Cir.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

■ Campbell was granted an evidentiary hearing by the district court. The Washington Supreme Court issued its decision denying Campbell's personal restraint petition and motion for a stay of execution on March 23, 1989. *State v. Campbell,* 112 Wash.2d 186, 770 P.2d 620 (1989). The next morning, the federal district court held a status conference to determine whether Campbell intended to file an application for a stay of execution and a petition for a writ of habeas corpus. The execution was scheduled for March 30, 1989.

Counsel for Campbell advised the district court that they would file an application for a stay and a habeas petition on the morning of March 27. The district court requested that Campbell be transported to the court for proceedings on March 27, and recommended that counsel be prepared for an evidentiary hearing. The petition and application for a stay were filed March 27, and the district court conducted an evidentiary hearing. The district court heard testimony from Campbell's state trial and appellate counsel, as well as from three other witnesses.

Campbell argues that this evidentiary hearing was inadequate. We do not agree. Although Campbell's attorneys had a limited amount of time to prepare for the hearing, they adequately developed the record concerning whether Campbell received ineffective assistance of counsel. The district court did not in any way limit Campbell's ability to present evidence on any or all of his claims. Such expedited procedures are not improper. *Barefoot v. Estelle,* 463 U.S. 880, 895, 103 S.Ct. 3383, 3395, 77 L.Ed.2d 1090 (1983). We note, in this regard, that the Supreme Court remarked upon this hearing as follows: "The [district] court acted with commendable dispatch, holding a hearing and issuing a written opinion denying a stay or other relief within days after the second petition was filed." *In re Blodgett,* —— U.S. ——, ——, 112 S.Ct. 674, 675, 116 L.Ed.2d 669 (1992) (per curiam).

Nor was Campbell prejudiced by the district court's expedited hearing schedule. Our holding today that Campbell knowingly and voluntarily waived his right to be present at the empanelling of the jury obviates the need for further evidence on whether his absence affected the outcome of the trial. The district court extended Campbell an opportunity to develop the factual record on every other claim that required an evidentiary hearing.

Campbell also alleges that he was denied an opportunity to present evidence on the issues he raises with respect to judicial hanging. We need not address whether Campbell was entitled to an additional opportunity to present evidence to the district court in March of 1989. It is clear from the record that the district court did not deny him such an opportunity. Our decision pending this appeal to grant a limited remand to the district court for the purpose of conducting such a hearing provides us a full record with

respect to all disputed facts. *See, Campbell v. Blodgett,* 992 F.2d 984 (9th Cir.1993) (denying reconsideration of remand order).

■ Campbell also claims that the district court erred in denying his application for a stay of execution. Where the district court has denied a stay of execution, but issued a certificate of probable cause, the petitioner "must then be afforded an opportunity to address the merits, and the court of appeals is obligated to decide the merits of the appeal." *Barefoot,* 463 U.S. at 893–94, 103 S.Ct. at 3395. In order to afford Campbell the opportunity to address the merits of the appeal, we issued an indefinite stay of execution pending appeal. *See id.* This issue is moot.

## VII

Campbell challenges the constitutionality of hanging under the Washington death penalty statute, Wash.Rev.Code 10.95.180(1). The statute provides that "[t]he punishment of death ... shall be inflicted either by hanging by the neck or, at the election of the defendant, by [lethal injection]." Campbell raises three questions with respect to judicial hanging as prescribed in the Washington statute:

(1) Whether execution by hanging violates *per se* the Eighth Amendment because it is cruel and unusual punishment;

(2) Whether the direction that the condemned be hanged unless he elects lethal injection is cruel and unusual punishment; and

(3) Whether the direction that the condemned be hanged unless he elects lethal injection violates Campbell's First Amendment free exercise rights by compelling him to participate in his own execution to avoid hanging.

The State argues that these claims are not justiciable. We reject this argument, and address each of Campbell's specific claims.

## A

■ The exercise of judicial power is limited to cases and controversies. U.S. Const. art. III, § 2. The concept of a case or controversy "implies the existence of present or possible adverse parties whose contentions are submitted to the court for adjudication." *Muskrat v. United States,* 219 U.S. 346, 357, 31 S.Ct. 250, 254, 55 L.Ed. 246 (1911) (quoting *In re Pacific Ry. Comm'n,* 32 F. 241, 255 (C.C.Cal.1887)). A justiciable controversy is definite, concrete, real, and substantial; it is subject to specific relief. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). A controversy is not justiciable if it is hypothetical, abstract, academic, or moot. *Id.* at 240, 57 S.Ct. at 463. If the relief available would be "an opinion advising what the law would be upon a hypothetical state of facts," the controversy is not justiciable. *Id.* at 241, 57 S.Ct. at 464.

■ The State argues that Campbell's claims are non-justiciable because he has the power to choose a form of execution that would render this controversy moot. A case is rendered moot "by an act of the parties, or a subsequent law." *United States v. Alaska S.S. Co.,* 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808 (1920). Mootness is caused by an act, not by the apprehension of a potential act. If the State's logic were accepted, an entire universe of claims would be foreclosed because a party might, in the future, adopt a course of action that would moot the controversy.

The State's focus on Campbell's ability to choose lethal injection is misplaced. In *Dear Wing Jung v. United States,* 312 F.2d 73, 75–76 (9th Cir.1962), we rejected the argument that the government may cloak unconstitutional punishments in the mantle of "choice." We held that voluntary, permanent departure from the United States as a condition of suspending a sentence was either cruel and unusual punishment or a denial of due process. The condition did not escape review on the ground that the defendant could choose the constitutional punishment of a prison term. We have also, on many occasions, considered the constitutionality of probation conditions, although in those cases as well, the defendant could have chosen to remain incarcerated. *E.g., United States v. Terrigno,* 838 F.2d 371, 374 (9th Cir.1988) (considering whether probation condition violated

defendant's First Amendment rights); *United States v. Consuelo–Gonzalez*, 521 F.2d 259, 264 (9th Cir.1975) (considering whether probation condition violated defendant's Fourth Amendment rights).

Campbell is able to choose lethal injection, but he has not done so. As the State conceded at oral argument, Campbell has consistently maintained that he will not exercise his power to choose. *See, e.g., State v. Campbell*, 770 P.2d at 623; Petition for Rehearing at 15. His refusal to exercise the option of lethal injection ensures that Campbell's death warrant will be fulfilled by judicial hanging. This case therefore presents a real dispute between adverse parties on a definite set of facts. We conclude that Campbell's claims regarding execution by hanging are justiciable.

### B

Campbell claims that execution by hanging violates *per se* the Eighth Amendment. We remanded this case to the district court for the limited purpose of holding an evidentiary hearing on this claim. The factual findings of the district court will be set aside only if they are clearly erroneous. *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We review mixed questions of fact and law de novo. *United States v. Spokane*, 918 F.2d 84, 86 (9th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2888, 115 L.Ed.2d 1053 (1991). We review questions of law de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### (1)

The Eighth Amendment prohibits "cruel and unusual punishments." The language derives from the English Bill of Rights of 1689, which states that "excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *See Furman v. Georgia*, 408 U.S. 238, 243–44, 92 S.Ct. 2726, 2729, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring). The proscription of cruel and unusual punishments has been attributed to reaction to barbaric, torturous punishments imposed by the Stuarts, *see Furman*, 408 U.S. at 253–55, 92 S.Ct. at 2733–35 (Douglas, J., concurring), and to illegal punishments (such as defrocking) imposed by the King's Bench, *see* Anthony F. Grannucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Cal.L.Rev. 839, 858–60 (1969). Either way, "there is no doubt whatever that in borrowing the language and in including it in the Eighth Amendment, our Founding Fathers intended to outlaw torture and other cruel punishments." *Furman*, 408 U.S. at 319, 92 S.Ct. at 2767 (Marshall, J., concurring).

The Clause has historically been interpreted to forbid such "'punishments of torture'" as disembowelment, beheading, quartering, burning at the stake, and breaking at the wheel. *Furman*, 408 U.S. at 264–65, 92 S.Ct. at 2739 (Brennan, J., concurring) (quoting *Wilkerson v. Utah*, 99 U.S. 130, 135, 25 L.Ed. 345 (1878)). The Supreme Court has rarely, however, addressed whether particular methods of execution employed in this country are unconstitutionally cruel. Judicial hanging was last directly addressed by the Court in 1878, in *Wilkerson*. The Court there specifically distinguished between various punishments of torture and hanging, the traditional method of execution at common law. *Wilkerson*, 99 U.S. at 135–37; *see also In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890) (upholding electrocution as method of execution); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947) (upholding second attempt at electrocution after first attempt failed to cause death); *but see Glass v. Louisiana*, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting).

Recent decisions construing the Eighth Amendment focus on whether the sentence constitutes "one of 'those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted,'" *Stanford v. Kentucky*, 492 U.S. 361, 368, 109 S.Ct. 2969, 2974, 106 L.Ed.2d 306 (1989) (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986)), and on whether

the punishment is contrary to "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). There is no dispute here that execution by hanging was acceptable when the Bill of Rights was adopted. *See Wilkerson*, 99 U.S. at 133–34.

The more difficult question is whether hanging comports with contemporary standards of decency. In addressing this issue, we note that neither the state officials, nor Campbell, nor our own research has revealed a single decision holding that imposition of the death penalty by hanging is cruel and unusual punishment within the contemplation of the Eighth Amendment.

■ To determine whether hanging is unconstitutionally cruel and unusual, we look to objective factors to the maximum extent possible. *Stanford*, 492 U.S. at 369, 109 S.Ct. at 2974 (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion)). Among these factors are statutes passed by society's elected representatives. *Id.*, 492 U.S. at 370, 109 S.Ct. at 2975 (citing *McCleskey v. Kemp*, 481 U.S. 279, 300, 107 S.Ct. 1756, 1771, 95 L.Ed.2d 262 (1987)). We presume that a punishment selected by a democratically elected legislature is constitutionally valid. *Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976). "We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved." *Id.* at 175, 96 S.Ct. at 2926.

■ Campbell relies heavily on the trend among several states in recent years to replace hanging with other methods of execution, chiefly lethal injection. *See, e.g., De-*

*Shields v. State*, 534 A.2d 630, 639 (Del.1987). Currently, two states, Washington and Montana, provide for execution by hanging. Wash.Rev.Code 10.95.180(1); Mont.Code Ann. § 46–21–103(3) (1987). Campbell relies on *Coker*, 433 U.S. 584, 97 S.Ct. 2861, and *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), for the proposition that when the number of states exacting a given punishment dwindles, the punishment drops beneath the constitutional floor.

*Coker* and *Enmund* do not dictate the result Campbell urges. Those cases concern the proportionality of the death penalty to the crimes of conviction,[10] as opposed to the method of execution. The distinction is critical. On the one hand, proportionality review entails examination of the actions both of state legislatures and of sentencing juries to determine contemporary standards of decency. *See, Thompson v. Oklahoma*, 487 U.S. 815, 821–22, 108 S.Ct. 2687, 2691–92, 101 L.Ed.2d 702 (1988); *McCleskey*, 481 U.S. at 300, 107 S.Ct. at 1771. On the other hand, methodology review focuses more heavily on objective evidence of the pain involved in the challenged method. *See, e.g., Glass v. Louisiana*, 471 U.S. at 1084, 105 S.Ct. at 2162 (Brennan, J., dissenting) (noting that "[f]irst and foremost" among the "objective factors by which courts should evaluate the constitutionality of a challenged method of punishment" is whether the method involves " 'the unnecessary and wanton infliction of pain.' " (Citation omitted.))[11] The number of states using hanging is evidence of public perception, but sheds no light on the actual pain that may or may not attend the practice. We cannot conclude that judicial hanging is incompatible with evolving standards of decency simply because few states continue the practice.[12]

---

10. *Coker* held that the death penalty was disproportionate to the crime of rape. 433 U.S. at 592, 97 S.Ct. at 2866. *Enmund* held that the penalty was disproportionate to the crime of aiding and abetting a robbery resulting in murder. 458 U.S. at 797, 102 S.Ct. at 3376.

11. *Cf. Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925 (consideration of the excessiveness of a form of punishment has two aspects: "First, the punishment must not involve the unnecessary and wanton infliction of pain. Second, the punishment

must not be grossly out of proportion to the severity of the crime." (Citations omitted.)); *see also Weems v. United States*, 217 U.S. 349, 373–74, 30 S.Ct. 544, 551–52, 54 L.Ed. 793 (1910).

12. Another line of cases addresses evolving standards of decency in the context of prison conditions and prisoners' medical needs. *Estelle v. Gamble*, 429 U.S. 97, 102–06, 97 S.Ct. 285, 290–92, 50 L.Ed.2d 251 (1976) (holding that deliberate indifference to prisoners' medical needs is cruel and unusual punishment); *Hoptowit v. Ray*,

 We do not consider hanging to be cruel and unusual simply because it causes death, or because there may be some pain associated with death. "Punishments are cruel when they involve torture or a lingering death...." *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890). As used in the Constitution, "cruel" implies "something inhuman and barbarous, something more than the mere extinguishment of life." *Id.* "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." *Resweber*, 329 U.S. at 464, 67 S.Ct. at 376. Campbell is entitled to an execution free only of "the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (plurality opinion).

Campbell does not argue that the punishment of death is disproportional to the crimes of which he was convicted. Our focus is therefore on whether the method of execution involves the unnecessary and wanton infliction of pain. We hold that it does not.

### (2)

Death by hanging occurs when a ligature encircling the neck is tightened by the weight of the body. Pathologists distinguish between four types of hangings: accidental, suicidal, homicidal, and judicial. Suicides account for the vast majority of hangings, but they do not generally employ the same methods as are used in judicial hanging.

Washington conducts judicial hanging according to Field Instruction WSP 410.500 (hereafter "Field Instruction"), a detailed methodology derived from U.S. Army Regulation No. 633–15, Procedure for Military Executions (1959). Under the Washington protocol, the rope must be between three-quarters and one-and-one-quarter inches in diameter. Field Instruction at ¶ VI.G.3.a(3)(d). The rope is boiled and then stretched to eliminate most of its elasticity. *Id.* The rope is then coated with wax or oil so that it will slide easily. *Id.* The Instruction provides a diagram for knotting the rope properly. *Id.* (Attachment B.)

Washington employs a "long-drop" method of hanging, in which the condemned is dropped a particular distance based on the prisoner's weight. The Instruction provides a chart for determining the distance of the drop. Field Instruction at ¶ VI.G.3.a(2). The purpose of the drop, as set out in more detail below, is to ensure that forces to the neck structures are optimized to cause rapid unconsciousness and death.

The district court heard live and deposition testimony from several pathologists and other witnesses with specific knowledge of hangings, judicial and otherwise. The testimony focused on several issues, including the mechanisms causing unconsciousness and death in a judicial hanging; the effect of various factors, including the length of the drop, the elasticity of the rope, and the placement of the knot; the risks of death by asphyxiation and decapitation, as opposed to death by injury to vascular, spinal, and nervous functions; and the execution of Westley Allan Dodd, which was conducted according to the Washington protocol.

The testifying pathologists described various mechanisms involved in death by judicial hanging. These include: (1) occlusion of the carotid arteries, (2) occlusion of the vertebral arteries, (3) occlusion of the jugular veins, (4) reflexive cardiac arrest, (5) occlusion of the airway, (6) tearing, transection, trauma, or shock to the spinal cord, (7) fracture or separation of the cervical spinal column, (8) interruption of the odontoid process, and (9) irreversible brainstem damage. These various mechanisms can, and probably do, occur in concert; thus, there is no single "pathway" to death by judicial hanging. And as the re-

---

682 F.2d 1237 (9th Cir.1982) (holding that the deficiency of medical care in the Washington State Penitentiary reflected a deliberate indifference to the serious medical needs of prisoners, but that standards of care set by medical experts described an ideal level of care rather than a constitutional minimum level of care). The "deliberate indifference" standard is not directly applicable either to proportionality or to methodology questions. *See, Rhodes v. Chapman*, 452 U.S. 337, 346–47, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (noting that a conclusion of deliberate indifference rests on a different factual determination from that of proportionality).

search of one of the testifying pathologists indicates, the legendary "hangman's fracture" is one of the less common routes to unconsciousness and death.[13]

The evidence demonstrates that, in general, interruption of vascular, spinal, or nervous functions by the mechanisms listed above results in rapid unconsciousness and death. For example, Dr. Donald Reay testified that occlusion of the carotid arteries alone causes a loss of consciousness within six to ten seconds.[14] Similarly, Dr. Ross Zumwalt testified that a severe trauma to the upper spinal cord would cause an instantaneous loss of consciousness and very rapid loss of life. On the other hand, if the sole pathway involved is occlusion of the airway, consciousness may persist for over a minute. Dr. Deryk ("Ryk") James testified that unconsciousness solely due to asphyxiation would take between a minute and a minute-and-a-half, but no longer than two minutes.

Although there is no way to predict with a high degree of accuracy which of the various mechanisms will contribute to unconsciousness and death in any given hanging, there are methods of increasing the likelihood that unconsciousness will be rapid and death comparatively painless. Chief among these is the length of the drop.

Judicial hanging did not always involve a drop. As Dr. James testified, the Anglo–Normans in the eleventh century placed a noose around the neck of the condemned, slung the other end of the rope over a beam, and hauled the person up. Later, executioners used ladders to reach the beam, and the condemned would be led up the ladder and then "turned off" it. The practice of dropping the condemned some distance did not develop until the late eighteenth century. At first, the drop was very short, no more than a foot or two. Executioners in England persisted with the short drop in the nineteenth century, while the Irish developed a long-drop method employing drops of up to seventeen feet. See generally Ryk James & Rachel Nasmyth–Jones, The Occurrence of Cervical Fractures in Victims of Judicial Hanging, 54 Forensic Science Int'l 81, 85–91 (1992). In the 1880s, the English studied the relative merits of the short and long drop, and concluded a long drop was more humane. See Report of the Committee Appointed to Inquire into the Execution of Capital Sentences (1886).

Appropriate drop distance is critical to conducting judicial hanging in the most humane way possible. If the drop is too short in relation to the weight of the prisoner, death is likely to result from the mechanism of airway occlusion; that is, the condemned will asphyxiate. If the drop is too long in relation to weight, death may result from decapitation. Between these two extremes, drop lengths are highly likely to cause death by some combination of vascular, spinal, and nervous mechanisms. This ensures that the condemned loses consciousness within a matter of a few seconds and dies rapidly thereafter. The Washington Field Instruction provides appropriate drop lengths based on weight to cause rapid unconsciousness and death.

A second important factor in bringing about a swift and painless death is the selection and treatment of the rope. Washington uses rope of a diameter between three-quarters and one-and-one-quarter inches. The evidence presented to the district court indicates that a very slender ligature is more prone to break the skin, increasing the chances of partial or complete decapitation.

---

13. Ryk James & Rachel Nasmyth–Jones, The Occurrence of Cervical Fractures in Victims of Judicial Hanging, 54 Forensic Science Int'l 81, 82 (1992). "Hangman's fracture" generally refers to a cervical dislocation or fracture of the second and third cervical vertebra, or separation of the odontoid process. Id. Drs. James and Nasmyth–Jones studied the remains of cervical spines of 34 criminals executed between 1882 and 1945 in Great Britain. They found fractures in six (19%) cases, four of which were crack-like fractures causing little displacement and perhaps no cord injury, and two of which involved separation of the odontoid process, which is more likely to cause cord injury.

14. Dr. Reay's findings are based on research involving the "carotid sleeper hold," in which the arteries are blocked by pressure from the arm and forearm of a person positioned behind the subject. Another witness, Dr. Boyd Stephens, testified that occlusion of the carotid arteries alone would probably cause a loss of consciousness within 15 to 30 seconds.

A thicker ligature is less likely to do so. More importantly, by treating the rope to reduce elasticity, the Washington protocol guarantees that the kinetic energy caused by the drop will be quickly transferred to and borne by the neck structures, rather than simply being absorbed by the rope. Finally, treating the surface of the rope to reduce surface friction allows the rope to slide easily and tighten about the neck. Several witnesses testified that applying pressure all the way around the neck was an important factor in causing rapid unconsciousness.[15]

A third factor bearing on whether unconsciousness and death are rapid and painless is the positioning of the knot. The Washington protocol specifies positioning the knot below the left ear. This subaural position ensures that energy from the drop is transferred to the spinal structures and that the carotid and vertebral arteries will likely be occluded. The evidence showed that placing the knot below the chin (submentally) would also transfer energy to the spinal structures.

Washington has conducted one judicial hanging according to the Field Instruction. On January 5, 1993, Washington executed Westley Allan Dodd. The district court heard extensive testimony related to the conduct of the execution and the mechanisms contributing to Dodd's death. At the State's request, Dr. William Brady witnessed Dodd's execution and pronounced Dodd's death. Dr. Brady testified that

> [w]hen Mr. Dodd's body dropped through the trap door there simply was no significant activity, there was no twisting, turning, no swinging. I carefully observed his chest and abdomen and I believe that there was one minimal effort at inspiration, breathing in, and following that, within several seconds, there may have been a small second inspiratory action.

Dr. Brady then watched Dodd's body for between 60 and 120 seconds. He then entered the execution chamber to approach the body and pronounce death. Dr. Reay performed an autopsy on Dodd. He concluded that the cause of Dodd's death was massive hemorrhaging occurring at the base of the brain from tears in the vertebral arteries, and the "energy wave which was delivered to the spinal cord, namely, spinal shock." Dr. Reay stated his opinion that Dodd became unconscious within a matter of seconds of being dropped.

### (3)

Campbell challenges several of the district court's evidentiary rulings. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Catabran*, 836 F.2d 453, 456 (9th Cir.1988).

The district court excluded several items of evidence offered by Campbell to show that judicial hangings have been "bungled" in the past, resulting in either decapitation or asphyxiation. Evidence excluded by the district court included (1) several photos of the 1901 New Mexico execution of "Black Jack" Ketchum, clearly showing that Ketchum was decapitated; (2) two newspaper accounts of the execution of Richard Quinn in 1910, stating that Quinn was asphyxiated and "pleaded pitifully with attendants to take him up and spring the drop again"; (3) the former testimony of the late Clinton Duffy, who, as warden of San Quentin prison in California, witnessed a judicial hanging which resulted in asphyxiation; and (4) a collection of research materials compiled by Watt Espy, Jr., detailing executions dating from the 1600s.

Federal Rule of Evidence 401 defines relevant evidence as that which tends to make the existence of a fact of consequence more or less probable than it would be without the evidence. Rule 403 permits the exclusion of relevant evidence on the grounds of prejudice, confusion of issues, misleading qualities, or delay. Having found that Washington relies on a specific protocol for judicial hanging, the district court excluded evidence that could not be reliably compared to Washington's method. The district court excluded evidence of hangings for which there was no

---

15. For example, as several of the pathologists testified, if pressure is applied to a single carotid artery, the other arteries will compensate for the loss of flow, and the person will not lose consciousness. Application of sufficient pressure to two or more of the arteries causes unconsciousness.

account of the weight of the prisoner, the length of the drop, and the width of the rope.

 Campbell argues that, for some of the "bungled" execution accounts he offered, certain information was available or could be deduced or estimated. For instance, the Ketchum photos permit a rough approximation of the length of the drop and perhaps the width of the rope. Such evidence could arguably have been admitted under Rule 401. The district court did not, however, abuse its discretion in excluding the evidence under Rule 403. The district court committed no error in concluding that its role under our remand order was to determine whether judicial hanging only as it is performed in Washington is cruel and unusual punishment. The district court was not required to consider evidence of hangings of marginal relation to hanging according to the Washington protocol. Even if we were persuaded that the evidence should have been admitted, we would find no prejudice here. The district court concluded that, even had it considered the proffered evidence, its ultimate findings would not have been changed.

Campbell argues that he should not be saddled with so difficult a burden of proof because there is an extreme paucity of evidence meeting the criteria established by the district court. He asserts that the limitations imposed by the district court leave him with a sample of one, the Dodd execution, with which to prove his case that hanging is unnecessarily painful. We do not agree. First, to the extent that Campbell argues that the State has destroyed or spoliated evidence, he misconstrues the record. The State's failure, until recently, to conduct autopsies of judicially hanged prisoners is neither the destruction nor the spoliation of evidence.[16] *See Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991) (destruction of

records cannot serve as basis for shifting burden of proof absent showing that the party was on notice of the records' potential relevance to litigation), *cert. denied*, ——— U.S. ———, 112 S.Ct. 1567, 118 L.Ed.2d 212 (1992). Campbell is not entitled on this basis to shift the burden of proof to the state officials. Second, Campbell could, and did, present evidence tending to undermine the state officials' argument that death by either asphyxiation or decapitation is all but impossible under the Washington protocol. That Washington has performed only one execution under its protocol left Campbell and the state officials on exactly the same footing with respect to proof of the method's effectiveness. We cannot say that Campbell was unfairly prejudiced by the district court's refusal to admit evidence of other judicial hangings.

 Campbell also argues that the district court erred in admitting Dr. Reay's testimony related to the "carotid sleeper hold." The "carotid sleeper hold" involves applying pressure to the carotid arteries by lodging the subject's neck between the upper arm and forearm of the person performing the hold. The airway is not occluded, because it is in the crook of the bent arm. The sleeper hold causes unconsciousness by occluding the carotid arteries. Campbell argues the testimony was irrelevant because the hold bears no resemblance to judicial hanging. The state officials did not argue, however, that the sleeper hold is akin to judicial hanging. The testimony demonstrated only how long a subject remains conscious when the carotid arteries are occluded. The district court did not abuse its discretion in admitting the testimony for this purpose.

 Campbell argues that the district court erred in excluding any evidence related

---

**16.** In this regard, Campbell's reliance on *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), is misplaced. That case involved an antitrust conspiracy which prevented plaintiffs from showing first-run films. Although no direct proof of damages was possible, the Court held that the jury could rely on circumstantial evidence of damages where the defendants' wrongs, by their nature, prevented precise proof of damages. As explained by the Court in *J. Truett Payne Co., Inc. v. Chrysler* *Motors Corp.*, 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981), accepting imprecise proof of damages is partly due to the nature of business damages, an issue obviously absent in this case. The exception is also premised on the plaintiff having established with other evidence that the defendant is a wrongdoer. *Bigelow* provides no basis for shifting the burden of proof or broadening the scope of admissible evidence simply because there is limited evidence to prove petitioner's theory.

to execution by lethal injection. The remand order under which the district court conducted the evidentiary hearing provided that the evidentiary hearing was to be limited to the issue of whether hanging is cruel and unusual punishment. The district court interpreted our remand order precisely as it was intended. The issue we address in response to Campbell's claim is whether judicial hanging according to the Washington protocol involves the unnecessary and wanton infliction of pain. The relative merits of lethal injection are irrelevant to this question.

### (4)

■ The district entered findings that judicial hanging conducted according to the Washington Field Instruction is not cruel and unusual punishment. The court found that the mechanisms involved in bringing about unconsciousness and death in judicial hanging occur extremely rapidly, that unconsciousness was likely to be immediate or within a matter of seconds, and that death would follow rapidly thereafter. The court found that the risk of death by decapitation was negligible, and that hanging according to the protocol does not involve lingering death, mutilation, or the unnecessary and wanton infliction of pain. We find no error in these findings. The evidence fully supports the district court's findings of fact.

Campbell charges that judicial hanging poses an unacceptable risk of causing death by either asphyxiation or decapitation. We reject this argument. Campbell failed to establish that the risk of either result is more than slight.[17] He has also failed to demonstrate that the presence of a slight risk of decapitation or asphyxiation renders judicial hanging unconstitutionally cruel. We reiterate that Campbell is not entitled to a painless execution, but only to one free of purposeful cruelty. *Resweber,* 329 U.S. at 464, 67 S.Ct. at 376. The risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review.

We hold that judicial hanging, as conducted under the Washington Field Instruction, does not involve the wanton and unnecessary infliction of pain, and therefore does not violate the Eighth Amendment.

### C

■ Campbell claims that his First and Eighth Amendment rights are violated by the statutory provision that allows him to elect death by lethal injection rather than by hanging. We reject both these claims.

Campbell's First Amendment challenge is premised on the Free Exercise Clause. He contends that his religious beliefs preclude him from participating at any level in his own execution, and that these beliefs are infringed upon by Wash.Rev.Code 10.95.180, which allows him to elect lethal injection and avoid death by judicial hanging.

We see no infringement upon Campbell's free exercise of his religious beliefs. We agree with Campbell that a statute providing for a choice between two methods of execution, one constitutional and the other unconstitutional, might place an impermissible burden on the free exercise of the asserted beliefs. *See Frazee v. Illinois Dep't of Employ. Security,* 489 U.S. 829, 832, 109 S.Ct. 1514, 1516, 103 L.Ed.2d 914 (1989). This is not, however, the situation here.

First, Campbell is not required to make any choice or to participate in the selection of the method to be employed in his execution. He may remain absolutely silent and refuse to participate in any election. The statute provides for imposition of the death penalty by hanging, and does not require him to choose the method of his execution. Second, as described above, we hold today that judicial hanging, as conducted according to the Washington protocol, is not an unconstitutional method of execution. The statute does not compel Campbell to compromise one constitutional right to avoid the infringement of another.

---

**17.** The expert testimony did not yield a reliable estimate of the risk of either decapitation or asphyxiation. We accept for purposes of this case that such a risk does exist. However, the evidence compels the conclusion that the risk has been minimized as much as possible through the adoption of the Field Instruction.

■ Campbell also argues that the statutory provision of an option for death by lethal injection constitutes cruel and unusual punishment. We need not, and do not, address whether lethal injection is a constitutional method of execution, as Campbell has consistently refused to exercise the option, and does not claim that lethal injection is unconstitutional. Campbell faces a heavy burden in attempting to show that the existence of an option related to his execution is cruel and unusual. *See Gregg,* 428 U.S. at 175, 96 S.Ct. at 2926. We cannot say the State descends to inhuman depths by allowing the condemned to exercise such an election. We believe that benefits to prisoners who may choose to exercise the option and who may feel relieved that they can elect lethal injection outweigh the emotional costs to those who find the mere existence of an option objectionable.

## VIII

■ Campbell claims in his petition that in Washington there is no person employed or retained by the State who is qualified to conduct a judicial hanging. He relies in part on Justice Dolliver's statement in *State v. Frampton,* 95 Wash.2d 469, 627 P.2d 922, 936 (1981), that "[i]t is uncontested that there are no trained hangers at the Washington State Penitentiary, nor are the prison authorities aware of any in the United States."

Washington's adoption of the Field Instruction renders the employment of a "trained hanger" unnecessary. The Field Instruction provides that

[t]he Superintendent will appoint and provide a briefing to those individuals as required to implement the Execution process. No individual will be required to participate in any part of the execution procedure.

Field Instruction ¶ VI.G.2.a. The Instruction provides for rehearsals of all phases of the execution, up to the springing of the door. Superintendent Tana Wood testified that the prison officials conducted many rehearsals of the Dodd execution. The state officials' reliance on the Field Instruction to perform judicial hanging obviates the need for employing a specific person trained to perform

the execution. We therefore reject Campbell's claim as moot.

## IX

When the clerk of this court shall issue the mandate in this case, the stay of execution pending appeal shall be of no further force and effect.

We affirm the district court's denial of Campbell's second petition for a writ of habeas corpus in its entirety.

AFFIRMED.

## APPENDIX A

AFTERNOON SESSION (October 21, 1982, 4:20 p.m.)

MR. MESTEL: Your honor, there is another matter. I don't know if you want to do this on the record or not, but, in an abundance of caution, I think probably we should.

My client would like to waive his presence at the jury selection and remain in Snohomish County. He is under a lot of stress and tension and he does not think it is necessary for him to attend the jury selection. He is willing to waive his presence in open court. He has fears, legitimate fears, as to the treatment he will receive from the custodial officers and inmates in Spokane and he would prefer to stay here and concentrate on the trial and his future.

THE COURT: This is preliminary. There is no point in addressing myself to Mr. Campbell's obtaining such a waiver if I won't allow it so I will hear from the prosecutor as to whether you think it is proper and appropriate. I would hear your comments and observations.

MR. ROCHE: I don't know if it is proper. I think it would have to be done in writing, I would imagine, to be considered proper in a death penalty case not to have the defendant there.

It sounds to me like . . . It seems to me that Mr. Campbell had expressed an interest throughout this trial in being here, no matter what was happening. It just strikes me as very . . . extremely odd at this point that now he says, at the most critical stage of this

case, the jury selection, where you are going to have 12 people who are going to decide whether he lives or dies, and he doesn't want any input into it.

As we have seen—I am concerned. We have seen so many games played by the defendant, I think it is just another game.

MR. MESTEL: The tendency—no matter what I request, the State just objects.

THE COURT: I'm not all that much surprised Mr. Mestel, as to their reaction. Admittedly, the things you've asked are unique and come as a surprise to anyone. Any time we are asking for anything out of the ordinary ... We do not like change and automatically resist change.

I see a number of reasons why, if he makes an intelligent waiver, I would not believe it could be the subject of appellate review. It shouldn't be regarded as reversible, I shouldn't think. Expense and manpower would be a consideration.

I grant you this is unique. It has not happened in my experience before. That, in and of itself, is no reason for me to automatically say no. Again, we've had a bombshell.

Let's do it this way. I will address myself to Mr. Campbell and satisfy myself that he knows what he is doing. I might want you to reduce it to writing, and the fact that I have done this doesn't necessarily mean I will allow it. But at least I will consider it over the evening and reflect on it and maybe sometime tomorrow I will give you ten minutes, if anybody can come up with any constitutional prohibition or something that would necessarily cause it to be the subject of appellate review or reversal.

The only thing I would ask you to keep in mind is that the State frequently tries many people in absentia who are ungovernable, and if the jury came in and he was ungovernable, that would be conduct for which he would be removed from the proceedings. I suppose that might be considered an invitation to be ungovernable and get sent back.

EXAMINATION BY THE COURT

Q Mr. Campbell, your attorney has said that you would prefer to remain in Snohomish County while we are selecting a jury in Spokane County. Is that Right [sic]?

A Yes, it is.

Q Are you fully aware of the fact that you do have a right to be present while a jury is selected?

A I do.

Q I would assume it might be a constitutional right, and if my memory is correct, unless leave is granted by the court rules, the defendant must be present at all stages of the proceedings, unless he voluntarily absents himself or—generally, along those lines.

You do have a right to be present while a jury is being selected.

A I understand that.

Q And if you stay here and a jury is picked over there, you won't be present to hear the questions your attorney asks of the jurors. You may hear those questions later and you may be of the opinion that you wished they had asked other questions. You will not be present to supply them with questions.

Do you understand that?

A Yes, I do.

Q You may look at the jurors and say, "Those aren't the type of jurors I would have wanted my lawyers to pick if I had been there."

You would waive any right to have any input whatsoever in the jury selection process, other than what you can tell your attorneys ahead of time. Are you aware of that?

A Yes, I am.

Q And you are willing to submit the issues in this case, which may well be your guilt or innocence and may be your life or your death, to 12 people who you have no choice in selecting and no part in selecting with—were not even present while they were selected?

A Yes.

Q You are still willing to waive your right to be present during the selection of the jurors?

A I am.

THE COURT: Mr. Roche, again, I have not made a decision, but are there any questions you feel I should put to Mr. Campbell?

MR. ROCHE: I can't think of any other questions. I still think the defense is setting another trap in this case.

THE COURT: That is one of the things I want to think about over the evening and I will give you an opportunity to think about it also.

MR. CAMPBELL: Your Honor, I answered your questions and I would like to speak my own reasons as to why I want this. I've a lot of confidence ...

MR. MESTEL: Fine with me.

MR. CAMPBELL: I have a lot of confidence in Mr. Mestel and Mr. Savage going over there. They do that for a living. I am trying to prepare myself for my part in the trial and I am trying to relax and get my head together.

What I am doing ... I feel like going to Spokane will be a real inconvenience. It's going to be a long ride. I will be cut off from things over here. I will spend all day in court, going through that kind of stuff. My time will be limited and I will not be able to prepare things I am working on right now. It is my decision to stay here in Snohomish County so that I can accomplish that.

THE COURT: You mentioned something I had not thought of. While they are in Spokane and they are selecting a jury, you would be somewhat cut off from your attorneys. You wouldn't be with them all day or see them at night. I don't know how long jury selection may be. It may be a week, it may be longer, or it may be shorter. You would have limited contact with your attorneys during that period of time.

MR. CAMPBELL: I understand what you're saying. What I am talking about, I wouldn't have the opportunity that I need to be preparing myself in a relaxed atmosphere.

THE COURT: I won't argue with you. I wanted you to understand that if they are over selecting a jury, you will have less contact with your attorneys than you would if you were also over there in the process of jury selection.

MR. CAMPBELL: I understand that.

THE COURT: YOu [sic] still prefer to stay here?

MR. CAMPBELL: I do.

THE COURT: If you will prepare something in writing, I will sign it. You might as well do that, anyhow, Mr. Mestel, and then I will sign that tomorrow sometime.

MORNING SESSION (October 22, 1982, 9:30 a.m.)

THE COURT: Once again, the State of Washington vs. Campbell. The record should reflect Mr. Campbell is present in court, along with his attorney, Mark Mestel, and Jim Roche, here on behalf of the State.

The primary purpose of this hearing this morning is to determine whether or not Mr. Campbell's request to waive his presence during jury selection will be granted. I've one additional question I'd like to put to Mr. Campbell because the thought had occurred to me over the evening.

Mr. Campbell, one other question. It is difficult for me to say that your waiver of right to appear during jury selection is an irrevocable waiver. I don't know whether it is or not. I don't know how an appellate court might treat that, but, in any event, if we get over there Monday and we start on jury selection and you change your mind, as a purely practical matter, it would be difficult, if not impossible, to arrange to have you brought over to sit through the rest of the process. So I think that, as a practical matter, if I approve this waiver, it probably is irrevocable and you wouldn't be allowed to change your mind.

Do you appreciate that?

MR. CAMPBELL: Yeah, I do.

THE COURT: Are you still willing to waive your right to appear, knowing if you want to change your mind, probably nothing could be done about it?

MR. CAMPBELL: I am.

MR. ROCHE: Your Honor, one practical consideration. One of the first things the Court always does in a trial is introduce the parties and counsel and ask the jury if they know any of these people. How will we get by that?

THE COURT: The same way we do in every instance: While we introduce, we do so because they are present. We also read off a list of witness names who are not present, and I suppose we'd follow the same practice with respect to an absent defendant. I have personally never presided over a trial where a defendant was tried in absentia. I have heard they have occurred in Snohomish County. At that point in time, the inquiry must be made of the jurors: "Do you know the defendant by name and identification?" I suppose we follow the same procedure.

MR. ROCHE: The problem with that, it is conceivable, although extremely unlikely, there could be a potential juror who might know Mr. Campbell by face, but not by name.

THE COURT: I presume there are photographs available, fairly recent.

MR. ROCHE: Yes, Your Honor. In addition, Mr. Campbell was in the reformatory for six years and since 1976 has never been east of the mountains. I would think it highly unlikely people in Spokane personally would be acquainted with him. Certainly, something we'd be interested in knowing.

THE COURT: It might be appropriate to each individual juror, ask them to observe a photograph and see.

I would assume we always run that risk with respect to witnesses and with respect to defendants. A person could be selected to sit on a jury and say: "I do not know Mr. Campbell," and someplace during the trial, say, it suddenly occurs they did know him ten years ago, but he's changed so much they have forgotten. I have had that happen with witnesses, not defendants.

I realize it is a problem, but I think it is not insurmountable and I think there is good cause to honor Mr. Campbell's request. As indicated, he has things he feels are more important to do in preparing for his trial than to sit through jury selection. He has good cause. I believe it is justified by the expense and difficulty and security means that would have to be taken to afford us to transport him and the security during the course of jury selection in a foreign county.

I will accept Mr. Campbell's waiver of his right to appear for any jury selection.

MR. CAMPBELL: Thank you, your Honor.

MR. ROCHE: Your Honor, we don't think the written waiver Mr. Mestel just handed me is sufficient in this case. We would ask— the only issue I can think of that's going to be raised is ineffective assistance of counsel, although I can see—since Court Rule 3.4 clearly states the defendant shall be present at all times, including the impanelling of the jury, which I think is absolutely essential in a death penalty case, but he will certainly— after Mr. Mestel and Mr. Savage leave the case, which will be at the end of the trial, his new attorneys will be scouring the record to see if Mr. Mestel and Mr. Savage are incompetent. This gives them a classic issue to bring up on appeal for ineffective assistance of counsel, among other things.

We'd ask Mr. Campbell personally waive in writing all future objections to be raised as to competency of counsel. It's happened already. The defense asked for things, then assigned error to it, and it's going to happen again.

MR. MESTEL: Your Honor, I thought this was fairly comprehensive. He is precluded from challenging anything about the jury selection. I will have him write on it, if you want.

THE COURT: Mr. Campbell, did you hear Mr. Roche's remarks?

MR. CAMPBELL: Yes, I did.

THE COURT: Do you understand what he is saying?

MR. CAMPBELL: Yes, I do.

THE COURT: He is suggesting that if, at a later time, you are represented by other counsel—even during the course of the trial, or, on appeal, you might have new counsel

that might be asserting on your behalf that Mr. Mestel and Mr. Savage were incompetent in allowing you to execute such a waiver. Are you willing to waive any claim of incompetency of counsel as result [sic] of this waiver?

MR. CAMPBELL: Specifically, for waiver?

THE COURT: Yes, specifically for waiver.

MR. CAMPBELL: Nothing past jury selection or anything like that; right?

THE COURT: With respect to your non-appearance at the jury selection process.

MR. CAMPBELL: Yeah, I will waive it.

MR. ROCHE: I'd still rather see it in writing.

THE COURT: I don't think that's necessary.

REINHARDT, Circuit Judge, with whom Circuit Judges BROWNING, TANG, and D.W. NELSON join, concurring and dissenting:

## Table of Contents

| | | |
|---|---|---|
| *Overview* | | 692 |
| I. | *Evolving Standards of Decency* | 695 |
| | A. *Legal Standards* | 695 |
| | 1. *General Principles* | 695 |
| | 2. *Specific Factors* | 696 |
| | B. *The Objective Evidence That Society Has Rejected Hanging* | 697 |
| | C. *The Inconsistency of Hanging with Human Dignity* | 700 |
| | D. *The Majority's Evisceration of the Eighth Amendment* | 703 |
| | (1) *The Absence of Any Rational Basis for the Majority's Approach* | 703 |
| | (2) *The Majority's Deliberate Disregard of Precedent* | 706 |
| | (3) *The Pernicious Consequences of the Majority's Rule* | 708 |
| | E. *Summary* | 708 |
| II. | *Unnecessary and Wanton Pain* | 708 |
| | A. *Legal Standards* | 709 |
| | B. *Analysis* | 711 |
| | 1. *The Compelling Evidence Regarding the Existence of Pain* | 712 |
| | 2. *The Lack of Probativeness of the Washington Protocol* | 714 |
| | 3. *The District Court's Perverse Refusal to Consider Evidence Regarding Alternative Methods of Execution* | 715 |
| III. | *Conclusion* | 716 |
| *Appendix A* | | 717 |
| *Appendix B* | | 726 |

### Overview

"The present mode of executing criminals by hanging has come down to us from the dark ages, and it may well be questioned whether the science of the present day cannot provide a means for taking the life of such as are condemned to die in a less barbarous manner."

These are words one might expect from someone who believes that hanging no longer comports with the standards of decency of the late 20th Century. Yet they were written not in 1994, but more than a century ago, in 1885. They come from David B. Hill, then the Governor of New York. Governor Hill did not seek to abolish capital punishment, only to have the state employ a less medieval means for the taking of human life.[1]

Over a century ago, enlightened individuals—even those who supported capital punishment—became concerned that hanging was a "barbarous" practice that was incompatible with then-contemporary standards of decency. Since that time, our standards of

---

1. *In re Kemmler,* 136 U.S. 436, 444, 10 S.Ct. 930, 932, 34 L.Ed. 519 (1890) (quoting the annual message of the governor of New York, dated January 6, 1885).

decency have evolved significantly. With respect to the concept of judicial hanging, they have evolved exponentially. Because new and less brutal methods of execution, such as lethal injection, have been developed, and evidence has mounted regarding the risks of pain and mutilation inherent in hanging, all but two state legislatures, both in the Ninth Circuit, have rejected hanging as a method of carrying out the death penalty. Inexplicably, the majority ignores all of these developments and concludes that hanging is acceptable in present-day American society—simply because, in the majority's view, hanging does not cause "unnecessary pain." I think it indisputable that the continued use of hanging is incompatible with society's evolving standards of decency. Moreover, although we need not reach the question, I think it equally clear that hanging inflicts unnecessary pain, both physical and emotional, on those condemned to die. Accordingly, I dissent from part VII–B of the majority opinion, in which the majority reaches the remarkable conclusion that, in *Anno Domini*

1994, in the United States of America, judicial hanging is constitutional.[2]

There are three main faults in the majority opinion. First, the majority drastically curtails the scope and meaning of the Cruel and Unusual Punishments Clause of the United States Constitution. My colleagues hold that barbaric and savage forms of punishment are not prohibited by the Eighth Amendment, except in cases in which the use of such techniques results in the needless infliction of pain. Until today, we have applied the Supreme Court's traditional standard (as we are bound to do) and have struck down methods of punishment *either* if they were contrary to society's evolving standards of decency *or* if they inflicted unnecessary pain. With one exception,[3] the Supreme Court has, expressly or implicitly, applied *both* elements of this standard in every cruel and unusual punishment case it has decided in recent years, as have we. However, today's majority, determined to avoid the holding that follows inexorably from the fact that contemporary society has overwhelmingly rejected hanging, refuses to apply the established

2. I also dissent from part VIII of the majority opinion, which concludes that a "trained hanger" is unnecessary. I agree, however, with the analysis in the rest of the majority opinion, with two exceptions. First, I do not reach the issue addressed in part VII–C of the majority opinion. Because I conclude that this case involves "a choice between two methods of execution, one [assumed to be] constitutional and the other unconstitutional," *ante* at 687, I need not reach the more difficult question of whether a statute requiring a defendant to choose between two *constitutional* means of execution would violate the First or Eighth Amendments.

Second, I dissent from part IV–B of the majority's opinion. In that part, the majority decides an issue that was neither briefed nor argued before the en banc court, although Campbell sought to file a supplemental brief on the point, and his request was denied. Part IV–B holds that Campbell is barred from raising his vagueness challenge to the sentencing procedures set forth in Wash.Rev.Code § 10.95.060(4) because he had raised that issue in an earlier petition. However, a review of the previous briefs indicates that Campbell did not raise this claim in his prior petition. Instead, he raised a challenge to a completely different statutory provision, Wash.Rev.Code § 10.95.070. These two challenges to separate statutory elements of Washington's capital sentencing procedure cannot be

considered the same "grounds" for relief. Because (1) the en banc court chooses to address the issue *sua sponte,* (2) the panel did not reach the merits of the claim, and (3) the panel erroneously found that a procedural bar existed, I would remand this issue to the panel for resolution on the merits. I note, for the record, that Campbell's claim seems far from frivolous—the instructions he challenges appear similar to those the Supreme Court invalidated in *Stringer v. Black,* —— U.S. ——, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

3. On one occasion, in *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), the Supreme Court stated that only the "unnecessary and wanton pain" standard applies in challenges brought by prisoners after incarceration. However, the Court has announced a contrary rule in prison cases decided both before and after *Albers. See Hudson v. McMillian,* —— U.S. ——, ——, 112 S.Ct. 995, 1001, 117 L.Ed.2d 156 (1992); *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (both prison cases stating that a punishment will violate the Cruel and Unusual Punishments Clause *either* if it inflicts unnecessary pain *or* if it is inconsistent with our evolving standards of decency). Hereafter, I will not mention the aberrant and short-lived *Whitley* statement each time I reiterate the otherwise uniform practice.

test. In the process, it removes nearly all judicial barriers to savage and barbaric punishments in the class of cases that lies at the core of the Eighth Amendment—method of punishment cases. To hold, as the majority does, that we review methods of punishment *only* to determine whether they inflict unnecessary *pain*, and that we do not look to *any* other factors to determine whether particular forms of punishment are acceptable to our civilized society, is to ignore not only all judicial precedents but also the very roots of the Eighth Amendment. Under the majority's unprecedented "rule," even the most inhumane forms of mutilation and savagery would be permissible, so long as they inflict no more pain than necessary.[4]

Second, the majority upholds the district court's finding that hanging involves no unnecessary pain, even though the district court had absolutely no basis for determining whether the risks of pain inherent in hanging are necessary or not. It is undeniable that every hanging involves at least some risk that the prisoner will die a slow, painful, tortuous death. Campbell offered evidence that would have shown that lethal injection entails substantially less risk of pain than does hanging. The district court refused to admit this evidence because it believed that it should consider only the risks that inhere in hanging, and not those inherent in other procedures. Yet one of the ultimate issues before the district court—and the issue on which the majority focuses exclusively—was whether hanging entails any · *unnecessary* risk of pain. It is logically impossible to consider whether the risks inherent in hanging are *necessary* without considering whether alternative methods of execution—such as lethal injection—obviate those risks. Because the district court prevented Campbell from introducing any evidence that would have permitted it to make a comparative inquiry, it erred as a matter of law.

Finally, the majority improperly concludes that the district court did not clearly err when it found that the Washington state hanging protocol has eliminated virtually all risk of pain and decapitation. Tellingly, the majority merely reiterates without analysis the portion of the testimony least harmful to its conclusion. Read in context, however, the testimony as a whole clearly showed that although in the majority of hangings death is relatively painless, each time an individual is to be hanged there is a significant risk of decapitation or of a slow, lingering, and painful death. It also showed that the Washington state protocol—on which the district court and the majority rely so heavily—consists solely of a 12–page typed set of prison regulations, less than three pages of which have anything to do with the mechanics of the actual hanging. The crucial parts of this protocol were simply copied without any medical advice or consultation from a 1959 military execution manual that had *never* been used in an actual hanging, even though the Washington state officials had no idea how the procedure set forth in the manual had been developed. The expert testimony made clear that this protocol was in fact not very different from hanging procedures

---

4. To be sure, the majority obfuscates its actions by referring approvingly to the standards that established precedent make applicable in Eighth Amendment cases. However, even the most cursory reading of its "analysis" reveals that the majority flatly refuses to apply all relevant factors other than unnecessary pain. The majority's entire ratio decidendi is contained in six sentences in its opinion. First, the majority concludes that the fact that the overwhelming number of state legislatures have rejected hanging is of little consequence because it "sheds no light on the actual pain that may or may not attend the practice." *Ante* at 682. The opinion then states that "Campbell is entitled to an execution free only of 'the unnecessary and wanton infliction of pain.'" *Ante* at 683 (citation omitted). The majority then completes its legal analysis by saying: "Campbell does not argue that the punishment of death is disproportional to the crimes of which he was convicted. Our focus is therefore on whether the method of execution involves the unnecessary and wanton infliction of pain. We hold that it does not." *Id.* There is no further mention of any of the other Eighth Amendment factors in the opinion. The next 11 pages of the 16 page section dealing with the hanging issue are devoted exclusively to the subject of unnecessary pain. Part VII–B then concludes as follows: "We hold that judicial hanging, as conducted under the Washington Field Instruction, does not involve the wanton and unnecessary infliction of pain, and therefore does not violate the Eighth Amendment." *Ante* at 687.

which had caused severe pain, lingering deaths, and mutilation in the past, and that these results would likely continue to occur in a number of cases under the Washington procedures. The district court's findings to the contrary are clearly erroneous.

As a result of today's decision, the Ninth Circuit stands alone among the federal courts in approving a savage and barbaric practice universally rejected in the rest of our nation. More than that, the majority does incalculable damage to the Eighth Amendment. Surely, this decision cannot be allowed to stand.

## I. Evolving Standards of Decency

### A. Legal Standards

#### 1. General Principles

The issue of what methods of punishment are unconstitutional is one that lies at the heart of the Eighth Amendment. That amendment was specifically designed to prohibit forms of punishment that were "cruel and unusual." Its purpose was to bar the imposition of savage and barbaric punishments on convicted felons and to ensure that punitive actions taken by the state were consistent with the standards of a civilized society. Thus, at the time of its adoption, the Eighth Amendment barred such punishments as embowelling alive, beheading, and quartering; public dissection; and burning alive. See Wilkerson, 99 U.S. at 135.

Since the Eighth Amendment was ratified, its reach has been expanded in two ways. First, the Supreme Court has recognized that the protections of the Eighth Amendment are "not static" and that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). The Court recognized as early as 1910 that the Cruel and Unusual Punishments Clause's prohibitions are not limited to those methods of punishment that were considered cruel or unusual at the time the Bill of Rights was adopted. See Weems v. United States, 217 U.S. 349, 372–73, 30 S.Ct. 544, 551, 54 L.Ed.

793 (1910). The Framers understood that our society's mores would evolve, and that some methods which had once been widely employed would become unacceptable to society, just as the torturous and barbaric punishments of the Stuarts had become unacceptable by the Framers' own time. See id. at 372, 30 S.Ct. at 551. They therefore framed a prohibition on cruel and unusual punishments which is dynamic and "progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." Id. at 378, 30 S.Ct. at 553.

Second, the Court has expanded the amendment's coverage beyond its prohibition on barbarous methods of punishment, to encompass such protections as a guarantee that penalties will be proportionate to the offenses for which they are imposed, see, e.g., Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), and a safeguard against inhumane conditions of confinement, including inadequate medical care. See, e.g., Helling v. McKinney, —— U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Despite these developments, the fundamental purpose of the Eighth Amendment has not changed: the question we face today—whether a particular method of punishment is uncivilized and barbaric—involves the core prohibition embodied in the Eighth Amendment.

As the Court made clear in Trop, a punishment that is incompatible with our evolving standards of decency violates the Cruel and Unusual Punishments Clause. In addition, a punishment violates the Clause if it involves "the unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, Stevens, JJ.). "[P]unishments 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or 'involv[ing] the unnecessary and wanton infliction of pain' are 'repugnant to the Eighth Amendment.'" Hudson v. McMillian, —— U.S. ——, ——, 112 S.Ct. 995, 1001, 117 L.Ed.2d 156 (1992) (emphasis added) (quoting Estelle v. Gamble, 429 U.S. 97, 102–03, 97 S.Ct. 285,

290, 50 L.Ed.2d 251 (1976)). We recognized both of these aspects to the Eighth Amendment inquiry in *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir.1985). The analysis set forth in these cases has been applied, expressly or implicitly, in every Eighth Amendment case in recent years.

As is often the case in contemporary jurisprudence, the two-part analysis that the Supreme Court reiterated in *Hudson*, and that we followed in *Haygood*, is somewhat artificial. In any Eighth Amendment case, our ultimate inquiry is *always* whether the punishment is consistent with evolving standards of decency. *See, e.g., Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925 (opinion of Stewart, Powell, Stevens, JJ.). The unnecessary infliction of pain is merely one way in which a punishment can violate these standards. However, because unnecessary infliction of pain is the most common and most readily measurable example of inconsistency with our evolving standards of decency, the cases frequently treat it as a separate form of violation.[5] Thus, if the court decides that a punishment is unnecessarily painful, it will ordinarily hold that a violation of the Eighth Amendment has occurred and will not go on to consider whether the punishment is otherwise inconsistent with our standards of decency. Similarly, if the court concludes that the punishment has been rejected by society·as savage and barbaric, it will not be necessary for it to consider whether it inflicts unnecessary pain. There is, however, no prescribed order to our analysis. We can start with either inquiry. Here, because the case involves a "core" Eighth Amendment issue, it seems more or-

derly to start with the more fundamental question. Accordingly, in part I, I discuss hanging's more general incompatibility with evolving standards of decency, and in part II, (while it is unnecessary to reach the point) I consider whether hanging involves the unnecessary and wanton infliction of pain.

2. *Specific Factors*

In determining whether a punishment is incompatible with our evolving standards of decency, a court may look to a number of factors. First and primarily, however, "we look to objective indicia that reflect the public attitude toward a given sanction." *Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925 (opinion of Stewart, Powell, Stevens, JJ.). The most important objective evidence consists of the statutes adopted by society's elected representatives. *See Stanford v. Kentucky*, 492 U.S. 361, 367–70, 109 S.Ct. 2969, 2974–75, 106 L.Ed.2d 306 (1989). Where state legislatures have reached a sufficient "degree of national consensus" in rejecting a particular punishment, *id.* at 370–71, at 2975–76, that punishment is unconstitutional and our inquiry may end. Although neither the Supreme Court nor this court has ever made explicit just how much of a consensus is sufficient, it is clear that at some point the state legislative trend will become so compelling that we cannot ignore it. To be sure, "it is for us ultimately to judge" whether the Eighth Amendment prohibits a given punishment. *Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982). However, once a punishment has been rejected as unacceptable by a sufficiently large number of state legislatures, we can no long-

---

5. Courts have also developed various specialized doctrines under the Eighth Amendment, such as the "deliberate indifference" standard that applies in some prison cases, *see Gamble*, 429 U.S. at 104, 97 S.Ct. at 291, the proportionality standards that govern inquiries into the appropriateness of a punishment to a particular crime, *see Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982), and the rule that capital sentencing procedures must reliably differentiate those who receive the death sentence from those who do not, *see Stringer v. Black*, —— U.S. ——, ——–——, 112 S.Ct. 1130, 1135–41, 117 L.Ed.2d 367 (1992). They have recognized, however, that all of these specialized doctrines are merely specific applications of the

ultimate question in *all* Eighth Amendment cases—whether the government action is consistent with our "evolving standards of decency." *See Gamble*, 429 U.S. at 102–03, 97 S.Ct. at 290; *Enmund*, 458 U.S. at 794, 102 S.Ct. at 3375; *Mills v. Maryland*, 486 U.S. 367, 383–84, 108 S.Ct. 1860, 1870, · 100 L.Ed.2d 384 (1988) ("Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case."); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982) (holding that the determination of whether prison conditions caused "unnecessary and wanton" pain was bound by "what the general public would consider decent").

er say that it is consistent with our society's standards of decency, regardless of what our view would be in the absence of such clear legislative action. *See, e.g., Coker v. Georgia,* 433 U.S. 584, 593–96, 97 S.Ct. 2861, 2866–68, 53 L.Ed.2d 982 (1977) (plurality opinion)· (striking down Georgia's death penalty for rape of an adult woman, largely because Georgia was the only state that imposed the death penalty for rape of an adult, and one of only three states that imposed the death penalty for any rape); *cf. Ford v. Wainwright,* 477 U.S. 399, 408–10, 416–18, 106 S.Ct. 2595, 2601–02, 2605–06, 91 L.Ed.2d 335 (1986) (relying on the fact that "no State in the Union permits the execution of the insane" in holding that the Eighth Amendment prohibits a state from executing an insane prisoner and that the state must provide an adequate hearing on the issue of sanity).

Where the legislatures have failed to reach this kind of general agreement that a punishment should be repudiated, however, we must inquire further. In such circumstances, as the Supreme Court has made clear, "legislative judgments alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power." *Gregg,* 428 U.S. at 174 n. 19, 96 S.Ct. at 2925 n. 19 (opinion of Stewart, Powell, Stevens, JJ.). In the absence of a clear and unequivocal legislative repudiation of a punishment, we must look to other objective indicia of public attitudes and to other objective factors. Among the latter are whether the punishment involves mutilation or dismemberment, whether it is historically associated with repression or tyranny, and whether it may fairly be characterized as dehumanizing or degrading. In short, we must ask whether the punishment "comports with the basic concept of human dignity at the core of the Amendment." *Id.* at 182, 96 S.Ct. at 2929. We answer this question not only by reviewing all of the pertinent judicial decisions but also by employing the tools of philosophy, religion, logic, and history, in an effort to obtain a full understanding of the nature of a civilized· society. While judges may not substitute their own judgment for that of the legislature, they are particularly well-equipped, by virtue of training, education, experience, and the characteristics which brought them to the bench, to apply these techniques to the type of issue before us. Moreover, by virtue of life tenure, federal judges may do so free of political pressures or· other extraneous considerations.

B. *The Objective Evidence That Society Has Rejected Hanging*

By any objective measure, hanging has been rejected by present-day society. This country has experienced far more than a "trend" toward abolition. Abolition is almost complete. In fact, it *is* complete, everywhere but in the northwestern corridor of the Ninth Circuit. Before the turn of the century, hanging was the "nearly universal form of execution." *State v. Frampton,* 95 Wash.2d 469, 627 P.2d 922, 934 (1981). Indeed, 48 states used to hang persons convicted of capital offenses.[6] In this century, however, hanging has been abandoned virtually everywhere, as states have sought less gruesome and torturous methods of execution. *See Furman v. Georgia,* 408 U.S. 238, 296–97 & n. 50, 92 S.Ct. 2726, 2755–56 & n. 50, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring) (stating that, as of 1972, eight states still employed hanging, while the remaining death penalty states had switched to "the supposedly more humane methods" of electrocution and lethal gas); *Frampton,* 627 P.2d at 934 (stating that, as of 1981, only four jurisdictions in the English-speaking world employed hanging: Washington, Montana, Delaware, and South Africa). Since 1853, 46 states have turned away from hanging. Fully 39 states abandoned hanging in favor of another, assertedly more humane method of execution, and an additional seven abolished the death penalty at a time when hanging was the method they employed.[7] Even the

---

**6.** Two states—Alaska and Hawaii—have not employed *any* form of capital punishment since their admission to the Union.

**7.** Appendix B sets forth the year in which each of the 46 states abandoned hanging, and the legisla-

tion by which they did so. Appendix B also includes legislative and judicial statements as well as other material which makes clear that the states abandoned hanging precisely because they considered it to be inhumane.

United States Army—on whose protocol the state so heavily relies—abandoned that form of punishment in 1986, as did the other military services; and in that same year the last two states outside the Ninth Circuit eliminated the practice and substituted lethal injection. At present, therefore, only *two states*, Washington and Montana, both in the Ninth Circuit, retain hanging as a form of execution. As a result of today's decision, only the Ninth Circuit still finds this abominable practice constitutional.[8]

No federal case has ever upheld a mode of punishment which has been as widely rejected as has hanging. Indeed, the Supreme Court has concluded that society has rejected punishments even where the objective evidence has been far less compelling than it is here. In *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), for example, the Court held that it was unconstitutional to impose the death penalty for vicarious felony murder. In reaching this conclusion, Justice White's opinion for the Court relied heavily on the fact that "only about a third of American jurisdictions would ever permit a defendant who somehow participated in a robbery where a murder occurred to be sentenced to die." *Id.* at 792, 102 S.Ct. at 3374. In particular, only *eight* states authorized the death penalty *solely* for participating in a felony in which a person was killed. *See generally id.* at 789–93, 102 S.Ct. at 3372–74. Largely because of this and other evidence of "[s]ociety's rejection of the death penalty for accomplice liability in felony murders," *id.* at 794, 102 S.Ct. at 3375, the Supreme Court concluded that imposition of the death penalty in such circumstances would violate the Eighth Amendment.

Similarly, in *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702

(1988), the Supreme Court held that the Eighth Amendment prohibited executions for crimes committed by children under 16 years of age. Even though 15–year–olds were eligible for the death penalty in the 19 death penalty states which had no minimum age, the plurality found that society had rejected the death penalty for such young children. The plurality looked to the 18 states which had adopted minimum age requirements for the death penalty, and relied on the fact that all 18 required the defendant to have been at least 16 years old at the time of the offense. *See id.* at 826–29, 108 S.Ct. at 2694–96 (plurality opinion). In her concurrence, Justice O'Connor recognized that 15–year–olds could be eligible for the death penalty in 19 states. *See id.* at 850, 108 S.Ct. at 2707 (O'Connor, J., concurring in the judgment). Nonetheless, she concluded that the application of the death penalty to 15–year–olds violated the Eighth Amendment, because "almost two-thirds of the state legislatures have definitely concluded that no 15–year–old should be exposed to the threat of execution," and no state had "affirmatively and unequivocally endorsed such a practice." *Id.* at 849, 108 S.Ct. at 2706.

Under *Enmund* and *Thompson*, hanging is, *a fortiori*, unconstitutional. The evidence that society has rejected hanging as a form of punishment is far more compelling than the evidence the Supreme Court found sufficient to compel a finding of unconstitutionality in those cases. In both *Enmund* and *Thompson*, the Court concluded that society had rejected a punishment even though it had been rejected by significantly fewer states than have rejected hanging. *Enmund* involved a practice which was still authorized in eight states, and *Thompson* involved a practice which was still lawful in nineteen.[9]

---

8. The majority ingenuously states that "neither the state officials, nor Campbell, nor our own research has revealed a single decision holding that imposition of the death penalty by hanging is cruel and unusual punishment within the contemplation of the Eighth Amendment." *Ante* at 682. The reason for this must be obvious to all except those who do not wish to see it. Because all of the state legislatures outside of Washington and Montana have themselves eliminated hanging, there has been little need for judicial pronouncements that hanging is unconstitutional. Indeed, since no one (with the exception of one

person who refused to challenge his conviction or punishment; *see infra* page 699) has been lawfully hanged in this country in over three decades, it would be surprising to find cases ruling on the question of hanging's constitutionality. Thus, the absence of cases does not detract from Campbell's argument—rather, it is simply one more indication that hanging is inconsistent with our evolving standards of decency.

9. In *Stanford*, the Court upheld the death penalty for 16– and 17–year–olds. Distinguishing *Coker*,

In contrast to the practices in those cases, *all but two* states, closely situated geographically, have rejected hanging. Contrary to the majority's characterization, this is not merely a "trend among *several* states in *recent* years to replace hanging with other methods of execution." *Ante* at 682 (emphasis added). Instead, there has been a virtually unanimous rejection by the states of this formerly universally accepted mode of execution. Beginning with New York's abandonment of hanging in 1888, every state (other than Washington and Montana) which has retained the death penalty has sought some other, less barbaric mode of execution. Many states did so in the early part of the 20th Century, many more did so in the 1930s and 1940s, and still more did so in recent years. This is, in short, a far greater "degree of national consensus" than the Supreme Court "has previously thought sufficient to label a particular punishment cruel and unusual." *Stanford*, 492 U.S. at 371–72, 109 S.Ct. at 2975–76.[10]

It is not only the sheer number of states that have abolished the practice that dictates the conclusion that hanging is unconstitutional. It is also the fact that the state legislatures have in the main been motivated by core Eighth Amendment concerns. The states that have abandoned hanging in favor of other methods of execution clearly did so because they agreed with Governor Hill's characterization of that method as a "barbarous" mode of punishment which came "from the dark ages" and had no place in the policies of a civilized society. Hanging has been considered so inhumane that state legislatures have found *all other* available methods of execution to be preferable. States have rejected hanging in favor of electrocution, lethal gas, lethal injection, and even the

firing squad. Although some of these methods may themselves be questioned as inhumane, the states have considered all of them to be more humane than hanging. Oliver Wendell Holmes, then the Chief Justice of the Massachusetts Supreme Judicial Court, expressed the view of all of the states which had moved from hanging to electrocution when he explained that the change "was devised for reaching the end proposed as swiftly and painlessly as possible." *In re Storti*, 178 Mass. 549, 60 N.E. 210, 210 (1901); *see also Malloy v. South Carolina*, 237 U.S. 180, 185, 35 S.Ct. 507, 509, 59 L.Ed. 905 (1915) ("Influenced by the results in New York eleven other States have adopted the same mode for inflicting death in capital cases; and, as is commonly known, this result is the consequent of a well-grounded belief that electrocution is less painful and more humane than hanging."). Forty years later, when the state of Louisiana finally abandoned hanging in favor of electrocution, it explained that "electrocution is recognized as a more humane and less painful manner or means of carrying out the death penalty than by hanging." *State ex rel. Pierre v. Jones*, 200 La. 808, 9 So.2d 42, 43 (1942). *See also* 1923 Tex.Gen.Laws ch. 51, §§ 1, 14 (changing from hanging to electrocution and referring to the "fact" that hanging "is antiquated and has been supplanted in many states by the more modern and humane system of electrocution."). Like the states that replaced hanging with electrocution, the states that moved from hanging to the gas chamber "sought to provide a method of inflicting the death penalty in the most humane manner known to modern science." *State v. Gee Jon*, 46 Nev. 418, 211 P. 676, 682 (1923). The same, of course, is true for the states that chose the lethal injection alternative.

*Enmund,* and *Ford,* the Court relied on the fact that "a majority of the states that permit capital punishment authorize it for crimes committed at age 16 or above." *Id.,* 492 U.S. at 371, 109 S.Ct. at 2976.

**10.** In one of its many unexplained non-sequiturs, the majority decrees that *Coker* and *Enmund* are inapposite because "[t]hose cases concern the proportionality of the death penalty to the crimes

of conviction, as opposed to the method of execution." *Ante* at 682 (footnote omitted). The majority has it backwards. The actions of the state legislatures are *most* relevant when they have been dictated, as here, by fundamental Eighth Amendment concerns. As I explain in the text, the states have rejected hanging precisely because they have found it to be a barbaric and inhumane punishment—a core Eighth Amendment concern.

Even in the two jurisdictions in which hanging remains on the books, it has been all but abolished in practice in recent years. Since 1963, *not a single person* who asserted his Eighth Amendment rights has been lawfully hanged in this country. The *only* person who has been judicially hanged during this period was Westley Allan Dodd, whom Washington executed last year after he refused to assert those rights. This fact, as well, provides strong evidence that hanging is no longer compatible with our society's standards of decency. *See, e.g., Thompson,* 487 U.S. at 831–33, 108 S.Ct. at 2696–98; *id.* at 852–53, 108 S.Ct. at 2708–09 (O'Connor, J., concurring) (both noting that the rarity with which a punishment is imposed indicates that it is cruel and unusual). Indeed, with the exception of South Africa [11] and a few small Caribbean states, there has not been another judicial hanging in the entire English-speaking world since 1966. In light of these facts, the majority's willingness to endorse so savage and barbaric a practice as constitutional is simply incomprehensible.

The legislatures of the 46 states which have abandoned hanging (and possibly of the two which never adopted it) have considered the facts and determined that judicial hanging is an inhumane manner of taking life. In doing so, they responded to the core concern of the Eighth Amendment—that the state may not employ savage and barbaric methods of punishment. The majority of this en banc court has no business substituting its judgment for the clearly-expressed view of nearly every state legislature in the nation.

Under the Constitution, that consensus binds us.[12]

In the case before us, it is not necessary to go further than our primary test—the objective evidence of public attitudes. This objective evidence is so overwhelming that it controls our decision. We are simply not free to disregard the nearly universal determination of our state legislatures that hanging is no longer compatible with our standards of decency. Because the people and the legislatures of this nation have made their judgment, and have clearly and consistently rejected the use of hanging as a form of execution, our task is at an end. No further judicial inquiry is required. However, the plain fact is that, here, *every* factor, singly and collectively, necessitates a determination that hanging constitutes cruel and unusual punishment. It is therefore helpful to examine some of the other relevant factors.

### C. The Inconsistency of Hanging with Human Dignity

It is not only the fact that almost every state has rejected hanging as a form of punishment that compels the conclusion that hanging fails to comport with our evolving standards of decency. It is also the fact that the practice of judicial hanging is demonstrably incompatible with the respect for human dignity that is the mark of a civilized nation. While some of us doubt that capital punishment of any kind is consistent with contemporary social and religious values, even those of us who are persuaded that state-sponsored executions are constitutional must conclude

11. With a newer, more enlightened government, even this bastion of judicial hanging may fall. *Cf.* Bill Keller, *South African Parties Endorse Constitution Granting Rights to All,* New York Times, Nov. 18, 1993, p. A1.

12. Thus, the majority is simply wrong when it states that "[w]e cannot conclude that judicial hanging is incompatible with evolving standards of decency simply because few states continue the practice." *Ante* at 682. Where nearly every state has abandoned a method of punishment, and they have done so *precisely because* they found it abhorrent and inhumane, we cannot *but* conclude that the punishment is inconsistent with our standards of decency.

I would emphasize that we are not faced with a determination by a large number of legislatures

that a process challenged as unconstitutional is in fact constitutional. Such a determination would not relieve us of our duty to examine the question with utmost care and ensure that the rights of the persons involved are fully protected. However, where as here the legislatures have demonstrated their view that a particular form of punishment is unacceptable to society, our role is a far different one. In such a circumstance, it would not be appropriate for us to question that legislative judgment, and we should not seek ways of undoing it. *See supra* pages 696–97; *cf. Katzenbach v. Morgan,* 384 U.S. 641, 651 n. 10, 86 S.Ct. 1717, 1724 n. 10, 16 L.Ed.2d 828 (1966) (holding that Congress can use its powers under Section 5 of the Fourteenth Amendment to *enhance* the protections of that Amendment, but not to *dilute* those protections).

that hanging is a savage and barbaric method of terminating human life. We are convinced that judicial hanging is an ugly vestige of earlier, less civilized times when science had not yet developed medically-appropriate methods of bringing human life to an end. Hanging is a crude, rough, and wanton procedure, the purpose of which is to tear apart the spine. It is needlessly violent and intrusive, deliberately degrading and dehumanizing. It causes grievous fear beyond that of death itself and the attendant consequences are often humiliating and disgusting.

In a number of cases, one of these consequences is decapitation. Every single expert witness at the evidentiary hearing—both those called by Campbell and those called by the state—admitted at one point or another that some decapitations will occur under the Washington state protocol.[13] Indeed, Campbell presented unrefuted testimony that the Washington protocol will actually *increase* the risk of decapitation, because it requires that the rope be treated to eliminate all elasticity, thereby assuring that the greatest possible amount of force will be transferred to the prisoner's neck. The risk that the force of the drop will be so great as to rip the head off of the body, while blood spurts uncontrollably, is but one of hanging's degrading incidents.

Hanging is associated with lynching, with frontier justice, and with our ugly, nasty, and best-forgotten history of bodies swinging from the trees or exhibited in public places. To many Americans, judicial hangings call forth the brutal images of Southern justice immortalized in a song hauntingly sung by Billie Holiday.[14] To many others, they are a symbol of rough and instant Western justice—of hanging first and asking questions later.[15] Yet to all of us, hangings are a remnant of an earlier, harder time, a time when in meting out punishment we were far less concerned with human dignity and decency. In the two states of the Ninth Circuit where hanging still exists, it stands out starkly as a barbaric anachronism.

We reject barbaric forms of punishment as cruel and unusual not merely because of the pain they inflict but also because we pride ourselves on being a civilized society. We look on capital punishment as a necessary evil. Few any longer view it as any cause for celebration or an occasion for civic festivities or public gatherings.[16] We impose capital

---

13. See Appendix A, *infra* at pp. 717–22. Because of the length of this dissent, I have set forth the detailed discussion of the evidence adduced at the evidentiary hearing in an appendix (Appendix A). I refer to that evidence in the main body of this dissent when necessary, however.

14. Southern trees
Bear a strange fruit
Blood on the leaves
And blood at the root
Black bodies swingin'
In the Southern breeze
Strange fruit hanging
From the poplar trees.
Pastoral scene
Of the gallant South
The bulging eyes
And the twisted mouth
Scent of magnolia
Sweet and fresh
Then the sudden smell
Of burning flesh.
Here is a fruit
For the crows to pluck
For the rain to gather
For the wind to suck
For the sun to rot
For the tree to drop

Here is a strange
And bitter crop.
*Strange Fruit*, by Lewis Allan.

15. This Western style of justice is reflected in the title of the book *Hang 'Em at the Airport*, by Ed Davis, the former Chief of Police of the City of Los Angeles.

16. Hanging has historically been associated with the spectacle of public executions. Charles Dickens, in a letter to the London Times, described the mayhem at a hanging he attended in 1849:

When I came upon the scene at midnight, the shrillness of the cries and howls ... made my blood run cold. As the night went on, screeching and laughing and yelling in strong chorus of parodies of negro melodies, with a substitution of 'Mrs. Manning' [one of the condemned prisoners] for 'Susanna'; ruffians and vagabonds of every kind flocked to the ground with every variety of offensive and foul language. Fightings, faintings, whistling, imitations of Punch, brutal jokes, tumultuous demonstrations of indecent delight when swooning women were dragged out of the crowd with their dresses disordered, gave a new zest to the entertainment.

Letter of December 13, 1849, *in Letters of Charles Dickens* 200 (1903), *quoted in* Negley K. Teeters,

punishment when we do only because a majority of citizens or legislators have concluded that it is a necessary means of combatting or of punishing violent crime. While this is neither the time nor the place to debate that dubious theory, we should all be able to unite, at a minimum, on the proposition that state-sponsored executions must be carried out in the least cruel and painful, the least uncivilized, manner possible. It is difficult in fact to imagine anyone advocating—or the Constitution permitting—any other course.

In fact, the Constitution requires that the state allow the person it executes to die with as much dignity as possible. *See Gregg,* 428 U.S. at 182, 96 S.Ct. at 2929 (opinion of Stewart, Powell, Stevens, JJ.). Although indignity may stem from the needless infliction of pain, it can also arise from the relatively painless infliction of degradation, savagery, and brutality. Cruelty does not necessarily involve pain. Indignities can be inflicted even after a person has died. For example, there can be little doubt that the Eighth Amendment prohibits the public exhibiting of carcasses on yardarms, and the stringing up of bodies in public squares. Likewise, it prohibits the dragging by caissons of corpses through the public streets after a state-sponsored execution, and the displaying of bodies outside the homes of their former occupants or in the neighborhoods in which they lived, as a warning to allies or co-conspirators. And finally, the Constitution prohibits drawing and quartering not only before but *after* the death sentence has been fully carried out. *See Wilkerson v. Utah,* 99 U.S. 130, 135–36, 25 L.Ed. 345 (1879). All these post-mortem forms of treatment of a person's body are abhorrent and would necessarily violate the Cruel and Unusual Punishments Clause, although, obviously, none of them could cause *any* pain to the executed person.

In short, the Constitution commands that we impose the death penalty in as civilized and non-brutal a manner as possible. I recognize the "oxymoronic" quality of this directive; nevertheless, I do not believe that it is open to debate. It is not only the individual's dignity that is at stake, it is the nation's and society's as well. To the extent that we can eliminate the degrading, brutal, and violent aspects of an execution, and substitute a scientifically developed and approved method of terminating life through appropriate medical procedures in a neutral, medical environment, we are obligated by the Constitution to do so. If medical science has developed a method of terminating life relatively painlessly and peacefully, and with comparative dignity, the Constitution requires that we employ that procedure rather than the savage, ugly, and antiquated methods of earlier times. The old days of Southern and Western justice must finally come to an end, in the states of Washington and Montana as elsewhere.[17] And even this court will someday have to recognize that barbaric and savage practices are not permitted under our system of law.

I will discuss the issue of a more medically appropriate method of execution—lethal injection—in connection with part II of this opinion, which sets forth more fully the proposition that the states may not use a *more painful* method of execution if a *less painful* method is available. Here, I need only emphasize that, notwithstanding the district court's improper refusal to permit the introduction of evidence regarding lethal injection, the administration of an injection to a person who has been sedated and placed on a bed by a medically trained person in a medical environment is obviously far less barbaric and uncivilized, far less inhumane and degrading, than the forced march of a prisoner up the gallows steps where the untrained hangman waits in hope that the drop will be spoiled

*Hang by the Neck* 33 (1967). Such scenes were common on this side of the Atlantic as well:
Perhaps no single event brought more spectators in those years, than a public hanging. People drove for miles to be present; some camped in the vicinity for several days. The large concourse of people brought camp followers to every large gathering. Entertainers, vendors, pick-pockets, promoters, evangelists, sight-seers, peddlers and medicine men would descend on the town before the fatal day.
Teeters, *supra,* at 39.

17. While Montana is the only state other than Washington to permit hanging, at least Montana can say in its defense that it has not actually hanged anyone for 50 years.

only by the defecation and voiding that result from the state's crude and violent effort to forcefully terminate a human life at the end of a rope.

### D. The Majority's Evisceration of the Eighth Amendment

The majority deliberately disregards all questions of savagery, barbarism, and cruelty, and refuses to apply the traditional factors by which courts determine whether our contemporary standards of decency have been violated. It does so on the basis of its unreasoned and unexplained conclusion that in addressing a challenge to the constitutionality of a "method of punishment," we must consider *only* whether that method unnecessarily inflicts pain. Without even a colorable attempt at constitutional analysis, the majority rejects the standard employed in every Eighth Amendment case in recent years. By its ex cathedra pronouncement, the majority eviscerates not only longstanding Eighth Amendment doctrine but the Eighth Amendment itself.

#### (1) The Absence of Any Rational Basis for the Majority's Approach

Contrary to all precedent, the majority deems it irrelevant that the state legislatures have almost uniformly concluded that hanging is no longer an appropriate form of punishment. It disregards all of the factors (other than unnecessary pain) that courts have traditionally considered when determining whether a particular punishment is consistent with our evolving standards of decency. The majority cannot cite a single case in

support of its astonishing and wholly unprecedented decision to bar the use of traditional Eighth Amendment concepts in cases involving forms of punishment,[18] nor even a legal argument based on a remotely analogous case.[19] There is simply no rational justification in the majority opinion or elsewhere for abandoning the traditional standards in favor of an examination of pain exclusively. Nor does the majority purport to offer any reasoned explanation why an exception to the rules governing Eighth Amendment cases should be carved out for cases involving methods of punishment—an exception that would drastically curtail the power of the federal courts with respect to the most fundamental of Eighth Amendment concerns and would preclude us from considering whether modes of punishment administered by the states meet the minimum standards of a civilized society. In fact, were we to limit our review in such cases *solely* to the pain question, federal courts would be powerless to stop the implementation of any number of uncivilized and barbaric punishments, so long as they did not inflict any more pain than necessary to meet some asserted penological interest.

The majority's entire discussion of the constitutionality of hanging rests on the perverse premise, ungrounded in prior law, that the Eighth Amendment imposes only one requirement with respect to a method of execution or other form of punishment—that it not inflict pain unnecessarily. Despite two hundred years of unbroken legal history to the contrary, the majority simply refuses to consider any of the other relevant factors. *See supra* note 4. It distinguishes *Coker* and

---

**18.** As I demonstrate *infra* pages 705–06 & n. 25, the majority's reliance on Justice Brennan's dissent from denial of certiorari in *Glass v. Louisiana*, 471 U.S. 1080, 1084, 105 S.Ct. 2159, 2162, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting from denial of certiorari), is wholly erroneous as well as disingenuous.

**19.** The majority does attempt to support its limitation on the use of the traditional Eighth Amendment standard with a footnote containing a *"cf."* citation to *Gregg v. Georgia*, but the passage quoted from *Gregg*, like the Brennan quotation, is taken entirely out of context. The *Gregg* passage sets forth considerations for determining

the "excessiveness" of a form of punishment. Yet, *on the very same page* as the passage the majority cites, the *Gregg* plurality made clear that "excessiveness" is only one part of any Eighth Amendment analysis. Thus, excessive pain and disproportion are *not* the exclusive considerations in Eighth Amendment analysis. The plurality notes both that courts are required to "look to objective indicia that reflect the public attitude toward a given sanction," *Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925 (opinion of Stewart, Powell, Stevens, JJ.), and that "[a] penalty must also accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.'" *Id.* (citation omitted).

*Enmund* —two cases which applied the traditional test and struck down punishments because they had been widely rejected by the state legislatures—because "[t]hose cases concern the proportionality of the death penalty to the crimes of conviction, as opposed to the method of execution." *Ante* at 682 (footnote omitted). The majority offers only two sentences in support of its purported distinction—a distinction which does not appear in *Coker, Enmund,* or any other case—notwithstanding the revolutionary consequences which would follow. In those two sentences, the majority simply pronounces, without any explanation whatsoever, that "proportionality review entails examination of the actions both of state legislatures and of sentencing juries to determine contemporary standards of decency," while "methodology review focuses more heavily on objective evidence of the pain involved in the challenged method." *Ante* at 682.

The factitious distinction created by the majority conflicts directly with the original intent of the Cruel and Unusual Punishments Clause. As Anthony Granucci demonstrated in his groundbreaking study, that clause arose out of a fear that the government would impose tortures and other barbarous forms of punishment on persons convicted of criminal acts.[20] Congress and the states adopted the Eighth Amendment with the understanding that it "was directed at prohibiting certain methods of punishment." Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning,* 57 Cal.L.Rev. 839, 841–42 (1969); *see also Groseclose v. Dutton,* 609 F.Supp. 1432, 1440 (M.D.Tenn.1985) ("It is evident that the prohibitions in the Eighth Amendment evolved primarily from the concern for the *manner* in which individuals would be put to death.") (emphasis added). In short, as noted earlier, the prohibition of inhumane

methods of punishment lies at the very core of the Cruel and Unusual Punishments Clause. If *any* part of Eighth Amendment law is subject to the Supreme Court's central "evolving standards of decency" test and entitled to the essential protections it affords, it is clearly that part which governs challenges to "methods of punishment." The majority's silence on this point tells us much about its opinion and the method by which it arrived at its wholly fallacious ultimate conclusion.

There is simply no rational basis anywhere in the opinion for the paradoxical exception the majority creates. This is apparent from the majority's distortion of the authorities on which it purports to rely and the inconsistency between its discussion of the appropriate legal standard and the test it ultimately employs. It is equally apparent from the fact that the majority barely mentions the standard it finally settles on, adopting it in the most indirect of manners. Moreover, before applying the rule that unnecessary pain is the *only* factor that must be considered, the majority sets forth two other contradictory rules and never disavows either of them. It simply explains the two rules, then ignores them.

The majority introduces its analysis with the non-controversial statement that "[t]o determine whether hanging is unconstitutionally cruel and unusual, we look to objective factors to the maximum extent possible." *Ante* at 682. It then cites the established rule set forth most recently in *Stanford,* suggesting that it intends to apply that rule. The *Stanford* rule states that: " '[F]irst' among the 'objective indicia that reflect the public attitude toward a given sanction' are statutes passed by society's elected representatives." *Stanford,* 492 U.S. at 370, 109 S.Ct. at 2975 (quoting *McCleskey v. Kemp,* 481 U.S. 279, 300, 107 S.Ct. 1756, 1771, 95 L.Ed.2d 262 (1987)) (emphasis added).[21] Apparently understanding that the *Stanford*

20. Among those who expressed that concern at the meeting of the Virginia delegates at which ratification of the Constitution was considered were Patrick Henry and George Mason. *See* Granucci, *infra,* at 841. Similar concerns were expressed at the Massachusetts Convention as well as by other state delegations. *See* 2 J. Elliot, *The Debates in the Several State Conventions on*

*the Adoption of the Federal Constitution* 111 (2d ed. 1881).

21. On the previous page, the *Stanford* court made clear that the "conceptions of decency" of "modern American society as a whole" are determinative of the Eighth Amendment inquiry. *See id.,* 492 U.S. at 369, 109 S.Ct. at 2974–75.

rule would, on its face, dictate the conclusion that hanging is unconstitutional, the majority next "restates" the rule by omitting the crucial first word of the quotation when it paraphrases the statement.[22] It then implements its "restated" *Stanford* rule by announcing a new category of analysis and a new method of determining Eighth Amendment violations. The majority declares that in cases involving "methodology review"—a category of analysis invented by the majority for purposes of this case[23]—we must "focus[ ] more heavily on objective evidence of the pain involved in the challenged method."

However, even the misrepresentation of *Stanford* and the hastily conceived rule for "methodology review" cannot do the majority's work for it. As a result, the majority quickly abandons all of its prior approaches and actually resolves the case by applying a standard that is even more inconsistent with Eighth Amendment law. The majority ultimately proceeds to decide the case as if its newly created rule were not that "methodology review" focuses "more heavily" on objective evidence of pain, but that it focuses *exclusively* on unnecessary pain.[24] Thus, despite its purported reliance on *Stanford,* the majority actually applies a rule that directly contradicts *Stanford* as well as the long line of Supreme Court precedent upon which that case relies.

In lieu of making any argument in support of its ultimate proposition that "methodology review" focuses *only* on unnecessary pain, the majority cites a single legal opinion—remarkably, it is a dissent from denial of certiorari written by Justice Brennan in *Glass v. Louisiana,* 471 U.S. 1080, 105 S.Ct.

2159, 85 L.Ed.2d 514 (1985). By lifting one sentence out of context and ignoring the rest of the opinion, the majority totally distorts Justice Brennan's position. In *Glass,* Justice Brennan (with Justice Marshall joining) argued that the Supreme Court should have granted certiorari to consider a capital defendant's Eighth Amendment challenge to electrocution as a method of execution. On the page *immediately following* the one sentence the majority cites, Justice Brennan makes clear that:

> The Eighth Amendment's protection of "the dignity of man" *extends beyond prohibiting the unnecessary infliction of pain when extinguishing life.* Civilized standards, for example, require a minimization of physical violence during execution *irrespective of the pain that such violence might inflict on the condemned.* Similarly, basic notions of human dignity command that the state minimize "mutilation" and "distortion" of the condemned prisoner's body. These principles explain the Eighth Amendment's prohibition of such barbaric practices as drawing and quartering.

*Id.* at 1085, 105 S.Ct. at 2162–63 (citations omitted) (emphasis added) (quoting *Trop,* 356 U.S. at 100, 78 S.Ct. at 597–98 (plurality opinion)). As in its use of *Gregg* and *Stanford,* the majority once again, by lifting a sentence out of context or omitting a crucial part of a sentence, relies on a case for a proposition which is directly contradicted within a page of the sentence it cites. *See supra* page 703; note 19. This is, in my view, not the way in which courts should

---

**22.** The majority states: *"Among* these factors are statutes passed by society's elected representatives." *Ante* at 682 (citing *Stanford,* 492 U.S. at 370, 109 S.Ct. at 2975 (citing *McCleskey,* 481 U.S. at 300, 107 S.Ct. at 1771)).

**23.** No other court has ever recognized "methodology review" as a separate category of Eighth Amendment analysis. Indeed, until today this term has *never* appeared in a judicial opinion discussing that Amendment—it did not even appear in the Justice Brennan dissent the majority quotes. *See infra* page 705. The only court *ever* to use the term in *any* context was the Arkansas

Supreme Court, in an action to review the Arkansas Health Services Commission's grant of approval for construction of a new 70–bed nursing home in Drew County. *See Beverly Enterprises–Arkansas, Inc. v. Arkansas Health Services Comm'n,* 308 Ark. 221, 824 S.W.2d 363, 371 (1992).

**24.** See *ante* at 687 ("We hold that judicial hanging, as conducted under the Washington Field Instruction, does not involve the wanton and unnecessary infliction of pain, and therefore does not violate the Eighth Amendment."); *see also supra* note 4.

arrive at decisions that determine fundamental constitutional rights.[25]

The majority's analysis is remarkable for other reasons as well. If only a single, narrow "unnecessary infliction of pain" test applies to Eighth Amendment challenges to methods of punishment, the majority must be truly sagacious in discovering this rule, for it is the first court in the more than two centuries of the Bill of Rights ever to have suggested it. In fact, the premise upon which the majority's holding is founded is so novel and extraordinary it was not even suggested by the state. Rather, it was simply created for purposes of this case—and I hope this case only[26]—by the majority. It has no place in our Eighth Amendment jurisprudence.

### (2) *The Majority's Deliberate Disregard of Precedent*

Contrary to the majority's representations, the touchstone of Eighth Amendment analysis in all types of cases is, beyond any doubt, whether a punishment conforms to our society's contemporary standards of decency. *See, e.g., Gregg*, 428 U.S. at 173, 96 S.Ct. at

2925 (opinion of Stewart, Powell, Stevens, JJ.). *One* way in which a punishment can contravene these standards is by inflicting pain unnecessarily. Yet that is certainly not the only way. Even a completely painless punishment may still evidence an utter disregard for " 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.' " *Id.* (quoting *Trop*, 356 U.S. at 100, 78 S.Ct. at 597). For example, the guillotine is a comparatively painless method of execution. Yet even if it were the *most* painless method, any court faced with the issue today would certainly hold that, whatever the state of the law in 1789, beheading is inconsistent with our current standards of decency, both because every state has rejected that form of execution *and* because there is a savagery to the extreme bodily mutilation and the outpouring of blood that is simply inconsistent with human dignity.[27] Similarly, all of the punishments involving postmortem mutilation discussed in part I–C would be held to be in violation of the Eighth Amendment, even though they would not cause the infliction of *any* pain.

**25.** Were the majority to consider any part of Justice Brennan's *Glass* dissent *other* than the sentence it takes out of context, it would be compelled to admit that, rather than supporting its unprecedented approach, Justice Brennan's analysis requires that judicial hanging be held unconstitutional. Justice Brennan's analysis is, without question, totally inconsistent with the majority's attempt to ignore all of the factors that demonstrate that hanging is inconsistent with civilized standards and human dignity. As Justice Brennan well understood, and stated in the very *dissent the majority selectively quotes, the* overriding principle that governs Eighth Amendment analysis is that the Cruel and Unusual Punishments Clause "has an 'expansive and vital character,' that *'draw[s] its meaning from the evolving standards of decency* that mark the progress of a maturing society.' " *Id.*, 471 U.S. at 1083, 105 S.Ct. at 2161 (quoting *Weems*, 217 U.S. at 372, 30 S.Ct. at 551; *Trop*, 356 U.S. at 101, 78 S.Ct. at 598 (plurality opinion)) (emphasis added). It is hardly surprising that Justice Brennan's dissent from denial of certiorari in *Glass* directly contradicts the majority's approach in this case. At least, that should not be surprising to anyone who has ever read Justice Brennan on the issue of capital punishment.

The best that can be said about the majority's use of the sentence from the dissent in *Glass* is that Justice Brennan did make the statement quoted by the majority. He did so, however, in a

far different context than the majority suggests. Justice Brennan essentially followed the method of analysis I have set forth in part I–A of this dissent. He first looked to the actions of state legislatures and noted that their decisions regarding the challenged method are entitled to great deference. Because the states had *not* reached a consensus to reject electrocution, however, he concluded that these legislative decisions could not be determinative, and that the courts must look to other factors in assessing the constitutionality of the method. He considered unnecessary pain and indignity to be foremost among *those* factors. *See id.*, 471 U.S. at 1083–85, 105 S.Ct. at 2161–63.

**26.** For an example of a death penalty opinion good for one case only, *see Gomez v. United States District Court*, 1992 WL 155238, No. 92–70237, 1992 U.S.App.Lexis 7931 (9th Cir. Apr. 19, 1992), *vacated as moot and withdrawn*, 966 F.2d 463 (9th Cir.1992), *modifying*, 1992 WL 566298, 1992 U.S.App. Lexis 8857 (9th Cir. Apr. 22, 1992).

**27.** I note that under the majority's professed rationale we would be compelled to reach a contrary conclusion. Nevertheless, I find it difficult to believe that even the members of the majority, if forced to the test, would be willing to follow the logical consequences of their actions.

As explained earlier, except for the majority, courts have uniformly required that a punishment *neither* inflict unnecessary pain *nor* otherwise violate "evolving standards of decency" and have not sought to limit the force of the Eighth Amendment by seeking to seal off a category of cases from its full protections.[28] Specifically, every contemporary federal case to give extended discussion to the constitutionality of a *method of execution* has engaged in the *entire* evolving standards of decency inquiry. None has said, as does the majority, that the defendant "is entitled to an execution free only of 'the unnecessary and wanton infliction of pain.'" *Ante* at 683 (citation omitted). In *Gray v. Lucas*, 710 F.2d 1048, 1058 (5th Cir.1983) (per curiam), the Fifth Circuit relied on the "principles ... articulated by the Supreme Court in *Estelle v. Gamble*, [429 U.S. 97, 102–03 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) ]," in deciding a challenge to the gas chamber. Those principles were, of course, the "contemporary standards of decency as manifested in modern legislation." *See Gamble*, 429 U.S. at 103–04 & n. 8, 97 S.Ct. at 290–91 & n. 8 (holding that the denial of medical care to prisoners constitutes cruel and unusual punishment and listing statutes from 22 states). The *Gray* court quoted extensively from *Gamble*'s formulation of the Eighth Amendment test, and applied "evolving standards of decency" in determining that execution by lethal gas was constitutional.[29] *See also Hill v. Lockhart*, 791 F.Supp. 1388, 1394 (E.D.Ark.1992) (rejecting claim that lethal

injection violates the Eighth Amendment because "[t]here is general agreement that lethal injection is at present the most humane type of execution available and is far preferable to the sometimes barbaric means employed in the past" and "[m]any states have now abandoned other forms of execution in favor of lethal injection").

The courts have looked to all of the ways in which a punishment can violate our standards of decency in cases involving non-capital as well as capital *methods of punishment*. A classic example is the Eighth Circuit's decision that the use of the strap to discipline prison inmates is unconstitutional. *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir.1968). In *Jackson*, the court looked beyond the narrow issue of unnecessary pain and concluded that the use of the strap is inconsistent with contemporary standards of decency, both because "[i]t is degrading to the punisher and to the punished alike" and because "[p]ublic opinion is obviously adverse." In reaching the latter conclusion, the court relied on the fact that only two states still permitted use of the strap. The *Jackson* court engaged in the proper constitutional analysis, for whatever the value of the strap to prison discipline might be (and I am certain that it would not be insignificant), that method of punishment is out of place in late 20th Century American society, a society that demands respect for human dignity.

By failing to apply the analysis employed in *Jackson* and all other method of punishment cases, and concluding instead that the

---

**28.** Even outside the core of the Eighth Amendment's protections, we have found the evolving standards of decency issue determinative. A challenge to the decision to impose the death penalty usually raises issues which we consider under the rubrics of reliability and proportionality. *See, e.g., Stringer, supra; Enmund, supra.* Similarly, in cases involving challenges to actions undertaken by prison authorities we generally focus on "deliberate indifference" or unnecessary pain. *See, e.g., Hudson, supra.* In *all* of these contexts, however, the courts have understood that the ultimate inquiry was *always* whether the government action comported with evolving standards of decency. *See McKinney v. Anderson*, 924 F.2d 1500, 1508–09 (9th Cir.1991) (relying on the fact that 45 states, the federal government, and numerous cities and counties had enacted statutes restricting smoking in pub-

lic places in holding that exposure to environmental tobacco smoke in prison can violate the Eighth Amendment), *aff'd sub nom. Helling v. McKinney*, —— U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Hoptowit*, 682 F.2d at 1246, 1253 (concluding that a prison's medical care system violated the Eighth Amendment only if it created conditions which exceeded "what the general public would consider decent"); *supra* note 5.

**29.** I express no view on the results of the Fifth Circuit's inquiry in *Gray*, especially in light of the significant trend among the states in abandoning the gas chamber in favor of lethal injection. I note that since *Gray* was decided, the number of states mandating execution by gas has dwindled from ten to three.

number of states rejecting a particular method of punishment is of little consequence because it "sheds no light on the actual pain that may or may not attend the practice," *ante* at 682, the majority flouts fundamental Eighth Amendment principles. In method-of-punishment cases, above all other, we may not limit our analysis to the narrow "unnecessary pain" question. The majority's holding eviscerates the Cruel and Unusual Punishments Clause and does so in precisely the area in which it was designed to have its greatest force.

### (3) *The Pernicious Consequences of the Majority's Rule*

The damage done to the Constitution by the majority's opinion is incalculable. Until this decision, it was universally understood that methods of punishment—the central historic concern of the Eighth Amendment—were measured against the absolute, unwavering values of a civilized society. Now, that is no longer the case in the Ninth Circuit. Until today, we could say with assurance that *under no circumstances* would we countenance, anywhere in our great nation, the use of barbaric punishments such as flogging, whipping, or the application of electrical devices to one's private parts. Under the majority's opinion, we no longer have any such assurance in the nine Western states, where the sole judicial concern is presumably a pragmatic one—whether the amount of pain inflicted is greater than necessary to accomplish a penological purpose.

Under the majority's standard, *any* method of punishment—even one which has long been put to rest—would be constitutional, so long as the pain it inflicts is deemed reasonably necessary. Given the deference we afford to state legislatures and prison administrators with respect to such questions—and given the majority's refusal to recognize the existence of pain even under the most obvious circumstances—today's decision clearly invites a return to the brutal and uncivilized ways of our past.

### E. *Summary*

In sum, there is simply no justification for the majority's failure to conduct an inquiry into whether society's "evolving standards of decency" prohibit hanging. The prohibition against barbaric and uncivilized methods of punishment lies at the heart of the Eighth Amendment. The cases *require* us to determine whether a particular punishment comports with societal standards, and they *require* us to look to state legislative actions to answer this question. *The majority cannot point to a single case holding—or even suggesting—otherwise.* Finally, were the majority to follow precedent and consider whether hanging violates our evolving standards of decency, it would be bound to conclude that it is a form of execution that has been unequivocally rejected as contrary to contemporary standards, and that the reason for its rejection is that this atavistic practice simply fails to provide the respect for human dignity that civilized society demands. Wholly apart from the question of unnecessary pain, well-established Eighth Amendment principles dictate that execution by judicial hanging be held to constitute cruel and unusual punishment. Notwithstanding the majority's actions, that will, fortunately, remain the law everywhere in this land but in the Ninth Circuit.

### II. *Unnecessary and Wanton Pain*

Even if the majority were correct that Eighth Amendment analysis is limited to the question of unnecessary pain, its conclusion that judicial hanging is constitutional would still be totally wrong. Hanging involves a high risk of pain, far more than is necessary to kill a condemned inmate. If the drop is too short, the prisoner may strangle to death, a slow and painful process. However, the hangman must also be concerned that the drop not be too long, for if it is, the prisoner may be decapitated. As one scholar has explained the risks involved:

> Before the advent of the "long drop" in the late nineteenth century, death by hanging was often a slow and painful process of strangulation. When the victim is dropped from a sufficient height his vertebrae are dislocated and his spinal cord crushed; unconsciousness is immediate and death fol-

lows a short time later. If the drop is too long, however, decapitation occurs. Although hanging has become something of an art in modern times, and may well be painless if properly performed, *evidence of bungled hangings abounds:* inadvertent decapitation when victims are dropped too long; strangulation when they are dropped too short to break their necks. *Strangulation may be the rule rather than the exception.* Unconsciousness is supposedly instantaneous even when the neck is not broken, but it is not entirely certain that this is true. If the victim is conscious, death by strangulation must be extremely painful.

Martin R. Gardner, *Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment,* 39 **Ohio St.L.J.** 96, 120 (1978) (emphasis added).

The risk of a slow, painful death by strangulation or asphyxiation has existed in all hanging cases throughout history. Although the "long drop" reduces the frequency of such painful deaths, a risk remains in every hanging that the prisoner will die through a slow, torturous process. The evidence developed at the hearing made clear that, even though the majority of hangings will result in rapid, relatively painless death, there is a significant risk that any given hanging will result in severe and excessive pain.[30] The evidence also made clear that the Washington state hanging protocol is virtually identical in all relevant respects to the hanging procedures which have caused slow, painful asphyxiations in the past.[31] Faced with this evidence, the district court was under a duty to examine alternative methods of execution and consider whether they might avoid the risks of pain that inhere in hanging. This is especially true in light of the fact that 39 state legislatures have determined that alternative methods are less painful and more humane than hanging, and that only one state other than Washington still has a statute on its books that permits such a form of punishment. Yet the district court refused to consider any evidence which demonstrated that lethal injection avoids the risk of pain associated with hanging. Had the district court done its job properly and compared hanging with other available methods of execution, it would have been bound to conclude that some hangings involve *unnecessary* pain, and all hangings involve a significant risk of *unnecessary* pain. Then, assuming that the majority would have still been willing to advance its novel view of the Eighth Amendment, it would nevertheless have been compelled, even under that view, to hold that hanging is unconstitutional.

### A. *Legal Standards*

The Supreme Court has made clear that—regardless of any other factors bearing on a punishment's consistency with our standards of decency—a punishment will violate the Eighth Amendment if it " 'involv[es] the unnecessary and wanton infliction of pain,' " *Hudson,* — U.S. at —, 112 S.Ct. at 1001 (citation omitted). Several cases have clarified the meaning of the Eighth Amendment's "unnecessary and wanton infliction of pain" standard. As these decisions demonstrate, the key inquiry in cases of the type before us is whether the pain is *necessary.*[32] If a

30. While the district court erroneously excluded important and probative evidence offered by Campbell regarding the practical effects of hanging, there was more than enough evidence before the court to eliminate any doubt that hanging involves a risk of painful and torturous death. *See* Appendix A.

31. For example, the British Royal Committee in 1886 found strong evidence that asphyxiation, and thus slow and painful deaths, had occurred in seven out of the 27 hangings it studied. Transcript at 102–03. The hanging procedure in Washington was comparable to the procedure employed in Great Britain during this period. Transcript at 106. The major difference between the two procedures occurs in the drop chart, but even the drop chart in Washington was roughly the same as the British chart—the drop lengths in Washington were shorter than the British lengths at the lower weights, and longer at the higher weights. Transcript at 143.

32. Where a prisoner challenges individual conduct which does *not* purport to be the penalty formally imposed for the crime, an additional inquiry into the officials' state of mind is necessary to determine whether the pain is wanton. *See Wilson v. Seiter,* 501 U.S. 294, —, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991); *Jordan v. Gardner,* 986 F.2d 1521, 1527 (9th Cir.1993) (en banc). Where, however, the prisoner can show

**710**

punishment inflicts more pain than an available alternative, that punishment will violate the Cruel and Unusual Punishments Clause. As the Supreme Court stated in *McCleskey*, "any punishment might be unconstitutionally severe if inflicted without penological justification." 481 U.S. at 301, 107 S.Ct. at 1772. Where two alternative methods of punishment serve the same penological goals, but one involves a markedly greater risk of pain, there is no penological justification for using the more painful method. Indeed, the use of the more painful method "is nothing more than the purposeless and needless imposition of pain and suffering." *Coker*, 433 U.S. at 592, 97 S.Ct. at 2866 (plurality opinion).

In the case of the death penalty, these principles require that a mode of execution carry the minimal practical risk of pain. In addition, it must not unnecessarily "involve torture or a lingering death." *Kemmler*, 136 U.S. at 447, 10 S.Ct. at 933. The Supreme Court has upheld the death penalty because it has concluded that death serves the goals of incapacitation, retribution, and deterrence. *See Gregg*, 428 U.S. at 183–86, 96 S.Ct. at 2929–31 (plurality opinion). However, it has never suggested that the state may inflict more pain than necessary to cause death. To the contrary, it has told us that to the extent any method of execution creates more suffering than is necessary to extinguish life, it "results in the gratuitous infliction of suffering," *id.* at 183, 96 S.Ct. at 2929, and hence violates the Eighth Amendment. As

the Supreme Court stated in *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (plurality opinion), "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the *necessary suffering* involved in *any method* employed to extinguish life humanely." *Id.* at 464, 67 S.Ct. at 376 (emphasis added).[33] In considering whether a method of execution violates the Eighth Amendment, then, a court may not look only at the pain and suffering caused by the challenged method, for it is impossible to determine whether the amount of pain caused by one method is *necessary* without looking at whether other methods cause less pain. A court must consider whether the method is among the least cruel in light of presently available alternatives. As Justice Powell stated in his dissenting opinion in *Furman*—an opinion which was later adopted by the Court in *Gregg*—"[N]o court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives." *Furman v. Georgia*, 408 U.S. 238, 430, 92 S.Ct. 2726, 2824, 33 L.Ed.2d 346 (1972) (Powell, J., dissenting).[34]

In order to be unnecessarily cruel, a method of execution need not inflict more pain than necessary every time it is employed. For example, a method that leads to painful strangulation in one out of five cases is unnecessarily cruel if there is an alternative method that causes a comparable amount of

---

that the punishment which has been *formally* imposed for his crime causes unnecessary pain, the fact that the state has adopted a needlessly painful method of punishment through ordinary legislative or judicial processes satisfies the wantonness requirement.

**33.** The majority cites *Resweber* to support its statement that Campbell is only entitled to an execution "free of purposeful cruelty." *Ante* at 687. However, *Resweber* does not stand for that proposition at all—quite the opposite. In that case, the Supreme Court held that it was not cruel and unusual to execute a prisoner in the electric chair after a first attempt at electrocution failed to kill him. The Court held that *unforeseeable* accidents could not make an execution cruel and unusual, but it also made clear that *unnecessary* pain in carrying out the death penalty was unconstitutional. Where, as here, risks of pain

and mutilation are *foreseeable* in a particular method of execution, *Resweber* proscribes that method unless these risks are necessarily involved in any method of taking life. *See id.* at 464, 67 S.Ct. at 376.

**34.** And as Justice Brennan stated in his dissenting opinion in *Glass*—an opinion upon which the en banc court purports to rely heavily for its conclusion—"it is firmly within the 'historic process of constitutional adjudication' for courts to consider, through a 'discriminating evaluation' of all available evidence, whether a particular means of carrying out the death penalty is 'barbaric' and unnecessary in light of currently available alternatives." *Glass*, 471 U.S. at 1084, 105 S.Ct. at 2162 (Brennan, J., dissenting from denial of certiorari) (quoting *Furman*, 408 U.S. at 420, 430, 92 S.Ct. at 2824 (Powell, J., dissenting)).

pain in only one out of 25 cases. There are two reasons for this conclusion. First, when a punishment involves a risk of pain that is greater than the risk involved in alternative punishments, there will be a number of cases in which the punishment actually inflicts pain that could have been avoided. When we examine whether a form of punishment is cruel and unusual, we are not limited to looking at the probable effect of the punishment on the particular case before us; frequently we look, as well, to the effect on cases in general. Second, a punishment which involves a higher *risk* of causing *physical* pain will necessarily cause a higher degree of actual *psychological* pain in *all* cases. A condemned inmate will always feel some degree of fear, anticipation, and anxiety as he awaits his execution, but, if he knows that he may linger in intense pain before dying, he is subject "to a fate of ever-increasing fear and distress." *Trop*, 356 U.S. at 102, 78 S.Ct. at 598–99 (plurality opinion). Thus, if a state chooses to execute defendants, it must adopt a method of execution that *minimizes the risk* that any person who is put to death will suffer unnecessary pain.[35] Otherwise, the state will have violated the Eighth Amendment.[36]

## B. *Analysis*

Following the evidentiary hearing we ordered in our limited remand, the District Court issued written findings of fact and conclusions of law. The district court's critical findings were as follows:

> 8. The Washington judicial hanging protocol and the Washington State Penitentiary staff's execution of that protocol has eliminated virtually all possibility of a tortured or lingering death.

> 9. The Washington judicial hanging protocol and the Washington State Penitentiary staff's execution of that protocol has eliminated virtually all possibility of unnecessary and wanton infliction of pain.

> . . . .

> 23.. ·Judicial hanging does not involve torture, lingering death, mutilation, or the unnecessary and wanton infliction of pain.

Findings of Fact and Conclusions of Law at 3, 6. These findings were clearly contrary both to the evidence adduced at the hearing and to the law. The evidence at the hearing left *no* doubt that hanging entails a risk of slow, painful strangulation. This risk has existed under *all* hanging protocols used throughout history, and it is simply fanciful, or worse, to conclude that the Washington protocol, which is substantially the same as these procedures, will eliminate this risk. Indeed, the evidence made clear that the Washington state hanging protocol will have little if any effect on the risk of slow, painful death. Thus, an examination of the record before the district court permits no alternative to a reversal of the district court's contrary findings on the ground of clear error. Moreover, faced with the indisputable fact that hanging—even in Washington—involves *some* risk of a painful death, the district court was required to determine whether this risk was *necessary*. Yet the district court, in addition to erroneously excluding a portion of the testimony offered by Campbell regarding the actual effects of hanging, also refused to consider evidence which would have shown that lethal injection entails substantially fewer risks than does that form of execution. Without this information, the district court had absolutely no basis for concluding that hanging in Washington creates no *unnecessary* risk of pain. Thus, the district court's

---

**35.** If there were any doubt about this proposition, it is resolved by Justice Brennan's dissent from denial of certiorari in *Glass*, on which the majority purports to rely as setting forth the standards for "methodology review". In his dissent (which I assume is now the law of the circuit), Justice Brennan stated that "[T]he Eighth Amendment requires that, as much as humanly possible, a chosen method of execution minimize the risk of unnecessary pain, violence, and mutilation." *Glass*, 471 U.S. at 1086, 105 S.Ct. at 2163.

**36.** This is not to say that only one method of execution will satisfy the Eighth Amendment at any given point in time. There may well be several methods of execution which are roughly equivalent from an Eighth Amendment perspective. Where, however, a method of execution presents substantially greater risks than alternative methods, it is unconstitutional.

findings and conclusions had no basis in fact or law.[37]

The clearly erroneous nature of the district court's factual determinations is exemplified by the following finding: "Petitioner presented no evidence that a judicial hanging carried out under the United States Army's execution regulation ever resulted in a decapitation, torture, lingering death, or the unnecessary and wanton infliction of pain." Findings and Conclusions at 2. This finding is ludicrous. *Of course* Campbell presented no evidence that a hanging carried out under the Army's regulations resulted in a decapitation—because the Army has *never* carried out a hanging under these regulations. *See* Espy Deposition 29. I quote this portion of the district court's decision simply to illustrate the way the district judge went about performing his constitutional obligations in this critically important proceeding. The end result was that the district court's opinion contains a series of factual and legal conclusions that are clearly contrary both to the record and to the law. It is particularly regrettable that this occurred in a case involving the imposition of the death sentence.

1. *The Compelling Evidence Regarding the Existence of Pain*

There is absolutely *no* question that *every* hanging involves a risk that the prisoner will not die immediately, but will instead strangle or asphyxiate to death. This process, which may take several minutes, is extremely painful. Not only does the prisoner experience the pain felt by any strangulation victim, but he does so while dangling at the end of a rope, after a severe trauma has been inflicted on his neck and spine. Although such a slow and painful death will occur in only a comparatively small percentage of cases, every single hanging involves a significant risk that it will occur.

The evidence presented at the hearing made this clear. As the majority rightly notes, hanging can cause death through a

variety of mechanisms. *See ante* at 683–84. In any given hanging, one or more—but not necessarily all—of these pathways will lead to death. Because of individual biological differences, however, it is impossible to determine before an execution which pathway will be the one that kills the prisoner. Transcript at 105–06; 351–53. Indeed, it is often impossible to determine *after* an execution which pathway *actually* killed the prisoner. Transcript at 102–03.

The difficulty in determining the pathway that will actually lead to death complicates the issue of whether hanging leads to torture or a lingering death, because some of the pathways to death in judicial hangings cause unconsciousness and death much more quickly than others. While the issue may be complicated, there can be no doubt that the district court clearly erred in determining that hanging would *virtually always* result in "immediate or near immediate" unconsciousness or death. Findings of Fact and Conclusions of Law at 4. In particular, the district court appears to have concluded that hanging would ordinarily result in occlusion of the carotid arteries, leading to unconsciousness within 6 to 12 seconds. *See* Findings of Fact and Conclusions of Law at 6. This is just plain wrong. Although arterial occlusion is the pathway which is most likely to lead to near-immediate unconsciousness in a hanging, the evidence presented at the evidentiary hearing made clear that it is also the single most *unlikely* pathway to occur under the Washington protocol.[38]

The medical evidence developed at the evidentiary hearing is too detailed to discuss in full in the body of this opinion. However, the record shows that there is a fair chance that death will not occur through the relatively quick and painless pathway of arterial occlusion, but instead through a slow, torturous pathway involving asphyxiation. Indeed, the *risk* of such a pathway inheres in *every hanging. See* Appendix A, *infra* p.

---

37. In Appendix A, I more fully demonstrate why the district court's findings were clearly contrary to the record.

38. In any event, six to twelve seconds must seem an exceedingly long time to a conscious prisoner

dangling at the end of a rope, as he experiences the effects of severe trauma. The district court should have considered whether any means of execution could render unnecessary even this amount of pain.

722–24. Moreover, the mere knowledge that death may be painful is sufficient in itself to cause the condemned inmate severe psychological pain. For these reasons, also, the practice of judicial hanging violates the Eighth Amendment.

This conclusion is not surprising, because every jurisdiction that has ever used hanging as a method of execution has understood that the risk of painful and torturous death exists. Even other states which have executed prisoners by hanging in this century have employed procedures which contemplate that death might actually take quite some time. As Clinton Duffy, the former warden at San Quentin, once described these procedures:

> The prisoner remains dangling from the end of the rope for from 8 to 14 minutes before the doctor, who has climbed up a small ladder and listens to his heart beat with a stethoscope, pronounces him dead. . . .
>
> The legal witnesses are dismissed after having signed the usual witness forms. However, the body of the condemned is left hanging below the gallows for an additional 15 to 20 minutes. This is to assure those in charge that ample time has elapsed before cutting the rope in order to make certain of death.

Gardner, *supra*, at 121 (quoting Clinton Duffy). Despite the fact that the evidentiary hearing was not conducted before a jury, the district court excluded under Federal Rule of Evidence 403 any evidence providing examples of slow, painful strangulations which had occurred in past hangings (including one or-deal lasting thirteen minutes). Although this evidence was the *only* direct evidence relating to the risk that hanging will cause a lingering death, the court excluded it because Campbell did not know every *detail* of the procedures used in these hangings. Campbell did know at the very least, however, that these bungled hangings occurred after the long drop (designed to minimize the risk of slow strangulation) had become universally employed. The district court unquestionably abused its discretion in refusing to admit this highly probative evidence.

The district court did, however, as does the majority, rely heavily on its conclusions regarding what happened during the one hanging that has occurred in this nation in the past three decades. Aside from the fact that one painless hanging (if it in fact was painless) would prove absolutely nothing about whether hanging produces a significant number of painful deaths—for example, one painful death out of four or five—reliance on the Westley Alan Dodd hanging constitutes simply one further violation of Campbell's rights to a fair proceeding. The state controlled all of the information relating to Dodd's execution by limiting access to the execution to people of its choosing and allowing only *its own expert* to conduct an autopsy on him. Called upon to remedy the state's manipulation of information, the district court refused Campbell's motion to have Dodd's hanging videotaped. Although the district court concluded that such taping—which would have enabled Campbell to develop a far fairer record—would violate Dodd's right to privacy, Dodd had never raised *any* objection to it. It was only the state that did.[39]

---

**39.** At the same time the district judge permitted the state to raise Dodd's right to privacy, he refused to allow any next friend to raise any of Dodd's rights, including the most important constitutional right of all—the right not to be executed unlawfully. The district judge's conduct in refusing to allow anyone but Dodd himself to assert his rights when doing so would hinder his execution, while allowing the state to assert those rights in order to remove impediments to Campbell's execution, is exceedingly difficult to harmonize.

Other district judges who have been faced with nearly identical situations have taken an entirely different approach from that of the district judge in this case. In the only other similar cases of which I am aware, the courts have held that persons to be executed in the future have a right to videotape another's execution in order to develop evidence of the effects of that method. *See Fierro v. Gomez*, No. C–92–1482 MHP, 1992 WL 566298 (N.D.Cal. April 21, 1992) (granting motion to videotape Robert Alton Harris's execution); *see also U.S. Judge OKs Videotaping of Execution*, Los Angeles Times, December 4, 1993, p. A21 (reporting that a federal District Judge in Maryland ordered the videotaping of the execution by lethal gas of John Frederick Thanos, as well as the monitoring of his brain waves, because "the constitutionality of the gas chamber is a 'serious question' that should be decided on 'the best possible evidence'.").

Under the circumstances, there is simply no rational basis for concluding that the state-generated evidence of the Dodd hanging provides any indication that hanging will not cause unnecessary pain. *See infra* pp. 723–24.

I do not mean to suggest that hanging will always cause a slow and painful death, or even that these results will occur most of the time. Even Campbell's expert witnesses agreed that hanging will lead to rapid unconsciousness and death in the majority of cases. *See, e.g.,* Transcript at 154–55 (testimony of Dr. James). However, the evidence before the district court overwhelmingly supported the common sense conclusion that the *risk* of slow, painful asphyxiation exists in every hanging. Only by ignoring the testimony at the evidentiary hearing could the district court have reached a contrary conclusion.

2. *The Lack of Probativeness of the Washington Protocol*

The evidence before the district court also made clear that the Washington state judicial hanging protocol (otherwise known as the Field Instruction) will have virtually no effect on this risk, because it is indistinguishable in all relevant respects from the hanging procedures which have led to painful strangulation deaths in the past. Reading the majority opinion, one might get the idea that the Washington protocol consists of a detailed series of instructions for varying the rope width and drop distance depending on a variety of factors which might make decapitation more or less likely in a particular prisoner according to the latest medical and scientific knowledge. Both the majority and the district court argue that the protocol has eliminated virtually all risk of decapitation. *See ante* at 687 n. 17 ("[T]he evidence compels the conclusion that the risk [of decapitation or asphyxiation] has been minimized as much as possible through the adoption of the Field Instruction."); Findings of Fact and Conclusions of Law at 2–3 ("The Washington judicial hanging protocol and the Washington State Penitentiary staff's execution of that protocol has eliminated virtually all possibility of decapitation.").

These *ipse dixit* statements are completely inconsistent will all of the evidence before the district court, however. The official-sounding Field Instruction (which the majority informs us is a "detailed methodology derived from U.S. Army Regulation No. 633–15," *ante* at 683) is hardly some set of scientific equations which magically eliminates all possibility of decapitation or strangulation. It is simply a 12–page typed set of operating guidelines for prison officials to follow during an execution. It contains no scientific references, and, in fact, very little of it sets forth the actual procedures for taking human life. Instead, it deals with such issues as the location for housing an inmate sentenced to death, the staff that can be present at an execution, visitation and telephone privileges, media relations, the procedures for moving the inmate to the execution holding cell, crowd control, and the final meal.

The evidence presented at the hearing showed that the crucial parts of the protocol were uncritically copied from a 1959 military execution manual which had never been used and has since been abandoned. The state did not consult a single medical expert in developing the protocol, and it did not even attempt to discover what methodology the military had employed in creating its 1959 procedures. In addition, the state did not take account of recent developments in forensic pathology which show that the more common pathways to death in a judicial hanging are different from what medical experts had thought in 1959. *See* Appendix A, *infra,* pp. 724–25.

The evidence at the hearing also showed that prison authorities could not detect special strangulation risks posed by the physical characteristics of individual prisoners, nor could they effectively alter the protocol to account for these differences. This is because the prison employs only relatively untrained physician's assistants for the task of conducting a medical inspection of the prisoner and because the crucial physical characteristics which affect strangulation risks often cannot be detected even by highly trained medical personnel. The evidence clearly showed that the protocol would have *virtually no effect* on the risk of slow stran-

gulation. The majority's reliance on this document constituted clear error.

### 3. The District Court's Perverse Refusal to Consider Evidence Regarding Alternative Methods of Execution

Faced with the undeniable fact that hanging involves a *risk* that the condemned inmate will die a slow and painful death, the district court was required to consider whether this risk was *necessary*. Because such a determination is impossible without considering whether other methods of execution avoid or significantly lessen this risk, the district court was required to consider the relative merits of alternative methods of execution. Yet it refused to consider *any* evidence relating to *any* method of execution other than hanging. *See* Transcript at 290–91. In particular, the court refused to allow Campbell to present any live testimony showing that lethal injection does not present the risks of decapitation and painful death that hanging does, and it refused to consider the deposition testimony on this issue which Campbell submitted. Because the district court prevented Campbell from showing that execution by lethal injection involves less pain than execution by hanging, it precluded him from showing that the pain associated with hanging is *unnecessary* to the termination of human life. Justice Powell would surely have been surprised at the district court's rulings. *See Furman*, 408 U.S. at 430, 92 S.Ct. at 2824 (Powell, J., dissenting) ("[N]o court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives."). He would have been even more astonished by the majority's cursory and unexplained endorsement of them.[40]

Campbell offered a great deal of deposition testimony relating to lethal injection. This testimony—which was unrefuted—made clear that lethal injection poses substantially less risk of a painful and lingering death than does hanging.[41] Both Dr. Longstreth and Dr. Graney noted that lethal injection significantly decreases the risk that the prisoner will feel pain, because the drug sequence in lethal injection begins with a sedative which almost always guarantees immediate loss of consciousness. Graney Deposition at 62–63; Longstreth Deposition at 63–65. As noted above, there are many cases in which *hanging* does not cause immediate loss of consciousness, although it does cause immediate spinal cord damage and paralysis. In these cases, hanging is like a lethal injection without the sedative, and it causes "a lingering death." *Kemmler*, 136 U.S. at 447, 10 S.Ct. at 933. Because the risk of prolonged suffering can be eliminated by employing the lethal injection technique, it is unnecessary to subject prisoners to that risk. For that reason alone, hanging is unconstitutional.

The fact that hanging causes unnecessary pain on a number of occasions is graphically illustrated by current standards of medical research. As both Dr. Longstreth and Dr. Graney testified, no university or scientific journal would allow an experiment in which animals were euthanized by hanging. Because hanging creates a risk of pain and paralysis, and does not reliably lead to immediate unconsciousness, it would not satisfy contemporary standards of research ethics. Instead, universities and other agencies doing research that involves the killing of animals require that a sedative be administered to the animal first, as in lethal injection. Longstreth Deposition at 63–65. Graney Deposition at 64–65.[42]

---

**40.** Indeed, one would expect a far different approach from an en banc majority that purports to adopt Justice Brennan's standards for "methodology review." *See Glass*, 471 U.S. at 1084, 105 S.Ct. at 2162 (urging "a *'discriminating evaluation'* of *all available evidence*, whether a particular means of carrying out the death penalty is 'barbaric' and unnecessary *in light of currently available alternatives*") (citation omitted) (emphasis added); *id.* at 1093, 105 S.Ct. at 2168 (engaging in such an analysis by comparing electrocution to lethal gas and lethal injection).

**41.** This is not to say that lethal injection poses no risks of pain, or that lethal injection is necessarily constitutional. *See Chaney v. Heckler*, 718 F.2d 1174, 1177–78 (D.C.Cir.1983) (noting evidence suggesting that lethal injection poses its own risks of pain), *rev'd on other grounds*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

**42.** The one exception occurs where the sedative would interfere with the research to be done after the animal's death. In such a case, the animal will be killed by some other means that

These practices of medical researchers are exactly the kind of "objective evidence of the pain involved" on which the majority states we should rely. *Ante* at 682. They show quite clearly that hanging involves a greater risk of pain than is necessary to cause death, because alternatives such as lethal injection can achieve that result without causing these risks. However, the district court refused to consider any of this information. *See* Transcript at 290–91. The court thus had no basis in fact or law for its finding that hanging presents no *unnecessary* risk of pain.

The majority concludes that the district court did not err in refusing to consider evidence relating to lethal injection. The majority states, correctly, that the hearing in this case involved only the question of whether *hanging* was unconstitutional. But there can simply be no plausible or rational explanation for the majority's next assertion, that "[t]he relative merits of lethal injection are irrelevant to this question." *Ante* at 687.[43] The risk of pain involved in alternative means of execution is obviously extremely relevant—indeed essential—to the question of whether hanging creates an *unnecessary* risk of pain. It is simply impossible to consider whether the risks involved in hanging are *necessary* without considering whether other methods of inflicting death avoid these risks. By showing that lethal injection presents substantially less risk of pain than hanging, Campbell has shown that hanging involves more than "the necessary suffering involved in any method employed to extinguish life humanely." *Resweber*, 329 U.S. at 464, 67 S.Ct. at 376. The district court unquestionably erred as a matter of law in refusing to consider this evidence, and the

majority's refusal to so hold is wholly unsupportable.

### III. *Conclusion*

Hanging is a violent, mutilative, barbaric procedure that has been resoundingly rejected by modern American society. Indeed, our society began rejecting it over a hundred years ago. Even aside from the risks of decapitation and lingering, painful death, *hanging is simply inconsistent with "'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.'"* *Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925 (opinion of Stewart, Powell, Stevens, JJ.) (quoting *Trop*, 356 U.S. at 100, 78 S.Ct. at 597). The state of Washington shows absolutely no respect for human dignity when it seeks to kill a person by stretching his neck at the end of a rope so that his spine will be torn apart; yet that is exactly the goal of judicial hanging. One veteran participant described a typical hanging this way:

> When the trap springs he dangles at the end of the rope. There are times when the neck has not been broken and the prisoner strangles to death. His eyes pop almost out of his head, his tongue swells and protrudes from his mouth, his neck may be broken, and the rope many times takes large portions of skin and flesh from the side of the face that the noose is on. He urinates, he defecates, and droppings fall to the floor while witnesses look on, and at almost all executions one or more faint or have to be helped out of the witness room.

*Gardner, supra*, at 121 (quoting Warden Clinton Duffy).

Hanging is, without the slightest doubt, "cruel and unusual"—in layman's terms and

---

minimizes pain, such as the guillotine. *See* Graney Deposition at 65.

**43.** The majority opinion does nothing more than confuse the issue when it claims that "[t]he district court interpreted our remand order precisely as it was intended." *Ante* at 687. For one thing, the district court did not interpret our remand order as at least some of us intended it. Certainly, there would have been no reason for any of us to assume that the determination of whether hanging inflicts *unnecessary* pain could be conducted without any consideration of alter-

native methods of execution and the pain they cause.

In any event, any dispute about the intended scope of the remand order is irrelevant. Campbell is entitled under the Eighth Amendment to a determination of whether hanging, in light of the alternatives, unnecessarily inflicts pain. Whether the district court erred in misreading our remand order or we erred in preventing the district court from engaging in the constitutionally mandated inquiry, Campbell has not had a fair or full adjudication of his constitutional claim.

in the constitutional sense. No other answer is consistent with our claim to be an enlightened and civilized nation. In *Anno Domini* 1994, when almost every state and most other nations have rejected such a savage and barbaric method of killing its citizens, no court could in good conscience say that hanging comports with our "evolving standards of decency." It is inconceivable to me that in one corner of our vast and proud country, a single judicial circuit is willing to violate its constitutional obligations and permit this unconscionable and long outmoded practice to exist.

In a time when public fear of crime and violence is high, it may be understandable that some judges will on occasion close their eyes to the dictates of the Constitution, and employ whatever form of rationalization or self-deception will lead them to the result they deem expedient. Here, however, there is not even any such excuse for the majority's actions. The issue before us is not whether Campbell will be executed, but only the method by which he will be put to death. Thus, the majority's decision to disregard all relevant Supreme Court precedent is simply inexplicable. Still, democracy has proved resilient and our Constitution has grown stronger as time has passed, notwithstanding temporary setbacks at the hands of courts motivated on occasion by political objectives. It has grown stronger in part because the judiciary on the whole has proved to be courageous, independent, and fair minded. The courts have usually corrected their own sins and errors long before they became irremediable. In this case, as in others, the Constitution will ultimately emerge unscathed. It is only this court that will be diminished by what the majority does today.

Until we reverse today's decision, our circuit will have a blotch on its reputation that will be a constant embarrassment to us all. I hope that before long we will be able to comprehend what has for some time been apparent to most of the rest of the civilized world. If not, the Supreme Court will undoubtedly be required to explain the meaning of the Eighth Amendment to us, either in this case or some other. In any event, I have no doubt that we will be compelled—if not today then some day—to perform our duty under the Constitution: We will be required to inform Washington and Montana that the state may not take the life of a citizen by so cruel and unusual a means. Without question, and despite the decision of my colleagues, hanging violates the Constitution. I dissent.

**Appendix A—The Facts Developed at the Evidentiary Hearing**

The evidence presented on remand clearly showed that hanging creates a significant risk both of decapitation and of slow asphyxiation. The evidence also showed that the Washington state hanging protocol is essentially useless in reducing these risks. The district court's findings that the protocol has eliminated virtually all risk of decapitation and lingering death are completely contrary to the evidence presented at the hearing and thus clearly erroneous.

*A. The Risk of Decapitation*

As the majority notes, the earliest methods of hanging involved little or no drop. The English used this so-called short drop method exclusively until the mid–19th Century, when the Irish developed a method involving a much longer drop. By the end of the 19th Century, the British had abandoned the short drop method entirely. They instead employed a procedure involving a drop length which varied according to the weight of the prisoner. The executioner would determine the length of the drop by looking up the prisoner's weight on a table and setting the drop length indicated for that weight. Washington employs a very similar method of hanging, and its drop length/weight table is quite similar to the one used by the British after the late 19th Century, although there are some differences. *See* Transcript at 143.

The British abandoned the short drop because it often led to painful death by slow suffocation. The long drop had some problems of its own, however. While the energy created by dropping the prisoner several feet was much more effective in causing a quick death, it was also much more effective in decapitating the prisoner. Despite the decapitation risks, the British concluded that

the long drop was a more humane form of hanging than the short drop. As stated by the Royal Committee:

> We are desirous, however, of recording our opinion with respect to "decapitations," that if the condition of the culprit is such as to suggest the risk on the one hand of decapitation, or, on the other, of death by strangulation, *i.e.*, of pain needlessly prolonged, we have no hesitation in saying that the risk of decapitation should be incurred. It involves no pain, for the culprit is already unconscious; whereas the fear of public censure has, as we have already stated, on several occasions led to an unnecessary prolongation of his sufferings.

Report of the Committee Appointed to Inquire into the Execution of Capital Sentences xiii (1886). Although the Royal Committee understood that a long drop created a risk of decapitation, it decided that this risk was worth taking where the only alternative—a short drop—created an increased risk of slow, painful strangulation.[44]

Because Washington employs a long drop, it comes as no surprise that a risk of decapitation exists under the Washington hanging procedure. Indeed, *every single expert* who testified at the evidentiary hearing acknowledged at one point or another that some prisoners who are hanged in Washington may be decapitated. *See, e.g.*, Transcript at 43, 101–02, 120–21 (testimony of Campbell's witness Dr. Deryk James); *id.* at 273 (testimony of State's witness Dr. Ross Zumwalt); *id.* at 332 (testimony of State's witness Dr. Donald Reay); *id.* at 421, 442 (testimony of State's witness Dr. Boyd Stephens); *id.* at 477–78, 480, 490–91, 497 (testimony of Campbell's witness Dr. Allen Tencer).

Despite this testimony, the district court found that Campbell "presented no credible

evidence that there was more than a negligible risk of decapitation under Washington's judicial hanging protocol." Findings of Fact and Conclusions of Law at 6–7. However, Campbell in fact presented solid, highly credible evidence that a significant risk of decapitation exists under Washington's protocol. Campbell's expert witnesses had studied the mechanics of judicial hanging, as well as past hangings which led to decapitation, and they fully and persuasively explained why hanging—even under the Washington protocol—created a risk that prisoners' heads would be cut off. The state's witnesses simply testified in conclusory terms that hanging in Washington would not present such a risk. Yet they had *absolutely no basis* for these conclusions—they were not familiar with the protocol, the medical literature, or historical examples of hangings which caused decapitation. Once this information was brought to the attention of the state's experts, they uniformly admitted that the risk of decapitation was greater than they had earlier thought. It was the *state* which failed to present credible evidence, not Campbell. The district court's findings to the contrary were clearly erroneous.

Dr. Deryk James, senior registrar in forensic pathology at the Wales Institute of Forensic Medicine, testified that it is "very likely" that the Washington hanging protocol will produce one or more instances of decapitation if it is implemented regularly over the next ten or twenty years. Transcript at 120. Dr. James, who conducted a groundbreaking study of the mechanisms of death in judicial hanging,[45] reached this conclusion by comparing the Washington protocol with those hanging protocols which have led to decapitation in the past:

> [I]f one looks at the drops that have previously caused decapitation and the weights of the people involved, the thickness of the rope, then if, for example, those people

---

44. The majority notes, correctly, that the Royal Committee "studied the relative merits of the short and long drop, and concluded a long drop was more humane." *Ante* at 684. The majority fails to mention that the Royal Committee reached this conclusion because it felt that *decapitation* was better than *strangulation*. Under today's standards of decency, where methods exist for killing prisoners without any risk of decapita-

tion *or* strangulation, a long drop risking decapitation can hardly be considered "humane."

45. See Ryk James & Rachel Nasmyth–Jones, *The Occurrence of Cervical Fractures in Victims of Judicial Hanging*, 54 Forensic Science Int'l 81, 82 (1992). The majority cites this study *ante* at 684 n. 13.

that were hanged then were hanged now, using the table given, I think one of them would have been given a longer drop, the other would have been a slightly shorter drop, but I think both of those would be at a high risk of decapitation.

Transcript at 121.

Dr. Allen F. Tencer elaborated on Dr. James's conclusions. Dr. Tencer is Director of the Biomechanics Laboratory at Harborview Hospital, as well as a professor in the University of Washington's Departments of Orthopedic Surgery and Mechanical Engineering and its Center for Bioengineering. He specializes in the biomechanics of the spine and spinal trauma. *See generally* Transcript at 458–62. After studying the details of the Washington hanging protocol,[46] Dr. Tencer concluded that a possibility of decapitation remained. Transcript at 477. Indeed, he explained, the Washington protocol actually *enhanced* the possibility of decapitation by requiring the rope to be treated to remove its elasticity.[47] As he explained on direct examination:

> Q. And what is the effect if the rope is treated, as it is recommended to be, as set forth in the Washington protocol, to the end that as much elasticity as possible is removed from the rope?
>
> A. Well, what happens in your system, if the rope is stiffer, more energy and higher force is delivered to the spine.
>
> Q. Does that have any impact on the likelihood that a decapitation would occur in a judicial hanging?
>
> A. Yes, because when you're trying to achieve the injury that apparently is being achieved here, that is, to pull the spine apart, as soon as you do it, there isn't very

much else there to guarantee that the neck will stay together. It's just musculature.

> What I'm really trying—you're walking a very fine line here between having enough energy and enough force to pull things apart, but not too much energy or too much force to create a catastrophic, quote, injury, which would be the neck— the head actually coming off. The reason is the spine itself is the structure that absorbs by far the greater amount of the energy.
>
> Q. And is the protocol set forth in the Washington state manual, the weight and length of drop, sufficient to assure that fine balance that you've just spoken of?
>
> A. No.

Transcript at 490–91.

By contrast with the detailed testimony of Doctors James and Tencer, which was quite evidently based on a good deal of study and knowledge concerning judicial hanging and the processes by which it causes death, the testimony of the state's experts was simply not credible. For example, Dr. Ross Zumwalt, the chief medical examiner for the state of New Mexico, testified that decapitation was not "absolutely impossible,"

> But I don't see how it could happen based on that length of drop, the noose diameter as described and policy used by the Washington state criminal system.

Transcript at 236–37. Yet Dr. Zumwalt did not explain what it was about the drop length or noose diameter that led him to this conclusion.

Indeed, the cross-examination made quite clear that Dr. Zumwalt had *no basis whatsoever* for his conclusions. On cross, Dr. Zumwalt stated that his conclusion regarding the rareness of decapitations in judicial hanging

---

**46.** Indeed, Dr. Tencer evidenced his familiarity and fluency with Washington's protocol by referring to specific elements of it throughout his testimony and explaining how these elements factored in to his ultimate conclusions. *See, e.g.,* Transcript at 481–82. Dr. Tencer's evident understanding of the ins and outs of the Washington protocol compares favorably—and strikingly—with the testimony of the state's experts. They rarely if ever referred to the specific details of the protocol, and instead simply made conclusory statements that hanging would not cause

harm. To take the most egregious example, Dr. Donald Reay—whose testimony "particularly aided" the district court (see Findings of Fact and Conclusions of Law at 5–6)—testified that he had not reviewed the table the state used to determine drop lengths and that he had not done any research into correlating drop length to body weight. *See* Transcript at 311–12.

**47.** The rope is treated to reduce the risk of slow strangulation. *See ante* at 685.

was based on two sources: his experience in performing autopsies on automobile accident victims who had been decapitated, and the "calculation and consideration of what forces I think would occur in a judicial hanging." Transcript at 267. Yet Dr. Zumwalt admitted that his experience with automobile accident victims actually gave him *no ability* to determine how much force is sufficient to produce decapitation.[48] Dr. Zumwalt also admitted that he had made *no attempt* to investigate *any* of the facts or medical literature regarding decapitations which had occurred in previous hangings. *See* Transcript at 270–73. When a colleague informed Dr. Zumwalt that a decapitation had occurred during the hanging of Black Jack Ketchum in Dr. Zumwalt's home state of New Mexico, he did not make even the slightest effort to acquaint himself with the facts of that case. When, at the hearing, Campbell's counsel showed Dr. Zumwalt several photographs of the Ketchum decapitation—the first time Dr. Zumwalt had seen them—Dr. Zumwalt altered his earlier opinion of the decapitation risks inherent in hanging. Noting that Ketchum's hanging involved a similar drop length and rope width to that in the Washington protocol, Dr. Zumwalt admitted that there was a greater risk of decapitation than

he had earlier thought. Transcript at 271–73.[49]

The testimony of Dr. Donald Reay, King County's chief medical examiner, was if anything even more baseless and conclusory. Dr. Reay testified that it was unlikely that the Washington state execution protocol would lead to decapitation:

Q. Doctor, directing your attention once again to Respondent's Exhibit No. 1, which is the execution protocol. If the provisions of that policy are followed relative again to weaving the noose, et cetera, and the appropriate drop length is determined, how likely do you think it is that a decapitation will occur?

A. I don't think decapitation is likely, certainly. Doing—examining the neck, and I did this twice today already, it's a very resilient structure, the body is quite resilient.

Q. But you don't deny though, sir— excuse me, Doctor, that some decapitations have occurred as a result of judicial hangings?

A. It could have happened. I think you could fashion a circumstance where it might happen. You could choose the victim's physical stature; the structure would make a difference.

Q. *So you have no ability from your experience to calibrate the amount of force sufficient to produce decapitation in the average case, do you?*
A. *That's right, I do not.*
Transcript at 268–69 (emphasis added).

---

48. Q. And in those cases [where automobile passengers are decapitated] do you have any ability to calculate the amount of force that was actually used successfully—the amount of force that caused the decapitation?

A. No, that would be impossible, because not only are you talking about the speeds and mass of the body and head, but you're talking about how much force is directed over how much surface area when the actual force strikes the body, whether it was a sharp edge or relatively blunt edge.

Q. So since you don't know, all that you can say is, whatever the amount of force was in those cases, it was sufficient to produce decapitation?
A. Yes.

Q. And you don't see the people who aren't decapitated in automobile accidents who go on to live, do you?

A. No, we don't generally see the survivors of automobile accidents.

Q. So you can't say anything about the amount of force that is sufficient to produce decapitation, can you?
A. No.

49. Despite these admissions, Dr. Zumwalt returned on redirect to his earlier baseless, conclusory opinion:

[T]he amount of force applied to the neck, based on that protocol, is not sufficient to cause decapitation, and I think there is a large margin of error there between the amount of force necessary to cause a quick and painless death and the amount of force that would be necessary to cause decapitation. And that I think following the protocol would stay within that margin.

Transcript at 296. This opinion is simply not credible in light of Dr. Zumwalt's earlier testimony that he did not know how much force was sufficient to cause decapitation and that he had not studied prior hangings which had resulted in decapitation to determine what factors led to decapitation.

Q. Doctor, the drop lengths that are provided for in Respondent's Exhibit 1, page seven, as it relates to a corresponding body weight, do you believe that executing a person of those weights and dropping them the corresponding lengths is likely to result in decapitation?

A. No, I don't think those drops would produce decapitation.

Transcript at 322–23. Dr. Reay gave no further explanation.

Given his responses, one might expect that he had actually reviewed the Washington state protocol or perhaps done some research regarding the effects of different drop lengths on people of different weights. Yet he did not perform any of this necessary preparation:

Q. Doctor Reay, have you had an opportunity prior to coming to Court today to review the drop lengths that correlate to the weights set forth on page seven of the exhibit?

A. They have been available to me. I have not studied them.

Q. You have not studied them. Have you conducted any type of research into correlating body weight to drop length in judicial hangings?

**50.** A similar exchange occurred later:

Q. Doctor Reay, have you conducted any research into the field of judicial hangings?
A. No, absolutely not.
Q. Have you reviewed the research papers or other writings related to judicial hangings which were supplied to you by the attorneys for either of the parties in this case?
A. I have not had—I have had the material, but I haven't spent any time with it.
Transcript at 332.

**51.** Like Dr. Zumwalt, Dr. Reay also had not seen the photographs of Ketchum's decapitation before the hearing. When Campbell's counsel showed him these photographs at the hearing, Dr. Reay altered his view of the risks of decapitation, stating that "I think it's possible on the basis of these photographs." Transcript at 332.

**52.** Q..... Doctor, last question, Do you have an opinion within a reasonable degree of medical certainty as to how likely decapitation would occur under Washington's protocol?

A. I have not done any drop lengths, anything of that sort.

Transcript at 311.[50] Like Dr. Zumwalt, then, Dr. Reay had *absolutely no basis* for his conclusion that the Washington state hanging protocol would not create a risk of decapitation. He had not seriously reviewed the protocol, and he had not consulted any of the literature on judicial hanging or done any of his own research on the subject.[51]

Dr. Boyd Stephens, the San Francisco medical examiner, had at least reviewed some of the medical literature on judicial hanging, but his testimony was also the most equivocal of all of the state's experts. On direct examination, he stated that he thought that decapitation would be "a very unlikely event" under the Washington protocol.[52] It became clear on cross-examination, however, that Dr. Stephens's opinion was based on a misunderstanding of the details of the Washington protocol. In coming to his conclusion regarding the risks under the Washington protocol, Dr. Stephens had relied on what he thought was the fact that the protocol provided for variations in the drop length based on anatomical differences of the prisoner. On cross-examination, he admitted that he had been mistaken.[53] Finally, Dr. Stephens forthrightly acknowledged that the data on judicial hanging are so limited that all of his

A. Well, there are a number of variables that occur in a hanging, many of which can be reviewed and potentially controlled. There will always be some variables that are not perceived or not controlled. I think that in looking at the protocol as written now that the likelihood of decapitation is extremely small or unlikely.
I don't think that one could state that it's impossible, but I believe that the guidelines as set forth would make this a very unlikely event. Transcript at 421.

**53.** Q. Were you mistaken?

A. I think so. That is included in other protocols, but I believe you're right, that it is not in the Washington directives.
Transcript at 426. Even if the Washington protocol *had* provided for such variations, the testimony of Drs. James and Tencer persuasively explained why it is impossible for medical personnel to detect and properly take account of all of a prisoner's anatomical idiosyncracies and thus to avoid the risk of decapitation. *See infra* p. 725.

conclusions entailed a good measure of uncertainty. Transcript at 448–49.

The district court also improperly excluded photographs of the execution of Black Jack Ketchum, who was hanged in New Mexico in 1901. These photographs clearly showed that Ketchum had been decapitated. The district court excluded these photographs under Federal Rule of Evidence 403, which allows a court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Because Campbell did not know the exact drop length, rope width, and so forth, used in the Ketchum hanging, the district court concluded that the relevance of the photographs was substantially outweighed by countervailing considerations.

However, Campbell did provide a great deal of information about the procedures used in the Ketchum hanging. While this information was not as specific as the Washington Field Instruction, it did indicate that the procedures used in the Ketchum hanging were quite similar to those used in Washington today. For example, Campbell was able to discern the knot placement in the Ketchum execution, as well as to provide general parameters for the rope width and drop length, as well as a general estimate of Ketchum's weight. Transcript at 272, 283.

This information would have allowed the court to compare the procedures that were employed in the Ketchum execution with those that are employed in Washington. Because of the similarities between these two procedures, the photographs would have been relevant—although not dispositive—evidence that a hanging protocol like that adopted in Washington state entailed a risk of decapitation. Aside from the state's own autopsy of Westley Alan Dodd, practically *no*

other evidence of the results of past hangings exists. Under these circumstances, the district court abused its discretion in refusing to admit the photographs.

Taken as a whole, the testimony admitted at the hearing made clear that hanging entails a significant risk of decapitation, even as practiced in Washington. The Ketchum photographs would have made this fact even more clear. The state's baseless and conclusory testimony to the contrary simply did not deserve any weight in the District Court's decision.

### B. *The Risk of Slow, Painful Death*

The district court concluded that "hanging under the Washington procedure would result in occlusion of the carotid arteries, causing unconsciousness within 6 to 12 seconds, and thereafter causing a quick and painless death." Findings of Fact and Conclusions of Law at 6. However, the district court ignored the persuasive and unrefuted testimony that the Washington protocol would not cause sufficient arterial occlusion to lead to nearly immediate unconsciousness in all cases. This testimony made clear that a risk of asphyxiation remains, and that death through a pathway involving asphyxiation might take several minutes.

The district court heard testimony that unconsciousness would occur within six to twelve seconds *if the hanging caused a complete occlusion of the carotid arteries.*[54] The six to twelve second figure came from experiments the state's expert Dr. Reay conducted using the so-called "carotid sleeper hold." The carotid sleeper hold is a form of chokehold used by law enforcement personnel to subdue suspects. The officer places the individual's neck between the arm and forearm, with the elbow facing away from the suspect's face. The officer applies pressure to both carotid arteries but leaves the airway unobstructed. This procedure is designed to occlude both carotid arteries rapidly. Transcript at 300–01. Dr. Reay conducted exper-

---

**54.** Four arteries supply blood to the brain, the two carotid arteries (one on each side of the neck) and the two vertebral arteries. At least two of these arteries must be occluded (blocked) in order to render an individual unconscious. Transcript at 111–14. Because the vertebral arteries are surrounded by the vertebrae, they are much harder to occlude than the carotid arteries, especially at the high point on the neck where the noose sits. *Id.* Thus, for a hanging to lead to unconsciousness by arterial occlusion, it must generally block off *both* carotid arteries. *Id.*

iments with the carotid sleeper hold on several FBI agents and found that the agents all became unconscious within six to ten seconds of the time their carotid arteries were occluded. Transcript at 301.

For the district court to have concluded that hanging causes unconsciousness within six to ten seconds, it must necessarily have concluded that hanging under the Washington protocol would reliably lead to rapid, complete occlusion of both carotid arteries. However, according to the unrefuted testimony of Dr. James, the Washington state judicial hanging protocol does not maximize the possibility that such occlusion will occur. The protocol calls for the knot to be placed high on the neck, snugly under the left ear. As a result of this knot placement, the bulk of the energy from the drop will be transferred to the right side of the prisoner's neck. While the right carotid will certainly be occluded, it is far less likely that the left carotid will be. Transcript at 111–14. The occlusion of only one carotid is insufficient to cause rapid unconsciousness, however, because the other carotid and the two vertebral arteries will compensate. Transcript at 112–13.

The testimony makes clear that the Washington judicial hanging protocol cannot reliably be counted on to cause rapid occlusion of both carotid arteries. *See* Transcript at 111–14; Graney Deposition at 29, 34, 37; Longstreth Deposition at 16.[55] As likely, the protocol could cause a spinal injury which paralyzes the prisoner yet leaves him conscious. In such a case, the prisoner would die of asphyxiation, after up to two minutes of conscious suffering. Longstreth Deposition at 42, 51. The district court thus clearly erred in determining that hanging under the Washington protocol would lead to rapid unconsciousness and death in virtually all cases.

The district court and the majority also rely much too heavily on the results of Westley Alan Dodd's autopsy, which they construe as showing that he died quickly and painlessly.[56] This reliance is misplaced, for several reasons. First, as both Campbell's experts and the state's experts explained, it is impossible to generalize from any single hanging to predict what the results of a future hanging will be. There are simply too many possible pathways to death, and too many variables that determine what pathway or pathways will occur in a particular case, to use any one case as a predictor for all future cases. *See, e.g.,* Transcript at 445, 450–51 (testimony of the state's expert, Dr. Stephens). Thus, even if Westley Alan Dodd was killed quickly and painlessly, this is anything but a guarantee that Charles Campbell or any other prisoner will not suffer a lingering death.

Second, to put it bluntly, the evidence regarding the Dodd execution has been manipulated by the state. It is a well-understood fact in American law that expert opinions often conflict and always serve the interests of the parties who seek to introduce them in court. We ordinarily understand that the truth is most readily uncovered when each party has equal access to the evidence and its own expert witness to examine and interpret the relevant facts. The court or jury can then weigh the expert opinions against one another and determine which is more credible.

Here, however, the state completely controlled all of the information relating to the Dodd execution, as well as to past executions. The state limited access to the Dodd execution to people of its own choosing and allowed only one expert—its own—to conduct an autopsy on Dodd. Not surprisingly, that expert testified that Dodd died quickly and painlessly. In addition, the district judge in this case prevented Campbell from develop-

---

55. Indeed, arterial occlusion apparently did not cause unconsciousness or death in Westley Alan Dodd's case. The photograph's of Dodd following the execution show a pronounced furrowing on the right side of his neck, but little redness on the left side, where the knot was located. Transcript at 114. Dr. Longstreth testified that Dodd experienced no disruption of blood flow to the brain. Longstreth Deposition at 68.

56. Actually, there was some conflict among the state's experts on the meaning of the autopsy findings. Dr. Reay, who performed the autopsy, stated that Dodd died quickly. Transcript at 307. Dr. Zumwalt, however testified that he could not say with reasonable medical certainty that Dodd had been rendered immediately unconscious. Transcript at 288.

ing any of his own independent evidence relating to the Dodd execution by refusing his request to videotape Dodd's hanging so that a fair record could be made. Dodd did not object to Campbell's request—only the state did. *See Campbell v. Blodgett,* 982 F.2d 1356 (9th Cir.1993). Had the state allowed Campbell's expert to conduct an autopsy—or had the district court granted Campbell's motion to videotape Dodd's hanging—the district court would have been presented with a fuller, fairer analysis of what the results of that hanging actually were.

The state's manipulation of evidence regarding hangings extends beyond the Dodd execution. Between 1909 and 1982, it was a misdemeanor in the state of Washington for anyone to publish the details of any execution. *See former* Wash.Rev.Code § 9.68.020. In addition, prior to the Dodd execution, no autopsy of a hanged inmate had ever been done in Washington state. Thus, only a very small universe of evidence existed regarding the results of hanging, in large part due to the state's suppression of information. The district court only exacerbated the problem caused by this paucity of evidence by excluding various evidence of two hangings which resulted in slow, painful deaths—one ordeal taking thirteen minutes. Although Campbell did not know all of the details of the procedures employed in these hangings, he did know that they occurred after the long drop had become universally employed. Thus, the evidence of these hangings was relevant and highly probative to show that a risk of lingering death remained even after adoption of the long drop. Because this was practically the *only* evidence available on these risks, the district court abused its discretion in refusing to admit it.

## C. *The Washington Hanging Protocol*

As I explained in the body of this opinion, the district court clearly erred in relying on the Washington state hanging protocol (also called the Field Instruction) to conclude that hangings in Washington will not be subject to the strangulation and decapitation risks that have afflicted hangings throughout history. The Field Instruction is a 12–page typed document that is devoted largely to administrative details such as media relations, crowd control, and the last meal. Less than two and a half pages of the Field Instruction set forth the actual procedure for hanging condemned inmates. Of these pages, only three instructions had anything to do with the risk of decapitation: the chart which determined a prisoner's drop length,[57] the instruction which set forth the width and treatment of the rope, and the instruction which stated that the knot would be placed behind the prisoner's left ear. All of these instructions—including the drop chart—came from a military execution manual prepared in 1959. *See* Transcript at 175 (testimony of Tana Wood).

Superintendent Wood oversaw the drafting of the Field Instruction. Transcript at 160. As she testified, the state simply lifted the crucial portions of its protocol directly out of the 1959 military execution manual. The state did not look to any other information regarding hanging procedure, nor did it do any research regarding prior executions in Washington, nor did it seek any advice from medical professionals. It just copied the procedures the military had adopted in 1959. Superintendent Wood explained that, although she had no idea how the military execution manual was prepared—or even whether the military had ever hanged anybody according to the procedures in the man-

---

**57.** According to this chart, drop length is solely a function of the prisoner's weight. The chart provides for the following drop lengths:

| WEIGHT (Pounds) | DROP DISTANCE |
|---|---|
| 120 | 8'1" |
| 125 | 7'10" |
| 130 | 7'7" |
| 135 | 7'4" |
| 140 | 7'1" |
| 145 | 6'9" |
| 150 | 6'7" |
| 155 | 6'6" |
| 160 | 6'4" |
| 165 | 6'2" |
| 170 | 6'0" |
| 175 | 5'11" |
| 180 | 5'9" |
| 185 | 5'7" |
| 190 | 5'6" |
| 195 | 5'5" |
| 200 | 5'4" |
| 205 | 5'2" |
| 210 | 5'1" |
| 220 and over | 5'0" |

ual (it had not)—she relied on the manual "[b]ecause it came from the military." Transcript at 178.

Leaving aside the fact that military procedures are hardly known for their accuracy or humanity, and leaving aside the fact that Superintendent Wood has no idea how or even whether the military personnel who put together the execution manual sought to minimize the risk of decapitation, the state ought to have been particularly wary of blindly adopting the military execution manual's procedures for hanging. The manual was, after all, prepared in 1959, and it adopted a drop chart that was quite similar to the one employed in Britain in the late 19th Century. Yet scientists have learned a great deal about the biomechanics of judicial hanging since 1959. Until Dr. James's groundbreaking study, the conventional expert wisdom held that hanging usually caused death by breaking the prisoner's neck. Thus, those designing hanging procedures sought to create enough force to break the neck, in order to avoid death by slow strangulation. Dr. James's research proved, however, that breaking of the neck is *not* a very common pathway to death in judicial hanging. *See* Transcript at 446–47 (testimony of state's witness Dr. Boyd Stephens). Thus, someone designing a hanging procedure today might seek to transfer less kinetic energy to the neck and hence decrease the risk of decapitation. Because the Washington state procedures were adopted from a military manual which could not have taken account of any of these developments in medical research, it can hardly be said to minimize the risk of decapitation in light of presently available alternatives. *Cf.* Albert Camus, *Reflections on the Guillotine* ("The truth is that in an atomic age we kill as we did in the age of steelyards ... science, which has taught us too much about killing, could at least teach us to kill decently.").

The district court seemed to rely heavily on the fact that the prison staff conducts various rehearsals of the hanging procedure in the weeks preceding an execution. *See* Findings of Fact and Conclusions of Law at 2–3 ("The Washington judicial hanging procedures are practiced frequently during the weeks prior to a scheduled execution by the staff of the Washington State Penitentiary."). Yet these rehearsals have virtually *nothing* to do with reducing the risk of decapitation.

Like the Field Instruction itself, the rehearsals are tailored primarily to the institutional goals of aiding a government agency in administering a complex procedure, rather than the medical goals of reducing the risk of mutilation of the prisoner. Thus, prior to the Dodd execution prison officials rehearsed the positioning of the witnesses and law enforcement personnel during the execution. Using a stand-in, they determined how long it took for the prisoner to walk from the cell to the death chamber. They also practiced opening and closing the curtains, as well as making sure the doors were locked. Most relevantly, they practiced putting on the hood, leg restraints, and noose, and they conducted at least one practice hanging using a sand bag in place of a person. Transcript at 162–66. None of these acts of rehearsal could significantly reduce the risk of decapitation, however, because they could not tell the prison officials anything about the ease with which the particular prisoner's head would come off.

The district court also seemed to rely on its finding that "[t]he Superintendent of the Washington State Penitentiary has authority to alter the judicial hanging protocol in accordance with the advice of medical experts to accommodate any unusual physical or medical abnormalities of the person to be hanged." Findings of Fact and Conclusions of Law at 3.[58] This reliance is doubly flawed. First, it is not clear that the Superintendent actually has the authority that the district court concluded she had. Superintendent Wood herself stated that the drop length would always follow the chart, and that the Washington protocol did not provide for adjustments due to the age, health, and muscular condition of the prisoner. *See* Transcript

---

58. Although the district court does not acknowledge the point, it is notable that the "medical experts" with whom the Superintendent will ordinarily consult in these matters are not doctors; they are *physician's assistants*. Transcript at 189 (testimony of Tana Wood).

at 183–86. However, she also stated that she thought that the ability to depart from the drop chart was "implicit in [her] position and authority." Transcript at 190.

Even if the Superintendent does have the authority to vary the drop length depending on the individual characteristics of a specific prisoner, the district court heard persuasive and unrefuted evidence that the state would be unable to detect those characteristics which made decapitation more likely. Superintendent Wood testified that, prior to the execution, a physician's assistant would perform a medical "inspection" focusing on the prisoner's height, weight, and veins. Transcript at 186. Yet as Dr. Tencer testified—and no witness contradicted him on this point—far more than these three variables may determine whether an individual is likely to be decapitated. Other crucial factors include the size of the prisoner's vertebrae, his bone density, the mineral content of his bones, his lifestyle, and the rate of loading. Transcript at 482–87. Many of these factors could not be detected in a comprehensive examination by a highly trained physician, much less in a cursory "inspection" by a physician's assistant.[59] Even if the Superintendent can vary the protocol, therefore, this fact does not measurably decrease the likelihood of decapitation.[60]

Finally, as noted above, the district court failed to consider the fact that the state's treatment of the rope to remove all elasticity—a procedure which the state proudly pointed to in arguing that its protocol would lead to a rapid death—actually *increased* the risk of decapitation. As all of the witnesses understood in this case, there is a tradeoff between increased risk of decapitation and decreased risk of asphyxiation. Yet the district court and the majority here let the state have it both ways by relying on the state's treatment of the rope in holding that death will be rapid, *see ante* at 684–85, while stating that the protocol also minimizes the risk of decapitation.

In sum, the reliance the majority and the district court place on the Field Instruction is misplaced. The district court heard persuasive and unrefuted evidence that the protocol will not decrease the risk of decapitation—in fact, it will increase this risk. The district court's factual findings to the contrary are clearly erroneous.

### Appendix B—The Rejection of Hanging in the United States

The following states abandoned hanging as a method of execution on the following dates:

*Alabama*—1923. *See* 1923 Ala.Acts No. 587 (changing from hanging to electrocution).

*Alaska*—Alaska has not had the death penalty since statehood.

*Arizona*—1933. *See* Ariz. Const. art. 22, § 22 (approved October 3, 1933) (changing from hanging to lethal gas).

*Arkansas*—1913. *See* 1913 Ark. Acts No. 55 (changing from hanging to electrocution).

*California*—1937. *See* 1937 Cal.Stat. ch. 172, § 1 (changing from hanging to lethal gas).

---

**59.** Dr. James also provided unrefuted testimony that the literature states that "it takes great experience in adjusting the drop," and that a few inches difference in the drop length can make an enormous difference in the results. Transcript at 156–57. Before the Dodd execution, Washington did not have an executioner with *any* experience in hanging. Now, the state has an executioner whose entire experience consists of the Dodd hanging. Such an inexperienced individual could hardly be relied upon to make the kinds of fine adjustments that would be necessary to avert decapitation—even if the state's physician's assistant could discover the prisoner's physiological conditions that warranted varying the protocol.

**60.** To the extent the Washington protocol allows for any variation of the drop length to fit the particular characteristics of an individual prisoner, the evidence presented at the hearing made clear that this procedure was quite like the one described in Brendan Behan's play *The Quare Fellow:*

[The hangman] gets the quare fellow's weight from the doctor so as he'll know what drop to give him, but he likes to have a look at him as well, to see what build he is, how thick his neck is, and so on. He says he can judge better with the eye. If he gave him too much one way he'd strangle him instead of breaking his neck, and too much the other way he'd pull the head clean off his shoulders.

Brendan Behan, *The Quare Fellow,* Act II (1956).

*Colorado*—1933. *See* 1933 Colo.Sess.Laws ch. 61, § 1 (changing from hanging to lethal gas).

*Connecticut*—1935. *See* 1935 Conn.Pub. Acts ch. 161, 266 (changing from hanging to electrocution).

*Delaware*—1986. *See* 65 Del.Laws ch. 281, § 1 (1986) (changing from hanging to lethal injection).

*Florida*—1923. *See* 1923 Fla.Laws ch. 9169 (changing from hanging to electrocution).

*Georgia*—1924. *See* 1924 Ga.Laws 195, § 1 (changing from hanging to electrocution).

*Hawaii*—Hawaii has not had the death penalty since statehood.

*Idaho*—1978. *See* 1978 Id.Laws ch. 70 (changing from hanging to lethal injection).

*Illinois*—1927. *See* 1927 Ill.Laws 400 § 1 (changing from hanging to electrocution).

*Indiana*—1913. *See* 1913 Ind.Acts ch. 315 (changing from hanging to electrocution).

*Iowa*—1965. *See* 1965 Iowa Acts ch. 435, 436 (abolishing the death penalty at a time when the state employed hanging as a method of execution).

*Kansas*—1977. Although hanging has not been formally abolished as a method of execution, there is no longer any offense for which capital punishment is authorized in that state.

*Kentucky*—1938. *See* 1938 Ky.Acts ch. 132, § 1137 (changing from hanging to electrocution).

*Louisiana*—1940. *See* 1940 La.Acts No. 14 (changing from hanging to electrocution). *See also State ex rel. Pierre v. Jones,* 200 La. 808, 9 So.2d 42, 43 (1942) (noting that the state justified the change on the grounds that "electrocution is recognized as a more humane and less painful manner or means of carrying out the death penalty than by hanging"); Helen Prejean, *Dead Man Walking: An Eyewitness Account of the Death Penalty in the United States* 18 (1993) ("Louisiana used to hang its criminals until the state legislature in 1940 decided that electrocution would be more humane and efficient.").

*Maine*—1887. *See* 1887 Me.Laws ch. 133 (abolishing the death penalty at a time when the state retained hanging as the method of execution).

*Maryland*—1955. *See* 1955 Md.Laws ch. 625 (changing from hanging to lethal gas).

*Massachusetts*—1898. *See* 1898 Mass.Acts ch. 326, § 6 (changing from hanging to electrocution); *see also In re Storti,* 178 Mass. 549, 60 N.E. 210, 210 (1901) (Holmes, C.J.) (stating that the change from hanging to electrocution was "devised for the purpose of reaching the end proposed as swiftly and painlessly as possible").

*Michigan*—1963. *See* 1963 Mich.Pub.Acts No. 119 (abolishing the death penalty at a time when the state retained hanging as the method of execution).

*Minnesota*—1911. *See* 1911 Minn.Laws ch. 387 (abolishing the death penalty at a time when the state retained hanging as the method of execution); *see also* Grant Moos, *Newspaper Details of 1906 Hanging Made it State's Last,* Minneapolis Star Tribune, March 26, 1992, p. 19A (stating that "the gruesome, slow death" of William Williams, who was hanged in 1906 and took 14½ minutes to die, "began a six-year movement in the Minnesota Legislature to abolish the death penalty, which finally succeeded in 1911").

*Mississippi*—1940. *See* 1940 Miss.Laws ch. 242 (changing from hanging to electrocution).

*Missouri*—1937. *See* 1937 Mo.Laws 221–23 (changing from hanging to lethal gas); *State v. Brown,* 342 Mo. 53, 112 S.W.2d 568 (1938) (per curiam).

*Montana*—Montana retains hanging as a method of execution, but it has not hanged anyone since the 1943 execution of Philip "Slim" Coleman, an African–American man who confessed to the killing of a white woman. Although not noted for the size of its African–American population, Montana next sought to hang an individual when in 1976 it imposed the death penalty on Dewey Coleman, another African–American, again following a confession to the killing of a white woman. This court reversed as to the death

penalty in *Coleman v. McCormick,* 874 F.2d 1280 (9th Cir.1989).

*Nebraska*—1913. *See* 1913 Neb.Laws ch. 32 (changing from hanging to electrocution).

*Nevada*—1921. *See* 1921 Nev.Stat. 387 (changing from hanging to lethal gas); *see also State v. Gee Jon,* 46 Nev. 418, 211 P. 676, 682 (1923) (stating that the legislature "sought to provide a method of inflicting the death penalty in the most humane manner known to modern science").

*New Hampshire*—1986. *See* N.H.Rev. Stat.Ann. title 62, ch. 630:5 (added 1986) (changing from hanging to lethal injection).

*New Jersey*—1906. *See* 1906 N.J.Laws 112 (changing from hanging to electrocution); *see also State v. Tomasi,* 75 N.J.L. 739, 69 A. 214, 217–18 (1908) ("Instead of hanging by the neck, [the legislature has] now provided that death shall be caused as speedily as possible by the direct application of electricity to the body of the convict. On its face the statute imports an effort by the lawmaking body to mitigate the pain and suffering of the convict.").

*New Mexico*—1929. *See* 1929 N.M.Laws ch. 69 (changing from hanging to electrocution).

*New York*—1988. *See* 1888 N.Y.Laws ch. 489 (changing from hanging to electrocution); *see also Kemmler, supra* note 1.

*North Carolina*—1909. *See* 1909 N.C.Sess.Laws ch. 443 (changing from hanging to electrocution).

*North Dakota*—1973. *See* 1973 N.D.Laws ch. 116 (abolishing capital punishment at a time when the state employed hanging as a method of execution).

*Ohio*—1896. *See* 1896 Ohio Laws 159–60, Senate Bill No. 216 (changing from hanging to electrocution).

*Oklahoma*—1913. *See* 1913 Okla.Sess. Laws ch. 113, § 1 (changing from hanging to electrocution).

*Oregon*—1937. *See* 1937 Or.Laws ch. 274, § 1 (changing from hanging to lethal gas).

*Pennsylvania*—1913. *See* 1913 Pa.Laws No. 528 (changing from hanging to electrocution).

*Rhode Island*—1973. *See* 1973 R.I.Pub. Laws ch. 280 (changing from hanging to lethal gas).

*South Carolina*—1912. *See* 1912 S.C.Acts No. 402, § 1 (changing from hanging to electrocution).

*South Dakota*—1939. *See* 1939 S.D.Laws ch. 135, § 11 (changing from hanging to electrocution).

*Tennessee*—1913. *See* 1913 Tenn.Pub. Acts. ch. 36 (first executive session) (changing from hanging to electrocution).

*Texas*—1923. *See* 1923 Tex.Gen.Laws ch. 51, § 1; *see also id.* § 14 ("The fact that our present method of putting to death condemned convicts by hanging the condemned in the counties where the judgment of death is obtained frequently creates great disturbance in the county, and the further fact that the system is antiquated and has been supplanted in many states by the more modern and humane system of electrocution create an emergency and an imperative public necessity. . . .").

*Utah*—1983. *See* 1983 Utah Laws ch. 112, §§ 1, 3 (changing from an election between shooting and hanging to an election between shooting and lethal injection).

*Vermont*—1913. *See* 1912 Vt.Laws No. 97, § 6 (changing from hanging to electrocution).

*Virginia*—1908. *See* 1908 Va.Acts ch. 398 (changing from hanging to electrocution).

*Washington*—Washington still employs hanging as a method of execution.

*West Virginia*—1949. *See* 1949 W.Va.Acts ch. 37 (changing from hanging to electrocution).

*Wisconsin*—1853. *See* 1853 Wis.Laws ch. 103 (abolishing the death penalty at a time when the state still employed hanging as the method of execution).

*Wyoming*—1935. *See* 1935 Wyo.Sess. Laws ch. 22, § 4 (changing from hanging to lethal gas).

In addition, the U.S. Military gave up hanging as a method of execution in 1986. *See* Army Reg. 190–55, § 6–2 (1986). Congress abandoned hanging as the federal method of executing civilians convicted of federal crimes in 1937. *See Andres v. United States,* 333 U.S. 740, 745 n. 6, 68 S.Ct. 880, 883 n. 6, 92 L.Ed. 1055 (1948) (" 'Many States ... use[d] more humane methods of execution such as electrocution, or gas.... [Therefore,] it appear[ed] desirable for the Federal Government likewise to change its law in this respect....' ") (quoting H.R.Rep. No. 164, 75th Cong., 1st Sess., at 1) (ellipsis and alterations in *Andres*).

POOLE, Circuit Judge, dissenting:

I believe that death by hanging inflicts intolerably cruel and unusual punishment, however heinous the crime; that it is unacceptable today as would be the rack and screw; and therefore is in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

I therefore dissent.